**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE GIGACLOUD TECHNOLOGY INC SECURITIES LITIGATION** | **No. 1:23-cv-10645-JMF** |
| | **CLASS ACTION** |
| **THIS DOCUMENT RELATES TO:** | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| **ALL ACTIONS** | **DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 2

SECURITIES ACT CLAIMS ............................................................................................... 3

I.      INTRODUCTION ................................................................................................ 3

II.     PARTIES ............................................................................................................. 5

III.    RELEVANT NON-PARTIES ............................................................................. 7

IV.     UNDERWRITER LIABILITY ALLEGATIONS FOR THE SECURITIES ACT
        CLAIMS. ............................................................................................................. 8

V.      SUBSTANTIVE ALLEGATIONS SHOWING THAT THERE WERE MATERIALLY
        FALSE AND MISLEADING STATEMENTS IN GIGACLOUD'S REGISTRATION
        STATEMENT ...................................................................................................... 9

        A.      BACKGROUND OF GIGACLOUD AND ITS IPO ............................... 9

        B.      DEFINITIONS OF ARTIFICIAL INTELLIGENCE AND MACHINE
                LEARNING. ........................................................................................ 10

        C.      THE REGISTRATION STATEMENT PORTRAYED AI AND MACHINE
                LEARNING AS A COMPETITIVE ADVANTAGE THAT WOULD BE
                CRUCIAL TO ATTRACTING THIRD-PARTY SELLERS TO THE
                GIGACLOUD MARKETPLACE, THE CORE OF THE COMPANY'S
                CORPORATE STRATEGY. ................................................................. 11

        D.      CONTRARY TO THE CLAIMS IN THE REGISTRATION STATEMENT,
                GIGACLOUD DID NOT USE AI AND MACHINE LEARNING IN ITS
                LOGISTICS OPERATION. ................................................................. 15

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS IN GIGACLOUD'S
        REGISTRATION STATEMENT ...................................................................... 18

VII.    CLASS ACTION ALLEGATIONS .................................................................. 24

VIII.   SECURITIES ACT COUNTS .......................................................................... 26

EXCHANGE ACT CLAIMS ............................................................................................ 29

I.      INTRODUCTION .............................................................................................. 29

II.     PARTY AND CONTROL PERSON ALLEGATIONS ..................................... 32

III.    ADDITIONAL SUBSTANTIVE ALLEGATIONS ONLY FOR THE
        EXCHANGE ACT CLAIMS. ........................................................................... 34

IV.    ADDITIONAL SCIENTER ALLEGATIONS ONLY FOR THE
EXCHANGE ACT CLAIMS ........................................................................ 37

    A.    INDIVIDUAL SCIENTER ALLEGATIONS AGAINST WU ............................ 37

        1.    WU WAS A MICROMANAGER WHO HAD ACCESS TO
INFORMATION ABOUT GIGACLOUD'S AI AND MACHINE
LEARNING CAPACITIES. ........................................................ 37

        2.    WU BOASTED ABOUT GIGACLOUD'S TECHNOLOGICAL
CAPACITY AND WAS PRESENT WHEN SCHROCK MADE
SPECIFIC CLAIMS ABOUT AI AND MACHINE LEARNING .......... 37

    B.    INDIVIDUAL SCIENTER ALLEGATIONS AGAINST WAN ........................ 38

    C.    INDIVIDUAL SCIENTER ALLEGATIONS AGAINST SCHROCK .............. 39

    D.    GIGACLOUD'S LOGISTICS TECHNOLOGY WAS A CORE
OPERATION OF THE COMPANY, SUPPORTING THE SCIENTER
OF WU, WAN, AND SCHROCK. ........................................................ 39

    E.    GIGACLOUD'S SCIENTER AND LIABILITY. ................................................ 41

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS MADE BY THE
EXCHANGE ACT DEFENDANTS DURING THE EXCHANGE ACT CLASS
PERIOD ...................................................................................................... 41

    A.    FALSE AND MISLEADING STATEMENTS IN
THE REGISTRATION STATEMENT .................................................. 41

    B.    FALSE AND MISLEADING STATEMENTS ON
GIGACLOUD'S WEBSITE .............................................................. 41

    C.    FALSE AND MISLEADING STATEMENTS IN GIGACLOUD'S
ANNUAL REPORT ON FORM 20-F FILED APRIL 24, 2023. ........................ 43

    D.    FALSE AND MISLEADING STATEMENTS MADE IN CONNECTION
WITH GIGACLOUD'S Q4 2022 EARNINGS CALL ON MARCH 17, 2023 ... 46

    E.    FALSE AND MISLEADING STATEMENTS MADE DURING
AND IN CONNECTION WITH GIGACLOUD'S Q1 2023 EARNINGS
CALL ON MAY 24, 2023 .................................................................. 47

    F.    FALSE AND MISLEADING STATEMENTS MADE DURING THE LD
MICRO INVITATIONAL XIII 2023 ON JUNE 6, 2023 .................................... 50

    G.    FALSE AND MISLEADING STATEMENTS MADE DURING AND IN
CONNECTION WITH THE Q2 2023 EARNINGS CALL ON AUGUST 15,
2023 ........................................................................................................ 52

VI.    LOSS CAUSATION ........................................................................................ 54

VII.    CLASS ACTION ALLEGATIONS ................................................................ 56

VIII.    APPLICABILITY OF PRESUMPTON OF RELIANCE:
FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS ................. 58

IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND
BESPEAKS CAUTION DOCTRINE ............................................................... 59

X.    EXCHANGE ACT COUNTS ........................................................................... 59

PRAYER FOR RELIEF ............................................................................................ 64

DEMAND FOR TRIAL BY JURY ............................................................................ 65

Co-Lead Plaintiffs Sashi Rajan and Meir Spear ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Lead Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, a review of the Defendants' (defined below) public documents; conference calls and announcements made by Defendants; United States ("U.S.") Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding GigaCloud Technology Inc ("GigaCloud" or the "Company"); investment analysts' reports about the Company; interviews of confidential witnesses; and information readily obtainable on the Internet. Lead Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.      This is a federal securities class action asserting two separate sets of claims under the federal securities laws.

2.      First, this complaint asserts strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). These claims (the "Securities Act Claims") are asserted on behalf of a class consisting of all persons and entities, other than Defendants, that purchased or otherwise acquired GigaCloud Class A ordinary shares pursuant or traceable to the Company's registration statement filed on Form F-1 with the SEC on July 8, 2022 and, as amended, declared effective on August 17, 2022 ("Registration Statement"). The Registration Statement was filed in connection with the initial public offering ("IPO") of

---

[1]    Emphases herein are added unless otherwise noted.

GigaCloud's Class A ordinary shares, and included the Issuer Free Writing Prospectus dated and filed with the SEC on August 2, 2022 ("Free Writing Prospectus") and the Prospectus, on Form 424B4, dated August 17, 2022 that the Company filed with the SEC on August 19, 2022 ("Prospectus"). The Registration Statement was negligently prepared and contained material misstatements. The Securities Act claims are asserted against GigaCloud, the signatories to the Registration Statement, and GigaCloud's directors at the time the Registration Statement became effective.

3.      Second, and separately, this complaint asserts securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 CFR 240.10b-5. These claims (the "Exchange Act Claims") are asserted on behalf of a class consisting of all persons and entities, other than Defendants, that purchased or otherwise acquired GigaCloud Class A ordinary shares during the period August 18, 2022 to September 28, 2023, both dates inclusive ("Class Period"). The Exchange Act Claims are asserted against GigaCloud, as well as its CEO, CFO, CTO, and President in connection with materially false and misleading statements they made or controlled during the Class Period.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77K and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a).

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27(c) of the Exchange Act, 15 U.S.C. §

78aa(c). Defendants conduct business in this Judicial District and a significant portion of Defendants' activities took place within this Judicial District. In addition, GigaCloud's operative Articles of Incorporation governing its Class A ordinary shares provide that unless GigaCloud consents in writing to the selection of an alternative forum, the United States District Court for the Southern District of New York (or, if the United States District Court for the Southern District of New York lacks subject matter jurisdiction over a particular dispute, the state courts in New York County, New York) shall be the exclusive forum within the United States for the resolution of any complaint asserting a cause of action arising out of or relating in any way to the federal securities laws of the United States, regardless of whether such legal suit, action, or proceeding also involves parties other than the Company.

7.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

<b><u>SECURITIES ACT CLAIMS</u></b>

## I.      INTRODUCTION

8.      The Securities Act Claims are based solely on negligence and strict liability, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Securities Act Defendants (defined below). Plaintiffs specifically disclaim any allegation of fraud, scienter, or recklessness in these non-fraud claims. All of the sources used in this complaint to support Plaintiffs' Securities Act Claims have been introduced solely for the purpose of showing there were material misstatements in GigaCloud's Registration Statement. Plaintiffs expressly disclaim any language in those sources that indicates that those misstatements were fraudulent or were made with scienter or recklessly for the purpose of their Securities Act Claims.

9.      GigaCloud purports to be "a pioneer of global end-to-end [business-to-business] ecommerce solutions for large parcel merchandise," which is primarily furniture. The Company has built an ecommerce platform, the "GigaCloud Marketplace," which connects manufacturers, primarily in Asia, with resellers, primarily in the U.S., Asia and Europe. GigaCloud purportedly executes delivery and sale of merchandise bought and sold on GigaCloud Marketplace through a network of warehouses up to and including last-mile delivery to the customer.

10.      GigaCloud's Registration Statement sold the Company to investors based on its competitive technological advantage. Even the Company's name, GigaCloud *Technology*, portrays the Company as, first and foremost, a technology company. GigaCloud claimed this technological advantage was derived from "self-learning [Artificial Intelligence]" ("AI"), which was the basis of the Company's alleged operational efficiency and a key component of the Company's central business strategy — to recruit more third-party buyers and sellers to GigaCloud Marketplace.

11.      However, the Registration Statement's claims about the Company's AI-powered technology infrastructure were false. Instead, according to a former GigaCloud software engineer and a former Supply Chain Manager, both of whom worked in Suzhou, China where GigaCloud's Information Technology ("IT") department was based, *no AI technology was involved* in GigaCloud's logistics. Rather, according to GigaCloud's former President of U.S. operations, GigaCloud used "AI" and "Machine Learning" as mere buzzwords, but its warehouse management system was neither state-of-the-art nor sophisticated. Instead, it was similar to what you would see in most other warehouse operations. Furthermore, a former employee who was tasked with recruiting U.S.-based buyers and sellers to GigaCloud Marketplace *had never heard about GigaCloud using AI*, despite the fact that the Registration Statement portrays it as an important tool for recruiting third parties to GigaCloud Marketplace and a key competitive advantage.

## II.    PARTIES

12.    Lead Plaintiffs purchased the Company's Class A ordinary shares pursuant and/or traceable to the Registration Statement as set forth in their previously filed Certifications (ECF Nos. 15-2 [Meir Spear] and 22-3 [Sashi Rajan]).

13.    Defendant GigaCloud is a Hong Kong-based corporation, incorporated under the laws of the Cayman Islands, with its principal executive offices located in El Monte, California (and previously, at the time of the IPO, in Hong Kong). GigaCloud's Class A ordinary shares trade on the Nasdaq Stock Market ("NASDAQ") under the symbol "GCT".

14.    Defendant Larry Lei Wu ("Wu") founded GigaCloud and was, at all relevant times, the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of the Company (including when the Registration Statement became effective), and signed or authorized the signing of the Registration Statement.

15.    Defendant Kwok Hei David Lau ("Lau") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company, was a Director of the Company when the Registration Statement became effective, and signed or authorized the signing of the Registration Statement.

16.    Defendant Xin Wan ("Wan") was, at all relevant times, Chief Technology Officer ("CTO") of the Company, was a Director of the Company when the Registration Statement became effective, and signed or authorized the signing of the Registration Statement. Defendant Wan also served as the Company's Executive Director from November 2020 until August 16, 2023.

17.    Defendant Frank Lin ("Lin") was a Director of the Company when the Registration Statement became effective and signed or authorized the signing of the Registration Statement.

18.    Defendant Xing Huang ("Huang") was a Director of the Company when the Registration Statement became effective and signed or authorized the signing of the Registration Statement.

19.    Defendant Zhiwu Chen ("Chen") was a Director of the Company when the Registration Statement became effective.

20.    Defendant Binghe Guo ("Guo") was a Director of the Company when the Registration Statement became effective.

21.    Defendant Thomas Liu ("Liu") was a Director of the Company when the Registration Statement became effective.

22.    Defendants Wu, Lau, Wan, Lin, Huang, Chen, Guo, and Liu are collectively referred to herein as the "Individual Securities Act Defendants."

23.    Defendant Aegis Capital Corp. ("Aegis") served as the sole underwriter and book-running manager of the Company's IPO. In the IPO, Aegis agreed to purchase 2,940,000 shares of the Company's Class A ordinary shares, as well as an over-allotment option of up to 441,000 additional Class A ordinary shares, which Aegis exercised in full.

24.    GigaCloud, the Individual Securities Act Defendants, and Aegis are collectively referred to herein as "Securities Act Defendants."

25.    As the issuer, GigaCloud is strictly liable under Section 11 of the Securities Act for any material misstatement or omission in the Registration Statement, while the other Securities Act Defendants are strictly liable under Sections 11 and/or 15 of the Securities Act are liable unless they prove that they conducted a reasonable investigation and had a reasonable ground to believe (and did believe) that there were no material misstatements or omissions.

### III.    RELEVANT NON-PARTIES

26.    Former Employee ("FE")-1 was a Java[2] Development Engineer at GigaCloud in Suzhou, China from July 2021 to June 2023. As a member of the Java development team, FE-1 developed software to handle logistics for the Company's U.S. warehouses and to monitor the distribution of the Company's inventory. This team was overseen by Yunbin Fan, director of the IT department.

27.    FE-2 was a Supply Chain Manager at GigaCloud in Suzhou, China from March 2021 to September 2023. FE-2's primary responsibility was to liaison with e-commerce businesses that purchased from GigaCloud and sold those products to individual consumers.

28.    FE-3 was GigaCloud's President of U.S. Operations from September 2021 to May 2022. FE-3 reported to Defendant Wu, with whom FE-3 spoke to by telephone almost every day. FE-3 worked out of GigaCloud's warehouse facility in City of Industry, California.

29.    FE-4 was GigaCloud's Business Development Director from December 2021 to September 2022. FE-4 was responsible for increasing the number of U.S.-based buyers and sellers on GigaCloud Marketplace. Located in New York State, FE-4 initially reported to FE-3, President of U.S. Operations. After FE-3 left the Company in May 2022, FE-4 reported to Scott Chorna, Vice President of Sales Operations. FE-4 met with FE-3, and then Chorna, approximately three times a week. FE-4 also had Zoom calls with Defendant Wu, the Company's CEO, every few months.

---

[2]    Java is a general-purpose programming language and one of the most popular programming languages in the world.

## IV.    UNDERWRITER LIABILITY ALLEGATIONS FOR THE SECURITIES ACT CLAIMS.

30.    Pursuant to the Securities Act, Aegis is liable for the false and misleading statements in the Registration Statement.

31.    Aegis is an investment banking house that specialize in, among other things, underwriting public offerings of securities. It served as the underwriter of the IPO and earned substantial fees thereon.

32.    Aegis also demanded and obtained an agreement from GigaCloud that GigaCloud would indemnify and hold Aegis harmless from any liability under the federal securities laws.

33.    Representatives of Aegis also assisted GigaCloud and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of GigaCloud, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Aegis to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During the course of their "due diligence," Aegis had access to internal, confidential, current corporate information concerning GigaCloud's business.

34.    In addition to availing themselves of access to internal corporate documents, agents of Aegis met with GigaCloud's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which GigaCloud's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about GigaCloud's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Aegis and

GigaCloud's management and top executives, Aegis knew of, or in the exercise of reasonable care should have known of, GigaCloud's existing problems as detailed herein.

35.     Aegis caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiffs and the other members of the Securities Act Class.

## V.    SUBSTANTIVE ALLEGATIONS SHOWING THAT THERE WERE MATERIALLY FALSE AND MISLEADING STATEMENTS IN GIGACLOUD'S REGISTRATION STATEMENT

### A.    Background of GigaCloud and its IPO

36.     In 2006, Defendant Wu founded GigaCloud's predecessor, Oriental Standard Human Resources Holdings Limited ("Oriental Standard"), as a limited liability company formed under the laws of the Cayman Islands. Oriental Standard initially offered IT outsourcing services out of Suzhou, China, but, partly in response to circumstances created by the financial crisis beginning in 2007, pivoted to ecommerce in 2010. Initially focused on Japan, Oriental Standard expanded to the United Kingdom in 2013. The following year, it entered the U.S. market with the acquisition of Comptree Inc. In January 2019, the Company launched the "GigaCloud Marketplace" ecommerce platform, which is described further below. Oriental Standard was renamed GigaCloud Technology Inc. effective February 28, 2021.

37.     GigaCloud purports to be a "pioneer of global end-to-end [business to business] ecommerce solutions for large parcel merchandise" that is primarily furniture. According to the Prospectus, the GigaCloud Marketplace integrates discovery, payments and logistics tools to connect manufacturers, primarily in Asia, with resellers, primarily in the U.S., Asia and Europe and then executes delivery and sale through a network of warehouses up to and including last-mile delivery to the customer.

38.     As of March 31, 2022, GigaCloud had only 694 full-time employees: 541 in China and 74 in the U.S.

39.     On May 31, 2021, the Company confidentially filed a draft registration statement with the SEC for a planned initial public offering of its stock. The Company conducted the IPO the following year, announcing that the IPO was complete on August 22, 2022. In the IPO, the Company sold 3,381,000 Class A ordinary shares at a price of $12.25 per share. The Company received net proceeds of approximately $34.2 million from the IPO.

**B.  Definitions of Artificial Intelligence and Machine Learning.**

40.     "Artificial intelligence" refers to more than just a complex computer system. Instead, it is "software and/or hardware that ***can learn to solve complex problems, make predictions or undertake tasks that require human-like sensing*** (such as vision, speech, and touch), perception, cognition, planning, learning, communication, or physical action" (emphasis added).[3]

41.     "Machine learning," refers to computer programs that automatically improve their performance through experience without relying on explicit rules-based programming to do so. Neural networks, which consist of thousands or millions of processing nodes generally organized into layers and are designed to process information similar to the human brain, are a prominent type of machine learning.

---

[3]   As defined by the National Institute of Standards of Technology, an agency within the U.S. Department of Commerce.

C. **The Registration Statement Portrayed AI and Machine Learning as a Competitive Advantage that Would be Crucial to Attracting Third-Party Sellers to the GigaCloud Marketplace, the Core of the Company's Corporate Strategy.**

42.     GigaCloud generates revenue from its business-to-business ("B2B") ecommerce site, the GigaCloud Marketplace, in two different ways. First, it sells its own merchandise to purchasers who market it directly to consumers, which it refers to as "1P" transactions. Second, it generates service revenue by facilitating transactions between third-party sellers and buyers on the marketplace, which it refers to as "3P" transactions. The types of service revenue that GigaCloud purportedly receives from 3P transactions include commission fees, warehousing fees, last mile delivery fees, and fulfillment fees.

43.     According to the Prospectus, increasing 3P activity on the GigaCloud Marketplace was the core of GigaCloud's corporate strategy. It stated that GigaCloud is "focused on facilitating B2B ecommerce transactions in our GigaCloud Marketplace." In contrast, the purpose of GigaCloud's 1P sales of its own inventory was to "enhance [the] marketplace experience" by increasing the amount and variety of inventory available thereon.

44.     Despite the Company's goal of focusing its business on third-party sellers, at the time of the IPO, approximately three-quarters of GigaCloud's revenue arose from sales of its own inventory —78.2%, 76.3%, and 72.2% of total revenues in 2020, 2021 and the three months ended March 31, 2022, respectively.

45.     The Prospectus asserted, however, that "[a]s we focus on expanding our GigaCloud Marketplace into a leading global large parcel B2B marketplace, we expect service revenue from 3P to grow faster than product revenue from 1P in the future." Moreover, the Company indicated that 3P sellers would be a key driver of the product catalog in its marketplace, which would help attract and retain buyers: "more buyer activity leads to more sellers, creating a virtuous cycle."

46.     The Company's technology was key to this goal since "[o]nce [the Company] attract[ed] new sellers and buyers to [its] marketplace," it would "leverage [its] technology and supply chain solutions to drive retention." The Prospectus further stated that GigaCloud's ability to "leverage our algorithm[] [to] determine when and where to ship a product, reduce the amount of time a product is handled and select the most effective delivery mechanism for the product" was the crux of its "Value Proposition to Sellers" and thus to the Company's outlook and financial results.

47.     The Prospectus emphasized that the key to GigaCloud's technological advantage was "***Data Intelligence Powered by AI***," which the Prospectus listed under "**Competitive Strengths**." It explained that "self-learning AI" improved the Company's "operating efficiency" by "automating and optimizing inventory globally based on historical data, rebalancing our merchandise across warehouses to maximize first mile collection and last mile delivery efficiency." The Prospectus further stated that GigaCloud's "in-house reinforcement learning algorithms are built to optimize our inventory management across our multiple warehouses around the world, analyzing historical data to determine how to manage our inventory and even where to establish our next warehouse" and that the learning algorithm also "accounts for the fragility of certain types of inventory and reduces the number of times a product is moved." The AI also purportedly "optimizes routing by organizing incoming orders and rebalancing inventory levels within our warehousing network."

48.     The Registration Statement specifically tied the Company's AI capacity to long-term growth of third parties that use GigaCloud Marketplace, stating: "We leverage our proprietary data and AI to accelerate the network effects in our marketplace. As our marketplace grows, we

12

accumulate user and product data to develop analytical and predicative tools such as product sales forecasts. This information is valuable to our sellers as it allows them to efficiently manage."

49.     The Prospectus boasted that "[o]ur AI-powered warehousing management system solves the many practical problems faced by sellers and buyers in connection with complex, cross-border transactions involving large parcel goods." Moreover, the Prospectus warned that "[t]he satisfactory performance, reliability and availability of our marketplace, software such as our AI, data analytics tools, warehouse management system and other technology infrastructures are *critical to our reputation and our ability to acquire and retain customers*."

50.     Since the Company charges commission fees for 3P transactions consummated on GigaCloud Marketplace, GigaCloud's revenues depended on the number of sellers and buyers who trade in GigaCloud Marketplace and the amount of gross merchandise value ("GMV") that GigaCloud Marketplace handles. Per the Prospectus, in the 12 months ended March 31, 2022, GigaCloud's users transacted $438.1 million of GigaCloud Marketplace GMV, representing a 69.1% year-over-year increase. The foundation of this growth was, supposedly, the Company's advanced AI algorithms. Accordingly, the Company told investors that any "unavailability of . . . our logistics algorithm would reduce the volume of GMV in our business operations," and thus decrease revenues.

51.     The Free Writing Prospectus, which was labeled "Investor Presentation," also boasted about how GigaCloud's AI and Machine Learning drove "Incremental Operating Efficiencies":



52.     One of the Company's other offerings to sellers—financing—was also purportedly driven by AI. According to the Prospectus, in September 2020, the Company began "leverag[ing] [its] data analytics in order to provide supply chain finance solutions to select quality suppliers based on [its] extensive data on their performance and quality." This purportedly provides additional value to sellers using the GigaCloud Marketplace.

53.     Thus, the Company's purported advanced AI and Machine Learning capabilities were, according to the Registration Statement, the foundation of the Company's operations, financial performance, and growth prospects.

54.     Aegis' first analyst report about GigaCloud, published on October 3, 2022, echoed the Registration Statement's portrayal of AI and Machine Learning technologies as key to GigaCloud's ability to attract third-party sellers and buyers to the GigaCloud Marketplace and, therefore, to the Company's future growth. It emphasized that GigaCloud's "[d]ata analytics help drive growth," stating that it was "building up a highly enviable and proprietary resource with regards to customer data" and that "[t]he company's artificial intelligence (AI) software, which generates seller ratings and credit profiles with volume data, can leverage such data to develop analytical and predictive tools such as sales forecasts, which can in turn help sellers more efficiently manage inventory and pricing." The report continued: "Such optimization strategies naturally help encourage additional sellers to join the platform and transact in the GigaCloud Marketplace. Increasing numbers of both sellers and buyers naturally lead to a growing cycle, as evidenced by the company's rapid top line expansion in recent years."

### D.  Contrary to the Claims in the Registration Statement, GigaCloud Did Not Use AI and Machine Learning in its Logistics Operation.

55.     Two former GigaCloud employees—a Java Development Engineer and a Supply Chain Manager—both of whom worked for the Company in Suzhou, China where its IT development and management is based, said that *no AI technology was involved* in GigaCloud's logistics.

56.      FE-1, the software engineer, worked for GigaCloud in Suzhou, China from July 2021 to June 2023. As a member of the Java development team, FE-1 developed software to handle

logistics for the Company's U.S. warehouses and monitor the distribution of the Company's inventory. This team was overseen by Yunbin Fan, director of the IT department.

57.     FE-1 stated that, although GigaCloud's Java development crafted "intricate management systems" that were "tasked with handling complex business processes," "**no AI technology was involved**."

58.     FE-2, the Supply Chain Manager, worked for GigaCloud in Suzhou, China from March 2021 to September 2023. FE-2's primary responsibility was to liaison with e-commerce businesses that purchased from GigaCloud and sold those products to individual consumers.

59.     Like FE-1, FE-2 said that "AI technology is not used" in GigaCloud's logistics. Instead, FE-2 said that what GigaCloud used was "just an ERP system." "ERP" stands for "Enterprise Resource Planning" and refers to an ordinary type of software that organizations use to manage day-to-day business activities such as accounting, procurement, project management, risk management and compliance, and supply chain operations.

60.     FE-1 and FE-2's reports were corroborated by former GigaCloud employees who had worked for the Company in the U.S.

61.     FE-3 served as the President of GigaCloud's U.S. Operations from September 2021 until May 2022. FE-3's primary responsibly was to manage a sales team that recruited third-party buyers and sellers to the GigaCloud Marketplace. FE-3 stated that GigaCloud used "AI" and "Machine Learning" as "buzzwords," but, in actuality, GigaCloud's warehouse management system was not state-of-the-art and would have been found in most warehouse operations. It was significantly inferior to Amazon's, where FE-3 used to work. For example, FE-3 explained that GigaCloud's "load balancing," the movement of inventory between warehouses to meet sales demand, was less sophisticated than what Amazon and Walmart are doing and was similar to most

other warehouse operations. For example, to decide which warehouse needed to be replenished, GigaCloud would consider how many units it was getting along with where the concentrations of orders were and how many weeks of stock it had at each distribution center. This was based on an unsophisticated calculation.

62.     FE-3 also noted that the system used for pulling data reminded him of systems that were decades old, and FE-3 was unable to make their own inquiries like FE-3 had done at other companies. Instead, FE-3 was only able to pull the data into Excel spreadsheets in pre-determined formats.

63.     FE-4, who was GigaCloud's Business Development Director from December 2021 to September 2022. FE-4 was responsible for increasing the number of U.S. buyers and sellers on the GigaCloud Marketplace. FE-4 initially reported to FE-3, the President of U.S. Operations. After FE-3 left the Company in May 2022, FE-4 reported to Scott Chorna, Vice President of Sales Operations.

64.     Despite being responsible for persuading U.S. furniture stores to use the GigaCloud Marketplace to source furniture, FE-4 had *never even heard about GigaCloud using AI*. Given that the Registration Statement claimed that GigaCloud's "AI-powered warehousing management system" solved problems faced by both buyers and sellers, this should have been part of FE-4's pitch to stores as well as manufacturers and importers. Instead, FE-4 had not even heard of any AI allegedly used by the Company and was never instructed to use AI as part of sales pitches. Furthermore, the existence of AI at the Company did not come up during two tours that FE-4 took of GigaCloud's California warehouses, during Zoom calls with Wu regarding how to build the business, which occurred every few months, or during thrice-weekly meetings with superiors.

17

65.     Further, though GigaCloud repeatedly touted to investors its use of AI to generate profiles for the Company's supply chain financing program, which financed sellers, this was also not part of FE-4's pitch to the U.S. manufacturers and importers that FE-4 was tasked with convincing to sell goods on GigaCloud Marketplace.

66.     These interviews with former employees show that: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning; (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations; and (3) despite the Registration Statements' repeated claims that GigaCloud's alleged AI technology was important for recruiting third-party sellers, GigaCloud did not pitch its AI capabilities when marketing the platform to third-party sellers.

## VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS IN GIGACLOUD'S REGISTRATION STATEMENT.

67.     The Registration Statement was negligently prepared. It contained a series of false and misleading statements that portrayed the Company as having highly sophisticated AI capabilities. The Registration Statement falsely emphasized GigaCloud's AI capabilities, claiming that these touched nearly every part of the Company's business, from routing orders and rebalancing inventory levels, to generating credit profiles for the Company's supply chain financing program, to determining order details, even to deciding where to establish new warehouses. The Securities Act Defendants are liable for those false and misleading statements either because they are strictly liable or because the statements were made negligently.

68.     The Prospectus twice stated, first in the "**Overview**" of the "**PROSPECTUS SUMMARY**" and again under "**Business Overview,**" that GigaCloud has "artificial intelligence software, or AI" that "optimizes routing by organizing incoming orders and rebalancing inventory

levels within our warehousing network" and that the Company leverages "AI to accelerate the network effects in our marketplace":

> ***We have artificial intelligence software, or AI, that generates seller ratings and credit profiles through volume data. Additionally, our AI optimizes routing by organizing incoming orders and rebalancing inventory levels within our warehousing network.*** Our software platform includes flexible trading tools with which sellers can set prices based on quantities, delivery dates and fulfillment methods, and buyers have the option to purchase merchandise individually or in bulk.

> ***We leverage our proprietary data and AI to accelerate the network effects in our marketplace.*** As our marketplace grows, we accumulate user and product data to develop analytical and predicative tools such as product sales forecasts. This information is valuable to our sellers as it allows them to efficiently manage inventory and pricing. As sellers succeed in our marketplace, more sellers join, which expands our merchandise offerings. Our broad merchandise selection, competitive pricing and virtual warehousing capabilities encourage buyers to join and transact in our marketplace. More buyer activity leads to more sellers, creating a virtuous cycle.

69.     The foregoing statement was false and misleading because, as described in Paragraphs 55-66: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

70.     Also, in the "**PROSPECTUS SUMMARY**," under the title "**Our Strengths**," the Prospectus listed "Data Intelligence powered by AI":

**Our Strengths**

We believe that the following components contribute to our success and differentiate us from our competitors:

- Pioneering cross-border B2B ecommerce marketplace for the large parcel market;

- Compelling value proposition to both sellers and buyers enhanced by network effects;

- Industry-leading supply chain capabilities;

- Our technology system;

- ***Data intelligence powered by AI***; and

- Experienced and innovative team.

("Our Strengths" bolded in original.)

71.     The foregoing statement was false and misleading because, as described in Paragraphs 55-66: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not a "strength[]" because it was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

72.     Under "**Competitive Strengths**," the Prospectus listed "***Data Intelligence Powered by AI***" and stated that the Company "leverage[s] self-learning AI to improve our operating efficiency":

> ***Data Intelligence Powered by AI***
>
> ***We leverage self-learning AI to improve our operating efficiency. Our system is capable of automating and optimizing inventory globally based on historical data, rebalancing our merchandise across warehouses to maximize first mile collection and last mile delivery efficiency.*** We have also developed trading pattern analytics tools that constantly analyze transaction patterns, generating insightful information to suppliers to make well-informed decision regarding markets. We also leverage our data analytics in order to provide supply chain finance solutions to select quality suppliers based on our extensive data on their performance and quality.

("Data Intelligence Powered by AI" emphasized in original.)

73.     The foregoing statement was false and misleading because, as described in Paragraphs 55-66: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not a "competitive strength[]" because it was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

74.     The Prospectus further stated under "**Logistics Network and Value-added Services**" that GigaCloud uses "AI" to "to determine optimal distribution of inventory among [its] warehouses" and that its "AI-powered warehousing management system solves the many practical

problems faced by sellers and buyers in connection with complex, cross-border transactions involving large parcel goods":

> **Warehousing Network**
>
> …
>
> **We use AI and data analytics to determine optimal distribution of inventory among our warehouses under a unified warehouse management system** and provide a virtual warehousing solution for sellers and buyers in our marketplace. **Our AI-powered warehousing management system solves the many practical problems faced by sellers and buyers in connection with complex, cross-border transactions involving large parcel goods**.

("Warehousing Network" emphasized in original.)

75.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

76.    Also under "**Logistics Network and Value Added Services**," the Prospectus listed "***AI Algorithm and Data Analysis***" and stated that "[o]ur in-house reinforcement learning algorithms are built to optimize our inventory management across our multiple warehouses around the world":

> **AI Algorithm and Data Analysis**
>
> **Our in-house reinforcement learning algorithms are built to optimize our inventory management across our multiple warehouses around the world, analyzing historical data to determine how to manage our inventory and even where to establish our next warehouse. Our algorithm also accounts for the fragility of certain types of inventory and reduces the number of times a product is moved**. Each time a product is handled, there is an increased chance of damage, which is an issue embedded in the home furnishing industry.
>
> We also create sales analytics and provide them to our sellers for a fee. ***The services provide meaningful value to our sellers bringing products to new markets and support a high retention rate.*** Additionally, we leveraged the data collected on

each seller's inventory, sales history and performance to establish a credit profile under our supply chain financing program.

("AI Algorithm and Data Analysis" emphasized in original.)

77.     The foregoing statement was false and misleading because, as described in Paragraphs 55-66: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art and would have been found in most warehouse operations.

78.     The Prospectus further stated: "***We use complex AI software*** in our technology infrastructure, which we seek to continually update and improve."

79.     The foregoing statement was false and misleading because, as described in Paragraphs 55-66: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

80.    The Free Writing Prospectus, in a PowerPoint, labeled "Investor Presentation," boasted about how GigaCloud had a "Data Driven Technology Stack Powered by AI & Machine Learning [that] Drives Incremental Operating Efficiencies," and "[o]ptimizes inventory levels globally to improve operating efficiencies."



81.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

## VII.    CLASS ACTION ALLEGATIONS

82.    With respect to the Securities Act Claims, Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following proposed Class:

> All persons and entities that purchased or otherwise acquired Class A ordinary shares issued by GigaCloud pursuant and/or traceable to the Registration Statement issued in connection with GigaCloud's August 2022 initial public offering, and were damaged thereby.

83.    Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of GigaCloud and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) GigaCloud's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

84.    The members of the Class are so numerous that joinder of all members is impracticable. Lead Plaintiffs believe that the Class members number at least in the thousands. GigaCloud sold 3,381,000 Class A ordinary shares in the IPO and, as of March 31, 2023, had over 31 million Class A ordinary shares outstanding. GigaCloud Class A ordinary shares traded actively on the NASDAQ during the relevant period.

85.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class are similarly situated in that they acquired GigaCloud Class A ordinary shares pursuant and/or traceable to the Registration Statement, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

86.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

87.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants' acts violated the federal securities laws as alleged herein;

- whether the Registration Statement contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;

- whether the Individual Securities Act Defendants were controlling persons under Section 15 of the Securities Act; and

- Whether any of the Individual Securities Act Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act.

88.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

89.    There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## VIII.  SECURITIES ACT COUNTS

### COUNT I

### Violations of Section 11 of the Securities Act
### Against the Securities Act Defendants

90.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, except to the extent they sound in fraud.

91.    This Count does not sound in fraud. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is disclaimed. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the IPO. Lead Plaintiffs do not allege that any Securities Act Defendant acted with intentional, reckless, or otherwise fraudulent intent with respect to the alleged misstatements in the Registration Statement. The Securities Act allegations herein are based in strict liability and negligence.

92.    The Registration Statement, at the time when it became effective, was inaccurate and misleading, contained untrue statements of material facts, omitted to state material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

93.    The Securities Act Defendants were responsible for the content and dissemination of the Registration Statement.

94.    GigaCloud is the issuer and registrant for the IPO. As issuer, GigaCloud is strictly liable for any material misstatements and omissions in the Registration Statement.

95.     The other Securities Act Defendants acted negligently in that none of them made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and not misleading, and that the Registration Statement did not omit any material facts required to be stated therein or necessary to make the statements made therein not misleading.

96.     Lead Plaintiffs and the Class acquired GigaCloud Class A ordinary shares pursuant and/or traceable to the Registration Statement.

97.     When they acquired GigaCloud Class A ordinary shares pursuant and/or traceable to the Registration Statement, Lead Plaintiffs and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths and omissions contained (and/or incorporated by reference) in the Registration Statement.

98.     Lead Plaintiffs and the Class have sustained damages. The value of GigaCloud Class A ordinary shares has declined substantially subsequent to and due to the Securities Act Defendants' violations.

## COUNT II

### For Violation of Section 15 of the Securities Act
### Against the Individual Securities Act Defendants

99.     Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.    This Count does not sound in fraud. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 15 claim, and any implication of fraud or scienter is disclaimed. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or

belief when made and at the time of the IPO. Lead Plaintiffs do not allege that any Securities Act Defendant acted with intentional, reckless, or otherwise fraudulent intent with respect to the alleged misstatements in the Registration Statement. The Securities Act allegations herein are based in strict liability and negligence.

101. During their tenures as officers and/or directors of GigaCloud, including at the time of the IPO and when the Registration Statement became effective, the Individual Securities Act Defendants acted as controlling persons of GigaCloud within the meaning of § 15 of the Securities Act.

102. By virtue of their positions of control and authority and their direct participation in and/or awareness of GigaCloud's operations and finances, the Individual Securities Act Defendants had the power to, and did, direct or cause the direction of the management, policies, and actions of GigaCloud and its employees, and caused GigaCloud to issue, offer, and sell Class A ordinary shares pursuant to the defective Registration Statement.

103. The Individual Securities Act Defendants had the power to, and did, control the decision-making of GigaCloud, including the content and issuance of the statements contained (and/or incorporated by reference) in the Registration Statement; they were provided with or had unlimited access to copies of the Registration Statement (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they signed the Registration Statement and were directly involved in or responsible for providing false or misleading information contained in the Registration Statement (and/or documents incorporated by reference therein) and/or certifying and approving that information.

104.    The Individual Securities Act Defendants acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Registration Statement was true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

105.    Lead Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of GigaCloud Class A ordinary shares pursuant and/or traceable to the Registration Statement.

106.    By reason of such conduct, the Individual Securities Act Defendants are liable pursuant to § 15 of the Securities Act.

## EXCHANGE ACT CLAIMS

## I.    INTRODUCTION

107.    All the preceding allegations in this complaint are repeated and realleged herein as they are applicable to Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act, with the exception of any disclaimers of fraudulent or intentional misconduct.

108.    The allegations in this Exchange Act Claims section of this complaint apply only to Plaintiffs' claims under the Exchange Act and are not alleged in respect of any of Plaintiffs' Securities Act claims.

109.    These Exchange Act Claims are based on reckless or intentionally fraudulent conduct by or on behalf of the Exchange Act Defendants (defined below) during the period August 18, 2022 to September 28, 2023, both dates inclusive (the "Class Period").

110.    Following GigaCloud's IPO, the Exchange Act Defendants continued to misrepresent the Company's use of AI. They made a series of material misstatements touting GigaCloud's supposedly "state-of-the-art technological infrastructure [that] streamlines our process every step of the way," even adding a page to the Company's website representing that

the Company's "Algorithm Enabled Technology Stack" formed the core of its business. According to these Defendants, GigaCloud's AI and machine learning capabilities in logistics differentiated the Company from competitors and served as the foundation for the Company's results and growth prospects.

111.    Wu told investors that GigaCloud was "*revolutioniz[ing]* the industry with . . . *state-of-the-art technology*." Iman Schrock, the Company's President boasted that "*machine learning and the algorithms* are a huge, huge part of what we do because *unlike any other company, we optimize the process from end to end*," and "*we are actually the only company in this space that load balances using AI from the source so that it sits in a strategic location so it's closer to the end consumer*," extolling the Company's logistics methods. Wan, the Chief Technology Officer, signed the Registration Statement despite it containing misrepresentations about the specific subject matter of his position.

112.    The Exchange Act Defendants' statements touting GigaCloud's AI and machine learning-powered technology infrastructure were false. As alleged above, two former GigaCloud employees—a software engineer (FE-1) and a supply chain manager (FE-2) —both of whom worked in Suzhou, China, the base of GigaCloud's IT department, reported that *no AI technology was involved* in GigaCloud's logistics. Further, as also alleged above, FE-3, the Company's former President of U.S. operations, stated that GigaCloud used "AI" and "Machine Learning" as "buzzwords," and that its warehouse management system was neither "state-of-the-art" nor sophisticated; it was similar to most warehouse operations, rather than "*revolution[ary]*." He specifically stated that Schrock's statement about load-balancing was "laughably false and Larry [Wu] knows that" and that Schrock's statement that "unlike any other company, we optimize the process from end to end" was a "grossly misleading overstatement."

30

113.    Further, the Exchange Act Defendants knew or were reckless in not knowing these adverse facts when they made misrepresentations to investors. Wu himself originally formulated GigaCloud's logistics and warehousing model, according to the former Supply Chain Manager, FE-2. FE-3, GigaCloud's former President of U.S. Operations, reported that the Company is "centralized" around Larry Wu as the "ultimate decision-maker." Wu was, according to FE-3, a very "hands-on micromanager," and "was involved in all significant decisions, and even insignificant decisions." FE-3 was not aware of a single department that didn't report directly to Wu, and FE-3 had twice-weekly calls with Wu and the IT department that included Wan, the CTO. Schrock made grandiose boasts about technical matters that, given his access to internal information as the Company's President (he replaced FE-3) and his background in the furniture industry, he was, at minimum, reckless in not realizing were false. Not only was the Company's logistics technology not "state-of-the-art" and "unlike any other Company," GigaCloud simply didn't have—as the former software engineer and Supply Chain Manager both reported—*any* logistics AI.

114.    When analysts asked for details about GigaCloud's technology development and its importance for the Company's prospects, they received misrepresentations in return. An investment firm called Culper Research began investigating the Company, including identifying and speaking with former Company employees. On September 28, 2023, Culper published a report revealing that Exchange Act Defendants' AI and machine learning claims were false. The Company's stock price fell more than 18% from its prior day's closing price to close at $7.69 per share on September 28, 2023, on unusually heavy trading volume, causing substantial investor losses.

## II.    PARTY AND CONTROL PERSON ALLEGATIONS

115.    Lead Plaintiffs acquired GigaCloud Class A ordinary shares at artificially inflated prices during the Class Period and were damaged upon revelation of the alleged corrective disclosure. (ECF Nos. 15-2 [Meir Spear] and 22-3 [Sashi Rajan]).

116.    Plaintiffs' claims under Section 10(b) of the Exchange Act are asserted against (1) GigaCloud, (2) Wu, (3) Wan, and (4) Iman Schrock ("Schrock") (GigaCloud's President, as discussed further below). These four Defendants are referred to collectively herein as the "10(b) Defendants."

117.    Plaintiffs' claims under Section 20(a) of the Exchange Act are asserted against (1) Wu, (2) Lau, (3) Wan, and (4) Schrock. These four Defendants are referred to collectively herein as the "20(a) Defendants."

118.    Together, GigaCloud, Wu, Lau, Wan, and Schrock are referred to collectively herein as the "Exchange Act Defendants."

119.    Defendant Wu founded GigaCloud's predecessor and has served as CEO since then. He signed the Registration Statement and, as GigaCloud's principal executive officer, certified that the Company's annual report on Form 20-F for the fiscal year ended December 31, 2022 (the "Form 20-F") fairly presented, in all material respects, the financial condition and results of operations of the Company. Wu further certified that the Form 20-F did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Form 20-F. Wu spoke on the Company's behalf during earnings calls with analysts and was quoted in the Company's press releases. GigaCloud's former President of U.S. Operations, FE-3, reported that the Company is "centralized" around Larry Wu as the

"ultimate decision-maker," and that Wu "was involved in all significant decisions, and even insignificant decisions" at GigaCloud.

120. Defendant Lau has served as the Company's CFO since May 2022. According to GigaCloud, Lau has been an investment banker for more than 12 years with experience in M&A and IPO transactions in the U.S. and China. Prior to joining GigaCloud, Lau served as the director of Wells Fargo Securities Asia Limited from August 2013 to May 2022. Lau received a bachelor's degree in commerce from University of Toronto in 2008 and a master's degree in economics from The University of Hong Kong in 2010. In addition, Lau acquired a certified financial risk manager issued by the Global Association of Risk Professionals in the U.S. in 2009. Lau signed the Registration Statement and, as GigaCloud's principal financial officer, certified that the Form 20-F fairly presented, in all material respects, the financial condition and results of operations of the Company. Lau further certified that the Form 20-F did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Form 20-F. Lau spoke on the Company's behalf during earnings calls with analysts and was quoted in the Company's press releases.

121. Defendant Wan has served as the Company's CTO since 2014. Wan received a master's degree in software engineering in 2007 and a bachelor's degree in software engineering in 2004 from Tsinghua University. Wan also received a bachelor's degree in chemical engineering and English from Dalian University of Technology in 2002. Wan signed the Registration Statement.

122. Defendant Schrock was hired as the Company's President in August 2022, prior to the IPO, and remains in that position today. According to GigaCloud's website, Schrock received

a Ph.D. in Organizational Psychology at University of Phoenix in 2014 and completed Disruptive Strategy at Harvard Business School in 2023. GigaCloud's website further states that Schrock held the position as the Vice President of Retail Sales of Abbyson Living, a furniture company, from 2006 to 2022. Other public sources state that, from 2011 to 2022, Schrock worked as an Adjunct Professor at American Military University and as a Professor at American Public University System, a private, for-profit university system and that, in 2014, he became a Board Member of the United States Academy of Project Management, a project management certification organization.

## III.    ADDITIONAL SUBSTANTIVE ALLEGATIONS ONLY FOR THE EXCHANGE ACT CLAIMS.

123.    During the Class Period following GigaCloud's IPO, investor interest in the possibilities of AI only increased. The startup OpenAI—backed by a billion-dollar investment from Microsoft—introduced its chatbot AI, ChatGPT, on November 30, 2022. Within two months, it gained 100 million monthly users. According to *Forbes*, "2023 was the year of AI".[4]

124.    The potential applications of AI are myriad. In one experiment, Stanford University researchers programmed computers to teach themselves biology, training the computers on raw data about millions of real cells and their genetic and chemical composition. Though the researchers did not inform the computers what the measurements meant, the computers were able to create a model of all the cells based on their similarity to each other and classify cells they had never encountered. According to a *New York Times* report on this and similar efforts, "[a]s the models scale up, with ever more laboratory data and computing power, scientists predict that they will start making more profound discoveries. They may reveal secrets about cancer and other

---

[4]        https://www.forbes.com/sites/rashishrivastava/2023/12/27/how-chatgpt-and-billions-in-investment-helped-ai-go-mainstream-in-2023/.

diseases. They may figure out recipes for turning one kind of cell into another."[5] Of course, a company that made such discoveries could be worth billions.

125.    GigaCloud and its officers crafted their investor pitch accordingly. The Company included a "Business Model" on its corporate website spotlighting the Company's "Algorithm Enabled Technology Stack" as the engine of the Company's operations. According to the website, GigaCloud was "at the forefront of innovation and progress." "At the heart of our success lies our advanced A.I. and M.L. technology stack," which was depicted as forming the center of the Company's three revenue streams of 1P, 3P, and logistics. It further stated: "[T]his state-of-the-art technological infrastructure streamlines our processes every step of the way."

126.    When the Company reported 2022 results in a Form 20-F filed on April 4, 2023 (the "Form 20-F"), it again emphasized that, in a "highly competitive market," "technological capabilities, including but not limited to . . . artificial intelligence" was key to success. The Form 20-F also repeated misrepresentations from the Registration Statement, including "in-house reinforcement learning algorithms are built to optimize our inventory management across our multiple warehouses around the world, analyzing historical data to determine how to manage our inventory and even where to establish our next warehouse" and that the learning algorithm also "accounts for the fragility of certain types of inventory and reduces the number of times a product is moved." The AI also purportedly "optimizes routing by organizing incoming orders and rebalancing inventory levels within our warehousing network."

127.    But the Exchange Act Defendants did not simply repeat their prior words. Matching the growth in investor interest in AI, Defendants Wu and Schrock made increasingly lofty—and

---

[5]    Carl Zimmer, *A.I. Is Learning What It Means To Be Alive*, New York Times, March 10, 2024 (updated March 12, 2024), https://www.nytimes.com/2024/03/10/science/ai-learning-biology.html.

misleading—statements about the Company's technology. Discussing the Company's Q1 2023 results, Defendant Wu boasted that GigaCloud's "state-of-the-art technology" was "*revolutioniz[ing]* the industry." Defendant Schrock doubled down, claiming that GigaCloud had harnessed AI and Machine Learning better than "***any other company***" to "optimize the process from end to end." The following month, Schrock told investors that "we are actually ***the only company*** in this space ***that load balances using AI from the source.***"

128.    Defendants' statements were false and misleading. As alleged in Section V.D., above, multiple former GigaCloud employees—including a software engineer (FE-1), a Supply Chain Manager (FE-2), a Business Development Director (FE-4), and the President of GigaCloud's of U.S. Operations (FE-3)—confirmed that the Exchange Act Defendants had misled investors. FE-1, the software engineer who worked on logistics software and the Supply Chain Manager, FE-2, reported that no AI technology was involved, bluntly contradicting Defendant Wu's claims of "state-of-the-art technology."

129.    Additionally, FE-3, the former President of U.S. Operations, specifically told Plaintiffs' investigator that GigaCloud's load balancing was not state-of-the-art and not sophisticated (Paragraphs 61 and 112). Accordingly, when asked about Schrock's statement that GigaCloud was "actually the only company in this space that load balances using AI from the source," he said it was "laughably false and Larry [Wu] knows that." FE-3 further stated that Schrock's claim that GigaCloud harnessed AI and Machine Learning better than "***any other company***" to "optimize the process from end to end," was a "grossly misleading overstatement."

## IV.    ADDITIONAL SCIENTER ALLEGATIONS ONLY FOR THE EXCHANGE ACT CLAIMS

### A.    Individual Scienter Allegations Against Wu

*1.    Wu Was a Micromanager Who Had Access to Information about GigaCloud's AI and Machine Learning Capacities.*

130.    Defendant Wu was the founder of the Company. He originally formulated the Company's logistics and warehousing model, according to FE-2, and thus would be aware that it did not employ AI and Machine Learning unlike what he told investors. FE-3, the President of U.S. Operations, reported that the Company is "centralized" around Larry [Wu] as the "ultimate decision-maker." This is corroborated by other sources, including FE-2's report that Wu was regularly informed about logistics operations.

131.    FE-3, who spoke with Wu almost every day, stated that Wu was heavily involved in day-to-day operations and probably knew 90% of what was occurring daily. FE-3 further stated that Wu was a "hands-on micromanager" who was involved in all significant decisions at the Company and many insignificant ones. FE-3 was not aware of a single department at GigaCloud that didn't report directly to Wu. Consistent with this, FE-3 stated that Wu was quite involved with the Company's CTO, Wan, in discussions about the Company's technology development efforts. In addition to near-daily calls with Wu, FE-3 had discussions with Wu and employees in China two times each week that were always joined by the CTO and others from IT.

*2.    Wu Boasted About GigaCloud's Technological Capacity and Was Present When Schrock Made Specific Claims about AI and Machine Learning.*

132.    Defendant Wu repeatedly boasted about GigaCloud's technology during the Class Period. For example, on GigaCloud's May 24, 2023 earning call, Wu stated that Company was "***revolutioniz[ing] the industry with our*** innovative business model and ***state-of-the-art technology***." Wu further stated in an August 15, 2023 press release of earning results that

"technological advances have propelled us to achieve another quarter of exceptional operational and financial results," and that "we will continue to leverage our data-driven solutions, technological capability and resources to expand and optimize our marketplace, gain market share and better serve our global customers with a stable and efficient B2B e-commerce platform."

133.    Defendant Wu was also present when Defendant Schrock stated at the June 6, 2023 LD Micro Invitational, that "***we are actually the only company in this space that load balances using AI*** from the source so that it sits in a strategic location so it's closer to the end consumer." According to FE-3, this statement is "laughably false and Larry [Wu] knows that." Wu was also on the May 24, 2023 Earnings call where Schrock said "***machine learning and the algorithms are a huge, huge part of what we do because unlike any other company, we optimize the process from end to end***," a statement that FE-3 referred to as a "grossly misleading overstatement."

134.    Wu repeated statements to the investing public regarding GigaCloud's technology and his presence at Schrock's egregious statements demonstrated his knowledge of the subject matter and show that he either knew his statements were false or made them recklessly.

**B.  Individual Scienter Allegations Against Wan**

135.    Defendant Wan has served as the CTO since 2014 and oversaw the IT department that purportedly developed GigaCloud's "state-of-the-art" technology. According to FE-1, Wan was the top decision-maker and supervisor of the Java development team in which FE-1 worked. The IT team would verify and monitor the distribution system of each warehouse every week and month, and then send it to Wan by email. Further, Wan participated in twice-weekly calls with Wu, FE-3, and other members of the IT department.

136.    Wan signed the Registration Statement that contained several statements touting GigaCloud's advanced technology and use of AI and Machine Learning for logistics, even though, as FE-1, reported, no AI technology was involved in GigaCloud's logistics.

38

C.  **Individual Scienter Allegations Against Schrock**

137.   Defendant Schrock replaced FE-3 as President and thus had the same broad access to the Company's operations, including its technology infrastructure, and contact with Defendant Wu that FE-3 did. Defendant Schrock's access to this information creates a strong inference that he acted with scienter when making false and misleading statements to investors.

138.   Additionally, during the Class Period, Schrock made multiple specific statements portraying the Company's AI capacity as industry leading. He stated at the June 6, 2023 LD Micro Invitational, that "***we are actually the only company in this space that load balances using AI*** from the source so that it sits in a strategic location so it's closer to the end consumer" and on the May 24, 2023 earnings call that "***machine learning and the algorithms are a huge, huge part of what we do because unlike any other company, we optimize the process from end to end***,"

139.   Schrock's specific statements about GigaCloud's AI capacity demonstrated his knowledge of the subject matter and show that he either knew his statements were false or made them recklessly.

D.  **GigaCloud's Logistics Technology was a Core Operation of the Company, Supporting the Scienter of Wu, Wan, and Schrock.**

140.   Wu, Wan, and Schrock repeatedly identified GigaCloud's technological capabilities as key to its business, making clear that its technology infrastructure was the Company's core operation.

141.   Both the Registration Statement, signed by Wu and Wan, and the Form 20-F, signed by Wu, discussed GigaCloud's AI-powered technology. For instance, the Prospectus of the Registration Statement and the Form 20-F both warned that "[t]he satisfactory performance, reliability and availability of our marketplace, software such as our AI, data analytics tools, warehouse management system and other technology infrastructures are ***critical to our reputation***

*and our ability to acquire and retain customers*, as well as maintain adequate customer service levels." The Prospectus and the Form 20-F both also listed, among the "***Key Factors Affecting Our Results of Operations***," "Our Ability to Effectively Invest in our ***Infrastructure and Technology Platform***," stating that the results of the Company's operations depended on its "ability to invest in our infrastructure and technology platform" and that "[o]ur ability to improve our operational efficiency ***depends on our ability to invest in our technology infrastructure and platform, including our virtual warehousing solution and AI technology***."

142.    According to both the Prospectus and the Form 20-F, the Company used AI across its operations, including in its overall "technology infrastructure," "to help with inventory management, including deciding when to place orders and in what quantities," to "generate[] seller ratings and credit profiles, to "optimize[] routing by organizing incoming orders and rebalancing inventory levels," to "create sales analytics and provide them to our sellers," and "to establish a credit profile under our supply chain financing program." In short, the Company's technology infrastructure, purportedly powered by advanced AI and Machine Learning, allegedly touched every aspect of the Company's business. Furthermore, the Prospectus also boasted that the Company had "a team of over 150 software engineers," comprising approximately one-quarter of the Company's employees, indicating the centrality of technology to the Company's business.

143.    The Company's website also represented that AI and Machine Learning technology was the "engine" of the Company's 1P, 3P, and logistics revenue streams.

144.    Defendant Schrock stated, at the June 6, 2023 LD Micro Invitational, that "[a]t the ***very center of the business***, the ***engine of the business*** is the ***algorithm enabled technology stack, that involves AI and machine learning***." On the Company's May 24, 2023 earning call, Schrock

told analysts that "*machine learning and the algorithms are a huge, huge part of what we do because unlike any other company, we optimize the process from end to end*."

145.    Given the centrality of technology to GigaCloud's business, it would be absurd to suggest these Defendants were not aware of key facts about that "engine."

### E. GigaCloud's Scienter and Liability.

146.    GigaCloud is liable for the acts of the Individual Exchange Act Defendants under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

147.    The scienter of the Individual Exchange Act Defendants and other employees and agents of GigaCloud are similarly imputed to GigaCloud under *respondeat superior* and agency principles, as well as the fact that GigaCloud's technology infrastructure comprised its core operations during the Class Period. Indeed, in the Registration Statement, GigaCloud acknowledged that "[w]e are highly dependent upon our senior management, particularly our chief executive officer, as well as our vice presidents and other members of our senior management team." Accordingly, regardless of whether the allegations against the Individual Exchange Act Defendants are sufficient, the facts alleged in this complaint must be imputed to GigaCloud.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS MADE BY THE EXCHANGE ACT DEFENDANTS DURING THE EXCHANGE ACT CLASS PERIOD

### A. False and Misleading Statements in the Registration Statement

148.    The Registration Statement was signed by Defendants Wu, Wan, and Lau. The allegations of its falsity in Paragraphs 67-81 are incorporated herein.

### B. False and Misleading Statements on GigaCloud's Website

149.    On information and belief, the Company's website contained the following statements during the Class Period.

150.    According to FE-3, Wu was involved in creating GigaCloud's corporate website and was aware of what it said.

151.    First, the website featured a page entitled "A.I., Machine Learning, and Tech" that included the following graphics:



152.    The foregoing statement and representation were false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

153.    In addition, the "Business Model" page of GigaCloud's website included the following statement and graphics, which included "[at] the heart of our success lies our advanced A.I. and M.L. technology stack" and "this state-of-the art technological infrastructure streamlines our processes every step of the way":

With more than ¼ of our global workforce committed to the fields of engineering and information technology, we find ourselves at the forefront of innovation and progress. At the heart of our success lies our advanced A.I. and M.L. technology stack, strategically integrated across every facet of our Marketplace's operations, including our sales channels. From product and warehousing data to buyer, seller, and end customer data that permeates various aspects of our business, this state-of-the-art technological infrastructure streamlines our processes every step of the way.



154.    The foregoing statement and representation were false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning and (2) the technology GigaCloud did use was not "state-of-the-art," sophisticated or "advanced" and, instead, would have been found in most warehouse operations.

C.  **False and Misleading Statements in GigaCloud's Annual Report on Form 20-F filed April 24, 2023.**

155.    On April 24, 2023, GigaCloud filed the Form 20-F, reporting its financial results for the fiscal year ended December 31, 2022. Defendants Wu and Lau, as the Company's principal

executive officer and principal financial officer, respectively, each signed the Form 20-F and certified that they had reviewed the Form 20-F and that it did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Form 20-F.

156.     The Form 20-F stated:

> ***We have AI software that generates seller ratings and credit profiles through volume data. Additionally, our AI optimizes routing by organizing incoming orders and rebalancing inventory levels within our warehousing network.*** Our software platform includes flexible trading tools with which sellers can set prices based on quantities, delivery dates and fulfillment methods, and buyers have the option to purchase merchandise individually or in bulk.
>
> ***We leverage our proprietary data and AI to accelerate the network effects in our marketplace.*** As our marketplace grows, we accumulate user and product data to develop analytical and predicative tools such as product sales forecasts. This information is valuable to our sellers as it allows them to efficiently manage inventory and pricing. As sellers succeed in our marketplace, more sellers join, which expands our merchandise offerings. Our broad merchandise selection, competitive pricing and virtual warehousing capabilities encourage buyers to join and transact in our marketplace. More buyer activity leads to more sellers, creating a virtuous cycle.

157.     The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

158.   The Form 20-F further stated under the heading "**Logistics Network and Value-added Services**":

*Warehousing Network*

…

*We use AI and data analytics to determine optimal distribution of inventory among our warehouses under a unified warehouse management system* and provide a virtual warehousing solution for sellers and buyers in our marketplace. *Our AI-powered warehousing management system solves the many practical problems faced by sellers and buyers in connection with complex, cross-border transactions involving large parcel goods.*

("Warehousing Network" emphasized in original.)

159.   The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

160.   Also under "**Logistics Network and Value-added Services**," the Form 20-F further stated:

*AI Algorithm and Data Analysis*

*Our in-house reinforcement learning algorithms are built to optimize our inventory management across our multiple warehouses around the world, analyzing historical data to determine how to manage our inventory and even where to establish our next warehouse. Our algorithm also accounts for the fragility of certain types of inventory and reduces the number of times a product is moved.* Each time a product is handled, there is an increased chance of damage, which is an issue embedded in the home furnishing industry.

We also create sales analytics and provide them to our sellers for a fee. *The services provide meaningful value to our sellers bringing products to new markets and support a high retention rate.* Additionally, we leveraged the data collected on each seller's inventory, sales history and performance to establish a credit profile under our supply chain financing program.

("AI Algorithm and Data Analysis" emphasized in original.)

161.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art and would have been found in most warehouse operations.

162.    The Form 20-F further stated:

> We use ***complex AI software*** in our technology infrastructure, which we seek to continually update and improve.

163.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

**D.    False and Misleading Statements Made in Connection with GigaCloud's Q4 2022 Earnings Call on March 17, 2023**

164.    On March 17, 2023, GigaCloud held an earnings call regarding its Q4 2022 earnings. In connection with that call, GigaCloud published an investor presentation that contained the following slide, which stated that GigaCloud had a "Data Driven Technology Stack Powered by AI & Machine Learning [that] Drives Incremental Operating Efficiencies," and "[o]ptimizes inventory levels globally to improve operating efficiencies."



165.    The foregoing statement was false and misleading because, described in Paragraphs

55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning

and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have

been found in most warehouse operations.

**E.  False and Misleading Statements Made During and in Connection with GigaCloud's Q1 2023 Earnings Call on May 24, 2023**

166.    On May 24, 2023, GigaCloud held an earnings call regarding its Q1 2023 earnings.

During the call, Defendants Wu, Lau, and Schrock presented to investors.

47

167.    Defendant Wu is liable for Schrock's misstatements made during this earnings call because he knew or should have known of their falsity and, as Schrock's superior, had the authority to correct them.

168.    During his introductory remarks, Defendant Wu stated: "First and foremost, I want to express my pride in the entire GigaCloud family for yet another remarkable quarter where we continued to ***revolutionize the industry with our innovative business model and state-of-the-art technology***."

169.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning and (2) the technology GigaCloud did use was not "state-of-the-art" or sophisticated and would have been found in most warehouse operations.

170.    Later in the call, an attendee posed this question: "My question is, could you please provide updates for your technological upgrades on your platform and how they contribute to the long-term success of your platform?"

171.    In response, Defendant Schrock stated:

Sure. I'll take this question, David. So a lot of the technological investments this year will be centered around optimizing the buyer and the seller data exchange to streamline the overall efficiency of the marketplace. We're in the B2B sector. ***So there are recurring transactions and data and machine learning can improve that process and make it more efficient***. ***And with that being said, machine learning and the algorithms are a huge, huge part of what we do because unlike any other company, we optimize the process from end to end***. And with that, I alluded to this as well earlier, over 1/4 of our entire workforce is dedicated to IT and engineering, and they're all dedicated -- their daily activity is into making this process as efficient and as effective as possible and our quest to make the cross-border B2B even better.

172.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning, (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would

have been found in most warehouse operations, and (3) GigaCloud was not "unlike any other company" in "optimiz[ing] the process from end to end," using AI and Machine Learning or otherwise. FE-3 stated that this statement was a "grossly misleading overstatement."

173.    In addition, in connection with the May 24, 2023 earnings call, GigaCloud published an investor presentation that contained the following slide representing that the Company had a "Data Driven Technology Stack Powered by AI & Machine Learning [that] Drives Incremental Operating Efficiencies," and an "AI/ML Empowered Software Framework" that "[o]ptimizes inventory levels globally to improve operating efficiencies."



174.    The foregoing statement was false and misleading because, described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning

and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

**F.  False and Misleading Statements Made During the LD Micro Invitational XIII 2023 on June 6, 2023**

175.    On June 6, 2023, Defendants Schrock and Wu attended the LD Micro Invitational XIII 2023, an event focused on micro-cap companies. The event's sponsors included the law firms of Ellenoff Grossman & Schole LLP and Lowenstein Sandler, as well as Roth Capital Partners LLC (whose analysts covered GigaCloud during the Class Period), Vision Financial Markets, and Maxim Group, among others. The event was recorded and made available online.

176.    Defendant Schrock presented on behalf of GigaCloud, with Defendant Wu watching his presentation. Schrock used a slideshow presentation entitled "GigaCloud Technology: Investor Presentation June 2023," as shown here:



177.    Defendant Wu is liable for Schrock's misstatements made during this presentation because he knew or should have known of their falsity and, as Schrock's superior, had the authority to correct them. Indeed, when Schrock answered a question about GigaCloud's corporate structure, Wu interrupted to clarify the answer.

178.    During his presentation, while presenting a slide featuring the same plane propeller graphic featured on the Company's website (and included in the screenshot at paragraph 153, above), stated:

> I'm going to show you the 3 aspects of the business. At the very center of the business, the engine of the business is the ***algorithm enabled technology stack, that involves AI and machine learning***. And there are 3 components [referring to the Company's 1P, 3P, and logistics revenue streams], like the propellers of a plane engine, that attach to this core of data.

179.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

180.    Several minutes later, Defendant Schrock stated:

> And ***we are actually the only company in this space that load balances using AI*** from the source so that it sits in a strategic location so it's closer to the end consumer. So not only the product can get to the end consumer faster, not only can be more efficient, but also it prevents damages. As furniture being big and bulky, additional touchpoints means additional chances for the product getting damaged.

181.    The foregoing statement was false and misleading because, described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning, (2) the technology GigaCloud did use, including specifically for load balancing, was not state-of-the-art or sophisticated and would have been found in most warehouse operations, and (3) other companies in GigaCloud's field load balance using AI. FE-3 stated that this statement was "laughably false and Larry [Wu] knows that."

182.    Shortly after that, Defendant Schrock presented the following slide:



183.    While presenting that slide, Schrock told attendees:

***The technology stack that is powered by AI and machine learning***, sits at core of various data points, and that's what makes us super strong, is that we utilize the data, like this end consumer data, because we deliver almost all of our orders directly to the end consumer, we can see what the consumers are buying and from where. And ***we utilize that data to continuously improve that load optimization that I just talked about that we do using algorithms*** to help the participants of the marketplace, whether its 1P or 3P, to take advantage of the most up to date data, to send their product to the exact locations where it has less touchpoints and quicker delivery time to the consumer.

184.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning and (2) the technology GigaCloud did use, including specifically for load balancing, was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

### G.  <u>False and Misleading Statements Made During and in Connection with the Q2 2023 Earnings Call on August 15, 2023.</u>

185.    On August 15, 2023, GigaCloud held an earnings call regarding its Q2 2023 earnings. Defendants Wu, Lau, and Schrock presented to investors.

186.    Defendant Wu is liable for Schrock's misstatements made during this earnings call because he knew or should have known of their falsity and, as Schrock's superior, had the authority to correct them.

187.    In Defendant Schrock's initial remarks, he stated:

We are dedicated to changing the way suppliers and resellers do business in buying, selling and shipping all things large and bulky through the ***state-of-the-art technology and innovation***, we believe this message and mission are resonating given the success of our marketplace.

Our outstanding profitability resulted in an ending cash balance of $181.5 million, up from $143.5 million as of December 31, 2022. As we have mentioned in the past, the strength of our balance sheet gives us the ability to selectively evaluate targets for tuck-in acquisitions. Our criteria for potential targets range from companies that would further penetrate our existing target markets, ***add new capabilities to our already robust technology stack***, penetrate a new segment of market or technology that would further enhance our users' experience on GigaCloud platform.

188.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

189.    In addition, in connection with the August 15, 2023 earnings call, GigaCloud published an investor presentation that contained the following slide representing that the Company had a "Data Driven Technology Stack Powered by AI & Machine Learning [that] Drives Incremental Operating Efficiencies," and an "AI/ML Empowered Software Framework" that "[o]ptimizes inventory levels globally to improve operating efficiencies."



190.    The foregoing statement was false and misleading because, as described in Paragraphs 55-66 and 128-129: (1) GigaCloud's logistics operation did not use AI and/or Machine Learning and (2) the technology GigaCloud did use was not state-of-the-art or sophisticated and would have been found in most warehouse operations.

## VI.    LOSS CAUSATION

191.    On September 28, 2023, at 9:51 a.m. Eastern time (after the markets opened), the investment research firm Culper Research posted a Tweet on the social media platform X (formerly known as Twitter) stating: "We are short GigaCloud Technology Inc $GCT. Our full report is now available at our website." This Tweet linked to a report about GigaCloud entitled "GigaCloud Technology Inc (NASDAQ:GCT): If It's Too Good To Be True…" (the "Culper Report"). This

Tweet was the first entry in a series of Tweets, or a Tweet thread, that included a Tweet (posted at 9:57 a.m. Eastern Time) stating that "we couldn't find a single GCT employee on LinkedIn or otherwise who claimed to have developed any AI for the Company, and $GCT's financial statements don't even include a software development line" and "[t]his narrative reeks of empty promotion."

192.     The Culper Report stated that Culper Research had taken a short position in GigaCloud's stock, betting that the price would fall, and set forth the reasons why it had taken that position based on extensive research into the Company, including an investigation of the Company's current and former employees. The Culper Report quoted Defendant Schrock as having said that GigaCloud uses AI to "transform the entire supply chain, "do something nobody else has ever done," and "continuously optimize economies of scale"—that is, exactly the species of statements this complaint alleges were false and misleading. As the Company had tweeted, the Culper Report stated that "we couldn't find a single GCT employee on LinkedIn or otherwise who claimed to have developed any AI for the Company." The report further observed that GigaCloud "doesn't even disclose software development expenses or capitalized software costs in its financial statements." The Culper Report thus revealed to the market that the Exchange Act Defendants' claims about GigaCloud's AI and Machine Learning technology capabilities were false and misleading.

193.     On this news, the Company's share price fell $1.78 from its $9.47 closing price on September 27, 2023, or more than 18%, to close at $7.69 per share on September 28, 2023, on unusually heavy trading volume of over 4.8 million shares (more than seven times the trading volume on September 27).

## VII.    CLASS ACTION ALLEGATIONS

194.    With respect to the Exchange Act Claims, Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following proposed "Exchange Act Class":

> All persons and entities that purchased or otherwise acquired GigaCloud Class A ordinary shares during the Class Period, and were damaged thereby.

195.    Excluded from the Exchange Act Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of GigaCloud and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) GigaCloud's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

196.    The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. Lead Plaintiffs believe that Exchange Act Class members number at least in the thousands. GigaCloud sold 3,381,000 Class A ordinary shares in the IPO and, as of March 31, 2023, had over 31 million Class A ordinary shares outstanding. GigaCloud Class A ordinary shares traded actively on the NASDAQ during the Class Period.

197.    Lead Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class. All members of the Exchange Act Class are similarly situated in that they acquired GigaCloud Class A ordinary shares and were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

198.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities

litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Exchange Act Class.

199.    Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

- whether the Exchange Act Defendants' acts violated the federal securities laws as alleged herein;

- whether the Exchange Act Defendants made materially false or misleading statements to the investing public during the Class Period;

- whether the 20(a) Defendants were controlling persons under Section 20(a) of the Exchange Act; and

- whether the 10(b) Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of GigaCloud Class A ordinary shares were artificially inflated during the Class Period because of the Individual Exchange Act Defendants' conduct complained of herein; and

- whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

200.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them.

201.    There will be no difficulty in the management of this action as a class action. Exchange Act Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## VIII.    APPLICABILITY OF PRESUMPTON OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

202.    For the Exchange Act Claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the Exchange Act Defendants' omissions and misrepresentations were material;

- GigaCloud Class A ordinary shares traded in an efficient market;

- GigaCloud Class A ordinary shares was liquid and traded with moderate to heavy volume during the Class Period, with an average weekly trading volume during the Class Period of over 4.3 million shares;

- GigaCloud Class A ordinary shares traded on the NASDAQ and was covered by multiple analysts during the Class Period;

- during the Class Period, there were eighty market makers for GigaCloud Class A ordinary shares;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of GigaCloud Class A ordinary shares; and

- Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold GigaCloud Class A ordinary shares between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

203.    Based upon the foregoing, Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

204.    Alternatively, Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the Exchange Act Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.  INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

205.  The protections applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made. No cautionary language could, or did, protect Defendants' material misstatements of present and historical fact.

206.  To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures GigaCloud or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of GigaCloud who knew that the statement was untrue or misleading when made.

## X.  EXCHANGE ACT COUNTS

### COUNT III

### Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Against Defendants GigaCloud, Wu, Wan, and Schrock

207.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, with the exception of any disclaimers of fraud, recklessness, and intentional misconduct.

208.  This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

209.    This Count is asserted against the 10(b) Defendants: GigaCloud, Wu, Wan, and Schrock. During the Class Period, the 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Exchange Act Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of GigaCloud's Class A ordinary shares. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GigaCloud Class A ordinary shares ; and (iii) cause Plaintiffs and other members of the Exchange Act Class to purchase or otherwise acquire GigaCloud Class A ordinary shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the 10(b) Defendants, and each of them, took the actions set forth herein.

210.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement, Form 20-F, investor presentations and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GigaCloud Class A ordinary shares. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GigaCloud's technology infrastructure.

211.    By virtue of their positions at GigaCloud, the 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Exchange Act Class, or, in the alternative, the 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the 10(b) Defendants. Said acts and omissions of the 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each 10(b) Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

212.    Information showing that the 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of GigaCloud, Defendants Wu, Wan, and Schrock had knowledge of the details of GigaCloud's internal affairs.

213.    Defendants Wu, Wan, and Schrock are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Wu, Wan, and Schrock were able to and did, directly or indirectly, control the content of the statements of GigaCloud. As the CEO, CTO, and President, respectively, of a publicly-held company, Defendants Wu, Wan, and Schrock had a duty to disseminate timely, accurate, and truthful information with respect to GigaCloud's businesses, operations, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GigaCloud's Class A ordinary shares was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning GigaCloud's technology infrastructure which were concealed by the 10(b) Defendants, Plaintiffs and the other members of

the Exchange Act Class purchased or otherwise acquired GigaCloud's Class A ordinary shares at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the 10(b) Defendants, and were damaged thereby.

214.    During the Class Period, GigaCloud's Class A ordinary shares was traded on an active and efficient market. Plaintiffs and the other members of the Exchange Act Class, relying on the materially false and misleading statements described herein, which the 10(b) Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired GigaCloud's Class A ordinary shares at prices artificially inflated by the 10(b) Defendants' wrongful conduct. Had Plaintiffs and the other members of the Exchange Act Class known the truth, they would not have purchased or otherwise acquired said Class A ordinary shares, or would not have purchased or otherwise acquired GigaCloud's Class A ordinary shares at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Exchange Act Class, the true value of GigaCloud's Class A ordinary shares was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of GigaCloud's Class A ordinary shares declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Exchange Act Class members.

215.    By reason of the conduct alleged herein, Defendants Wu, Wan, and Schrock, and thereby GigaCloud, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

216.    As a direct and proximate result of the 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's Class A ordinary shares during

the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

## COUNT IV

### Violations of Section 20(a) of the Securities Exchange Act of 1934
### Against Defendants Wu, Lau, Wan, and Schrock

217.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, with the exception of any disclaimers of fraud, recklessness, and intentional misconduct.

218.    This Count is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

219.    This Count is asserted against the 20(a) Defendants: Wu, Lau, Wan, and Schrock. During the Class Period, the 20(a) Defendants participated in the operation and management of GigaCloud, and conducted and participated, directly and indirectly, in the conduct of GigaCloud's business affairs. Because of their senior positions, they knew the adverse non-public information about management statements described above.

220.    As the CEO, CFO, CTO, and President, respectively, of a publicly owned company, the 20(a) Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GigaCloud's businesses, operations, and future prospects, and to correct promptly any public statements issued by GigaCloud which had become materially false or misleading.

221.    Because of their positions of control and authority as senior officers, the 20(a) Defendants were able to, and did, control the contents of the various reports, press releases, presentations and public filings which GigaCloud disseminated in the marketplace during the Class Period concerning GigaCloud's businesses, operations, and future prospects. Throughout the Class Period, the 20(a) Defendants exercised their power and authority to cause GigaCloud to engage in the wrongful acts complained of herein. The 20(a) Defendants, therefore, were "controlling

persons" of GigaCloud within the meaning of Section 20(a) of the Exchange Act. In this capacity, the 20(a) Defendants in the unlawful conduct alleged which artificially inflated the market price of GigaCloud's Class A ordinary shares.

222.    Each of the 20(a) Defendants, therefore, acted as a controlling person of GigaCloud. By reason of their senior management positions and/or being directors of GigaCloud, each of the 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, GigaCloud to engage in the unlawful acts and conduct complained of herein. Each of the 20(a) Defendants exercised control over the general operations of GigaCloud and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Exchange Act Class complain.

223.    By reason of the above conduct, the 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GigaCloud.

224.    In addition, Defendant Wu, by virtue of his position as the CEO of GigaCloud, had the power to direct the actions of, and exercised the same to cause, Defendant Schrock to engage in the unlawful acts and conduct complained of herein. Defendant Wu had a duty to correct promptly any public statements issued by Defendant Schrock which were materially false or misleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.    Awarding Lead Plaintiffs and the Class damages, including prejudgment and post-judgment interest;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Lead Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated:  March 18, 2024                              Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jonathan D. Park*
Jeremy A. Lieberman
Jonathan D. Park
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jpark@pomlaw.com

*Counsel for Co-Lead Plaintiff Sashi Rajan*
*and Co-Lead Counsel for the Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Co-Lead Plaintiff*
*Sashi Rajan*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Brian B. Alexander
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com

pkim@rosenlegal.com
balexander@rosenlegal.com

*Counsel for Co-Lead Plaintiff Meir Spear*
*and Co-Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Co-Lead Plaintiff*
*Meir Spear*