# EXHIBIT 13

STEPHEN T. KAM (Cal. Bar No. 327576)
Email:  kams@sec.gov
RUTH C. PINKEL (Cal. Bar No. 164470)
Email:  pinkelR@sec.gov
SARAH S. NILSON (Cal. Bar No. 254574)
Email:  nilsons@sec.gov
WENDY E. PEARSON (Cal. Bar No. 211099)
Email: pearsonw@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Katharine Zoladz, Regional Director
Gary Y. Leung, Associate Regional Director
Brent Wilner, Associate Regional Director
Douglas Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.  2:24-cv-06311 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| ANDREW LEFT, AND CITRON CAPITAL, LLC, | |
| Defendants, | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of

COMPLAINT                                                        1

the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Left resided in this district during the relevant period. Further, during the relevant period, defendant Citron Capital, LLC had its principal place of business in this district.

## SUMMARY

4. Defendant Andrew Left ("Left") is an activist short publisher. Starting around 2008, Left published tweets and reports which recommended investment ideas to the market through his online platform, Citron Research. These publications frequently purported to expose negative information on target companies, were often larded with hyped rhetoric, and frequently urged his readers to sell their stock in the target companies. At times, these publications also presented positive information on target companies and encouraged Left's readers to buy. Left and Citron Research had a substantial following – on twitter alone, Citron Research had more than a hundred thousand followers.

5. This civil enforcement action concerns Left's misuse of the Citron Research platform in connection with reports and tweets he published between approximately March 2018 to December 2020 (the "Relevant Period") relating to 23 target companies on at least 26 separate occasions which allowed him to generate approximately $20 million in illegal trading profits through a scheme to defraud.

COMPLAINT 2

6. Through these reports and tweets, Left exploited his Citron Research platform by taking the following steps. First, Left established long or short exposure in the target company through equity shares and/or options. Next, Left issued reports and tweets informing his readers or leading them to believe that he had long or short exposure in the target company. Left then recommended that his readers trade in the same direction as his positions. Finally, in many cases, Left gave his readers a purported price target, *i.e.*, a share price at which the stock would trade. Following Left's reports and tweets, the price of these target stocks moved on average more than 12%. Unbeknownst to the market, however, Left planned to capitalize on those price movements and quickly reverse his own positions in the equity shares and options – which he had induced readers to follow – but at prices far higher (or lower) than the price targets Left had pushed to his readers and the marketplace. In other words, Left *bought back* the stock almost immediately after telling his readers to *sell*, and Left *sold* stock almost immediately after telling his readers to *buy*. This fraudulent practice deceived investors and allowed Left to use his Citron Research reports and tweets as catalysts from which he could derive short-term profits. Left directed this trading in furtherance of the scheme through his personal accounts and accounts in the name of his entity, Defendant Citron Capital, LLC ("Citron Capital"), generating millions in profits.

7. To carry out this scheme, Left and Citron Research ("Defendants") engaged in several deceptive acts. For example, in order to present Citron Research as an independent publication to investors, Defendants posted purported "investor letters" to create the false impression that Citron Capital was a successful hedge fund with investors, when in fact Citron Capital never had any outside investors and Left simply used Citron Capital to trade his own money. They created anonymous websites to enhance the recommendations in their tweets and reports so they could induce more trading activity in a target company and generate higher profits for their scheme. Left also created phony invoices for "consulting services" that he did

COMPLAINT 3

not provide for the purpose of concealing that he was receiving over $1 million from a hedge fund in exchange for Citron Research publishing certain reports and tweets. Defendants used price targets to give the impression that the stock would drastically move in the direction of their recommendation, and to attract media attention that would amplify their recommendations.

8. Defendants also made several false and misleading statements in connection with the scheme. For example, Defendants told the market that they would stay long a target stock until the price hit $65, when in fact they immediately began selling the stock at $28. They falsely represented to the market that Citron Research was an independent research outlet that had never received compensation from hedge funds, when in fact they had. They stated that they had long or short exposure in target stocks and included purported price targets at which they claimed the stock would move, when in fact they planned to immediately trade in direct contradiction to those statements. Left bragged to colleagues that some of these statements were especially effective at inducing retail investors to trade based on his recommendations and said that it was like taking "*candy from a baby*."

9. Through their conduct, and as further detailed in this complaint and Appendix A, Defendants violated the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and pursuant to Section 20(a) of the Exchange Act, Left is responsible for Citron Capital's violations of Section 10(b) as a control person of the entity.

10. As a result of this conduct, the SEC is seeking permanent injunctions against Defendants and conduct-based injunctions against Left for their violations of the federal securities laws, and to bar Left from acting as an officer or director of a public issuer pursuant to Sections 20(e) and 21(d)(2) of the Exchange Act. The SEC also seeks an order barring Left from offering or selling penny stocks and from acting as or being associated with any investment adviser. The SEC further seeks to disgorge their ill-gotten gains, along with prejudgment interest thereon, and to

COMPLAINT 4

impose civil money penalties against Defendants pursuant to Sections 21(d)(3) of the Exchange Act and 20(d) of the Securities Act.

## THE DEFENDANTS

11. **Andrew Left** ("Left"), age 54, was a resident of Beverly Hills, California during the Relevant Period. He currently resides in in Boca Raton, Florida. In 1998, Left was sanctioned by the National Futures Association (a self-regulatory organization for the U.S. derivatives industry) for making false and misleading statements to customers. In 2016, the Hong Kong Futures and Securities Commission barred Left from trading securities in Hong Kong for five years.

12. **Citron Capital, LLC** ("Citron Capital") is an investment adviser established by Left and Business Associate One in October 2018. Citron Capital registered with the SEC as an investment adviser between October 2018 and April 2019, and thereafter was an exempt reporting adviser registered with the California Department of Business Oversight until March 2022. Citron Capital managed an investment fund, Citron Capital LP ("Citron Fund").

## RELATED PERSONS AND ENTITIES

13. **Citron Research** ("Citron Research") (formerly "StockLemon.com") is not a formal entity, but rather Left's online moniker through which he releases tweets and reports purporting to expose frauds or other problematic conduct at target companies. Left has been releasing online stock commentary since at least 2001 and has used the Citron Research moniker since approximately 2008.

14. **"Business Associate One"** is the person with whom Left formed Citron Capital in October 2018. From at least that point forward, Business Associate One assisted Left in operating Citron Capital and Citron Research.

15. **Anson Funds Management, LP** ("Anson Funds") is a limited partnership organized under the laws of Texas with a principal place of business in Dallas, Texas. It has been registered as an investment adviser with the SEC since

COMPLAINT                                                    5

2012.

16. **Anson Advisors, Inc.** ("Anson Advisors") is a corporation organized under the laws of Ontario, with a principal place of business in Toronto, Canada. Anson Advisors is registered with the Ontario Securities Commission and has reported to the SEC as an exempt reporting adviser since 2013. Anson Advisors and Anson Funds (collectively, "Anson") are co-investment advisers of a number of private pooled investment vehicles. Anson was the subject of a cease-and-desist and administrative proceeding with the SEC related to its work with Left and other short publishers. *In the Matter of Anson Advisors Inc. and Anson Funds Management LP*, Inv. Adv. Act Rel. No. 6622 (June 11, 2024).

17. **Portfolio Manager One** was employed by Anson Advisors as a Portfolio Manager.

18. **Hedge Fund Two** is an investment adviser that manages private funds. From January 2019 through January 2021, Citron Capital acted as a sub-adviser for Hedge Fund Two.

19. **Third-Party Intermediary** is a small research firm that provides research to a handful of clients. Third-Party Intermediary at times had separate engagements with Left and Anson to provide research services.

**TERMS USED IN THIS COMPLAINT**

20. An investor typically takes a "long" position when he or she anticipates that the value of the security will increase. If the price increases, the investor may profit by selling shares of the security for more than he or she purchased the security. If, on the other hand, the price decreases, the investor may take a loss.

21. An investor typically takes a "short" position when he or she anticipates that the price of the security will decrease. A "short sale" by an investor is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security,

COMPLAINT 6

typically from a broker-dealer or an institutional investor. The investor can subsequently "cover" or "exit" his or her short position by purchasing the security and returning it to the lender. If the price decreases, the investor may profit by covering (purchasing the security) for less than the short sale price. If, on the other hand, the price increases, the investor may take a loss.

22. The terms "call" and "put" options, as used in this complaint, refer to contracts that give their holders the right, but not the obligation, to buy (a call option) or sell (a put option) a fixed number of shares of the underlying security at a specific price—called the "strike price" or "exercise price"—on or before a specified time. Each equity options put and call contract typically represents 100 shares of the underlying security. The purchaser of a call option typically believes that the price of the underlying stock will rise. The purchaser of a put option typically believes that the price of the underlying stock will fall.

23. A "limit order" is an order to buy or sell a security at a specified price or better.

**THE ALLEGATIONS**

I. **Defendants' Fraudulent Scheme to Manipulate the Market**

    A. **Left Develops Citron Research and Its Reputation as an Independent Research Firm**

        1. **Left Creates Citron Research**

24. Defendant Andrew Left began publishing reports recommending investment ideas to the market in the early 2000s through StockLemon.com, a website he created.

25. Left rebranded his platform under the name Citron Research in 2008. From that point forward, Left used Citron Research as a platform to release reports and tweets containing trading recommendations, which often included information about target companies, statements that Citron was long or short the stock, the projected direction the target companies' stock price was moving, and encouraged

COMPLAINT 7

readers to take a short or long position in the companies.

26. Left established Citron Research as an activist "short" publisher, largely releasing negative or disparaging information on target companies.

27. Left often drafted Citron Research's short publications in a sensationalist exposé style and strongly encouraged readers to sell the stock of the target company. These publications would often declare a company a "*fraud*," "*scam*," or "*scheme*," and use powerful imagery and language, such as calling a company "*the Harvey Weinstein of social media,*" "*uninvestable*," declaring that "*investors have been warned*," "*wait until Senate finds out what Citron has published*," and warning that the "*SEC should immediately HALT this stock.*"

28. At times, Left also used Citron Research's platform to recommend "long" investment ideas by presenting positive, favorable descriptions of a target company and its stock's value. On the long side he also used powerful imagery and language, such as "*S&P Stock of the Year*," "*biz is on fire*" and "*Citron Research is Bullish on the Most Shorted Stock in the World*."

29. Left disseminated his views through written reports posted on the Citron Research website, CitronResearch.com. The reports were also published to subscribers through an email blast, and typically linked to a tweet from Citron's twitter feed, @CitronResearch. Left also frequently appeared on media broadcasts such as CNBC where he would discuss the recommendations he had published through Citron Research.

30. Left sometimes expressed his views on stocks by posting tweets stating or leading readers to believe that he had "long" or "short" exposure in a target company without posting an accompanying report.

### 2. Left Creates Citron Capital and Holds It Out as a Successful Hedge Fund with Outside Investors

31. In late 2018, Left and Business Associate One created Citron Capital.

32. Left touted Citron Capital as a successful hedge fund with double and

COMPLAINT                                        8

triple-digit returns through purported "investor letters" that he posted publicly.

33. In these purported investor letters, Left created the false impression that Citron Capital had outside investors. For example, certain investor letters represented that Citron Capital managed a "*pooled investment vehicle*" and referenced the "*Fund's offering memorandum.*" In addition, in a July 17, 2019 investor letter, Left wrote "*the managers of Citron would like to reassure our investors*" when discussing Citron Capital's trading strategy.

34. Left also gave the appearance of having a successful hedge fund to the media to enhance his public image. In February 2019, when communicating with a CNBC producer, Left said the "*Citron fund is up close to 40%. SEC Registered.*" He also sent a year-end investor letter to CNBC with the subject line "*First year of Citron Capital in the books.*"

35. However, Citron Capital never had any outside investors. In reality, Left only used Citron Capital as a vehicle to trade his own money.

### 3. Left Controls Both Citron Research and Citron Capital

36. Left controlled both Citron Research and Citron Capital and at times blurred the lines between the two entities. For example, Left noted in the Citron Research reports that they "*have been prepared by either Citron Research or Citron Capital.*" Left also at times defined "Citron" as both Citron Research and Citron Capital, or represented that "Citron" held a position, referring to the position held in the Citron Capital account.

37. Left controlled the day-to-day business operations and policies of Citron Research. Left had ultimate responsibility for Citron Research's business, crafting the narratives and drafting Citron Research's publications. At all relevant times, Left controlled the content and dissemination of these publications. Left was also a frequent guest on financial news media programs as the person behind Citron Research and advocated Citron Research's investment views. Left had ultimate

COMPLAINT 9

responsibility for the tweets published by Citron Research through its twitter feed, @CitronResearch.

38. Left had the authority to control the business operations and policies of Citron Capital with assistance from Business Associate One. As a principal of Citron Capital, Left solely directed all trading and investment decisions of Citron Capital and owned all of Citron Capital's funds. Left and Business Associate One extensively participated in the day-to-day business of Citron Capital. Left was the sole public voice on behalf of Citron Capital and made media appearances and drafted and disseminated purported investor letters.

**4.    Left Promotes Himself and Citron Research to the Public as a Trustworthy, Independent Publisher**

39. Left promoted Citron Research to the public on its twitter header as "*representing the other side of Wallstreet,*" and "[t]*he Other Side of Research.*" The Citron Research website also stated that Left had been "*quoted in every major US financial publication, including Forbes, Fortune, Wall Street Journal, Barron's, CNBC, Investors' Business Daily, and Business Week.*"

40. Left presented Citron Research as publishing independent research and held himself out as a "*private investor*" who led "*a team of investigators.*" In July 2011, Left told the Financial Times that "*the role I play in the market is I try to tell the other side of the story, when everybody blindly cheerleads, there's always another side of the story ...*" In addition, in the "About Citron Research" section of the Citron Research website Left represented that "*The goal of this website is and has always been to provide truthful information in an entertaining format to the investing public.*"

41. Left also portrayed himself to the media as an independent publisher. In September 2018, Left told a CNBC representative "*I do not trade based on TV appearances.*"

42. In August 2019, Left continued to promote Citron Research as an

COMPLAINT                                          10

independent research firm, telling his readers that "*in 18 years of publishing, we have never been compensated by a third party to publish research*."

### B. Left's Trading Recommendations Published Through Citron Research Move the Market

#### 1. Left Brags that the Tweets and Reports He Publishes Through Citron Research Are Capable of Moving the Market

43. During the Relevant Period, Citron Research had more than one hundred thousand followers on twitter. Citron Research's tweets were also picked up by the media and quickly disseminated to a much wider audience.

44. Many of the recommendations published on Citron Research were "short recommendations," where Left induced investors to sell their shares in the target company. The publications making the short recommendation often represented to the market that Citron also had short exposure or was "short" in the target stock.

45. Investors often sold their stock in response to Left and Citron Research's short recommendations. This typically led to a decline in the stock price.

46. Citron Research also published positive "long recommendations" on certain target companies, where Left induced investors to buy the stock by promoting the companies. The publications making the long recommendation often represented that Citron had a long position or was "long" in the target stock.

47. Investors often bought stock in response to Left and Citron Research's long recommendations, which typically led to an increase in the stock price.

48. Due to the large number of followers Citron Research had on twitter and the attention that its tweets and reports garnered from the media, Left knew, or was reckless and negligent for not knowing, that investors often bought or sold stock in response to Left and Citron Research's recommendations, and thus his stock recommendations in the tweets or reports impacted the market.

49. For example, in or around March 2018, Left bragged to colleagues that

COMPLAINT
11

he was confident he could "*destroy*" or "*kill*" companies by publishing a tweet or report, and told a colleague in August 2018 that he had a "*hot voice*" that he planned to "*take a vantage [sic] of.*"

50. Left knew that he could make money off his tweets because of his readers and the impact he had on their trading behavior, telling a colleague, "*I save tweets for easy money.*" Similarly, in May 2018, Left repeated a quote from a Business Insider article: that he could "*send a stock tumbling with a single tweet.*"

**2.     Left Uses Target Prices to Amplify the Trading Recommendations He Publishes on Citron Research**

51. Left frequently included a target price in the Citron Research reports and tweets that he published, leading his readers to believe that this was the price at which he thought the stock would trade.

52. The target prices were typically far above (for long publications) or far below (for short publications) the stock's current trading price, giving the market the impression that the stock prices of the target companies would drastically increase or decrease in the direction of the Citron Research recommendation.

53. The Citron Research tweets contained little to no analysis of how the price target had been determined.

54. While the reports sometimes contained purported analysis of the price targets, Left at times drastically revised the target prices in the days or hours prior to posting the report.

55. Left included these price targets for the purpose of encouraging the media to pick up, and thereby amplify, his trading recommendations.

56. When paired with the inflammatory language in the Citron Research publications, the target prices captured the immediate attention of the press, which led to further dissemination of the reports and tweets.

COMPLAINT                                    12

### C. Left's Misuse of the Citron Research Platform For His Personal Profit

57. At times, Left exploited the Citron Research platform by stating or leading readers to believe that he had long or short exposure in the target stocks, inducing his readers to trade in the same direction as his stated positions, and providing purported price targets for the target stocks.

58. In reality and unbeknownst to investors, Left planned to quickly abandon his stated long or short exposure in order to capitalize on the stock price moves following the release of these reports and tweets, and planned to do so at far different prices than the price targets he was projecting to the market.

59. Through these actions, Left bought stock almost immediately after telling his readers to sell, and sold stock almost immediately after telling his readers to buy.

60. This fraudulent practice deceived investors. It allowed Left to use the Citron Research reports and tweets to lead investors to believe they were truthful, independent stock recommendations, when in fact they contained false statements or misleading half-truths intended to create a catalyst to move the target company's stock price so that Left and Citron Capital could profit.

#### 1. Left's Trading Strategy

61. Left told Business Associate One that his strategy was built around publishing recommendations on Citron Research for the purpose of causing price moves in target companies from which he could quickly profit.

62. For example, in or around 2018, Left explained to Business Associate One that "*creating a catalyst is the best way to make money*."

63. Left instructed Business Associate One to "*Trade on day of article or day before and max $50k in options, get out immediately on catalyst*." Left also instructed Business Associate One to "*STOP GAMBLING, run a fund . . . ONLY PLAY CATALYST*."

COMPLAINT                                     13

64. Left's strategy focused specifically on taking advantage of unsuspecting investors who followed Citron Research's recommendations, yet who did not know of Left and Citron Capital's plan to quickly sell or purchase contrary to Citron Research's recommendations, and at a price far different than the price targets Citron Research provided.

65. Left told others that one of his strategies involved targeting retail investors, because these investors were likely less informed and therefore more likely to follow his recommendations, stating that "*these retail holders are nervous. we will hit them*" and "*Now that I know who owns [the target stock]. candy from a baby.*"

66. In addition, Left used Citron Capital investor letters containing information about Citron Capital's intended trading – which he posted publicly or sent to the media for broad distribution – as catalysts around which Defendants could trade and profit.

67. Left's catalyst strategy was built around inducing his readers to follow the trading recommendations on Citron Research.

68. To that end, at times Left represented to his readers or led them to believe that he was trading consistent with the recommendations in the publications he issued through Citron Research.

69. In some short recommendations, Left represented to his readers or led them to believe that he had short exposure in the target stocks. He provided price targets well below the stock's current trading price to give the impression that the price of the stock was set to drastically decline.

70. In some long recommendations, he represented to his readers or led them to believe that he had long exposure in the target stocks. He provided price targets well above the stock's current trading price to give the impression that the price of the stock was set to drastically increase.

71. At times, Left represented to his readers or led them to believe that he

COMPLAINT                                    14

intended to purchase or sell target stocks only when that stock reached a specific price.

## 2. Left Deceives the Market by Quickly Trading Inconsistent With His Statements

72. Unbeknownst to his readers, with respect to the stocks identified in Appendix A, Left immediately traded inconsistently with the recommendations that he posted to Citron Research.

73. Left generated profits by trading in both his personal accounts and Citron Capital's account around his recommendations. Prior to issuing short recommendations, Left had established short exposure in his personal account and in the account of Citron Capital in the target company's securities. He typically did this through a combination of stock and options positions; for stock, short selling the stock, and for options, buying puts or, less often, selling calls.

74. After establishing short exposure, Left then released a short report and/or negative tweet about the issuer through the Citron Research platform.

75. Left knew, or was reckless and negligent for not knowing, that the information in the publication typically triggered others to sell the stock, leading to a decline in the stock price, and a corresponding price move in the options. For example, a decrease in the stock price would cause the price of corresponding put options to increase, and the price of corresponding call options to decrease.

76. Shortly after recommending to the market that it sell a target company's stock, Left then quickly bought back the stock or call options at the depressed price to close the short position, or sold his put options for a higher price, yielding significant profits.

77. Left engaged in a similar practice for long recommendations he published on Citron Research. Left would buy stock (or buy calls or sell puts) in advance of issuing long recommendations. After establishing long exposure, he then issued the long recommendation through Citron Research that the stock price

COMPLAINT 15

was likely to increase and recommended that his readers buy the stock.

78. Left knew, or was reckless and negligent for not knowing, that the information in the publication typically triggered others to buy the stock, leading to an increase in the stock price, and a corresponding price move in the options.

79. Shortly after inducing his readers to buy the stock, Left then sold his stock or call options, or bought back his put options, upon the increase in stock price following his publications, generating large profits for himself and Citron Capital.

80. On the long side, Left sold stock as investors, whom he had told to buy, were buying that stock. On the short side, Left bought stock as investors, whom he had told to sell, were selling that stock.

81. Left typically began trading contrary to the recommendations within minutes or hours of issuing them, demonstrating that he planned to trade inconsistently with the statements in his recommendations before publishing those statements. At times, Left also entered limit orders to exit his positions before the report or tweet was even released. For example, if he had short exposure in a stock and planned to release a negative report, he entered an order to buy back the stock if the stock price decreased by a certain amount. If he had a long position and planned to release a positive report, he entered an order to sell the stock if the stock price increased by a certain amount.

82. At other times, Left traded short-dated options positions that would expire on the day of or in the days following the publication of his recommendation at a strike price that was well above (for short reports) or well below (for long reports) the target price he published to the market.

### 3. Left Conceals His Trading Strategy

83. At the time he was issuing stock recommendations, Left did not disclose in the Citron Research tweets and reports that he intended to quickly trade in a manner that was inconsistent with those recommendations.

COMPLAINT 16

84. At the time he was issuing price targets, Left did not disclose in the Citron Research tweets and reports that he intended to quickly trade the stocks at prices far from the target prices he provided to the market.

85. In doing so, Left concealed his own financial motivations for issuing the publication and his intention to capitalize on the price movements he created. He misled investors by quickly reversing his position – which he had induced readers to follow – but at prices far higher (or lower) than the price targets he suggested.

**D.  Defendants' Execution of Their Scheme to Defraud through the Citron Research Publications**

86. During the Relevant Period, as set forth in Appendix A, Defendants executed the scheme to defraud outlined above by publishing Citron Research tweets and reports containing trading recommendations on 23 target companies on at least 26 separate occasions ("Citron Research Publications"). Following the Citron Research Publications, the prices of the target stocks moved, on average, more than 12% (measured from the end-of-the day closing price on the day before the report or tweet to end-of-day closing price on day of the report or tweet).

87. In 21 of the 26 Citron Research Publications, Left also included a target price that purported to represent the price at which Citron Research thought the stock would trade. Consistent with their scheme, in all 21 instances Left and Citron Capital traded at prices far from the targets they provided to the market.

88. Defendants' trading around the Citron Research Publications yielded approximately $20 million, at times generating millions of dollars from trading around a single tweet.

**E.  Left and Citron Capital's Acts in Furtherance of the Scheme**

89. During the Relevant Period, the Defendants engaged in a variety of deceptive acts in furtherance of their scheme to defraud investors.

COMPLAINT 17

### 1. Defendants Misrepresent and Conceal Their Trading

#### a) NVTA

90. On July 17, 2019, Left had long exposure in Invitae Corporation ("NVTA") in both his personal account and in Citron Capital's account. At this point in time, Defendants stood to profit if NVTA's stock price increased.

91. On July 17, 2019, Left promoted NVTA in a Citron Capital investor letter stating, "*on the long side we're most excited about our position in Invitae (NVTA).*" The investor letter represented that "*we continue to add to our position at current levels*" and that we "*expect the stock to trade to $100 in the next 24 months.*"

92. Despite representing that they would *"continue to add to our position at current levels"* and that they believed the stock would trade to $100, Citron Capital and Left sold shares of NVTA between July 18 and July 25 at an average price of approximately $24.

93. Between July 25-30, 2019, Left discussed with his colleague his hope to "*get stock to 30*" and asked "*[w]hat can I put in a tweet to juice it[?]*"

94. On July 31, 2019, Left again promoted NVTA in a report and tweet as a good investment to buy and reiterated that Citron Research expected NVTA's stock to sell at $100, tweeting "*certain that Invitae is on its way to $100.*" Left represented in the report that he *"will continue to stay long until the stock hits at least $65 as we believe it is on its way to $100.*"

95. Contrary to their $100 price target and representation that they would *"stay long until the stock hits at least $65,"* Left and Citron Capital began selling stock that very day at prices at or around $27 to $28 and did not continue to stay long until the stock hit $65.

96. In the days leading up to the release of the July 31, 2019 NVTA report, Left adjusted the price target in internal drafts of the report from $60 to $100, a change of more than 66%.

COMPLAINT 18

97. The Defendants' statements to the market that they would take one action when they really intended to take another were materially false and misleading and deceptive.

98. Left's actions of internally changing the amounts of the target price from $60 to $100, at a time when he was privately discussing his hope to move the stock to $30, demonstrates that his selection of a target price was not tied to any specific analysis but rather was used to manipulate and influence a target company's stock price in a way that benefitted Defendants.

### b) ROKU

99. On January 8, 2019, Left and Citron Capital acquired short exposure in ROKU, a video streaming company, meaning that they would profit if ROKU's stock price decreased.

100. That same day, after they acquired their short exposure, Left published a tweet calling ROKU "*uninvestable*" and encouraged his readers to sell their stock: "*We initially went long $ROKU at $35. However, have to recognize when the story has changed. APPLE TEAMING UP WITH SAMSUNG, ROKU CEO selling last week, and short interest at lows. Risk/reward no longer there. Expect big retracement. ROKU stock is uninvestable now.*"

101. Despite telling his readers that ROKU stock was uninvestable, within two minutes of issuing the tweet, Left began buying back shares of ROKU and had completely covered his short exposure within nine minutes of the tweet. Citron Capital also began exiting its short exposure within one minute of the tweet, and completely exited within ninety minutes of the tweet.

102. Later that day, after Defendants had exited their positions, Left falsely told his readers that he had not traded in ROKU: "*[W]e are watching $ROKU from the side After successfully shorting ROKU as it traded as high as $50 in late 2017, we reversed our position at $35 last year. With Apple teaming up with Sams, LG, and Vizio investors must consider the risk to the bigger story.*"

COMPLAINT                                            19

103. Left's representation that "[W]e *are watching $ROKU from the side*" was materially false and misleading and designed to further Citron Capital's reputation as an independent publication, when in fact they had just profitably traded around the Citron Research tweet.

104. Left and Citron Capital's trading in ROKU around the Citron Research tweet during this time generated proceeds of approximately $600,000.

105. That same day, Left bragged to a friend about the profits he made in ROKU saying, "*Lol. Was a great set up for Trade this morning.*"

### 2. Left Misrepresents His Trading Positions in Media Interviews

106. Left also made statements to the media designed to conceal that he was trading inconsistent with the statements in the Citron Research Publications.

#### a) CRON

107. On August 27, 2018, Left messaged Portfolio Manager One "*I have a hot voice in cannibas. Let's take a vantage [sic] of it.*" Left instructed Portfolio Manager One to not overthink Citron Research's next target company stating, "*Stop being such a pussy. It's OK to be wrong.*"

108. Left decided to issue a short publication on Cronos Group, a Canadian cannabis company that traded on the NASDAQ under the ticker symbol "CRON."

109. Left told Portfolio Manager One "*we can DESTROY CRON*" and through a "*cron short we could get 2 bucks,*" indicating he believed that he would make $2 per share from trading around a publication on CRON.

110. On August 29, 2018, Left had short exposure in CRON, meaning that he would profit if CRON's stock price decreased. That same day, Left sent draft bullet points to Portfolio Manager One with a short-term price target for CRON of $6. A subsequent draft of the bullet points included a price target of $5. On August 30, 2018, Portfolio Manager One sent a report to Left to be published through Citron Research with a price target of $7.50.

COMPLAINT                                          20

111. Later that same day, Left published a report and sent a tweet to his readers recommending that they sell CRON and that the true valuation of the company was $3.50 per share: "*$CRON tgt price $3.5. Everything that is contaminated about the Cannabis space. ALL HYPE with possible securities fraud.*" The tweet linked to the report which was titled, *"Cronos: The Dark Side of The Cannabis Space.*"

112. An hour later, Left posted another tweet to alert his readers that he was going to appear on CNBC Fast Money to promote his recommendation: "*Andrew Left from Citron on CNBC Fast Money 5:25pm ET to discuss why $CRON is the most overhyped of all the 'pot stocks' with a target price of $3.5.*"

113. During Left's CNBC interview, the interviewer repeatedly asked him if he continued to hold a short position in CRON: *"what's relevant to people watching is, are you just as short the stock right now as you were at the beginning of the day."* Left responded that he *"took a small size position off today but I am still extremely short the stock,"* and reiterated his recommendation that the stock would trade to $3.50.

114. This statement was materially false and misleading because, by the time of that interview, Left had exited more than 75% of his short exposure at well above $3.50, despite representing to his readers that this was the true valuation of the company.

115. Left later bragged to Portfolio Manager One that he had received 100 emails on CRON and that *"NOT 1 of them was intelligent . . . . I swear not 1 person with a smart answer not 1"* and further bragged that "*i could write a tweet about a part 2 and get another $1.*"

116. Left also made clear that one of his trading strategies was centered around making recommendations to retail investors and boasted that "*short more cron if we get 10.5 now that I know who owns it. candy from a baby.*"

117. In total, Left's trading around the Citron Research Publications on

COMPLAINT                                      21

CRON generated profits of approximately $500,000.

### b) BYND

118. On May 17, 2019, Left and Citron Capital had short exposure in Beyond Meat Inc ("BYND"), meaning they stood to profit if the stock price decreased.

119. On May 17, 2019, Citron Research issued a negative tweet on BYND recommending that Citron Research readers sell the stock and assigning a target price of $65, despite the fact that BYND was then trading at approximately $87: *"$BYND has become Beyond Stupid"* and *"We expect $BYND to go back to $65 on earnings."*

120. Despite his negative statements to the market, only 10 days before Left told a colleague that he thought the price of BYND would increase, stating "*i think BYND goes to 100*."

121. Within seven minutes of the May 17, 2019 tweet, Left exited the majority of his short exposure in BYND. Similarly, Citron Capital completely covered its short positions within 12 minutes of the tweet.

122. Later that day, in advance of an article CNBC planned to release, a reporter emailed Left asking whether he still held a trading position in BYND. In response, Left stated that he "*shorted some today*."

123. This statement was materially false and misleading because Left had exited the majority of his short exposure and Citron Capital had already sold all of its short exposure.

124. Six minutes after this email exchange, Citron took additional short exposure in BYND, before the release of the CNBC article. Within an hour, CNBC published an article titled "*Short seller says Beyond Meat hype is 'beyond stupid,' places bet against the shares*." After the article was released, Citron exited this additional short exposure.

COMPLAINT                                      22

### 3. Defendants Traded Inconsistent With Citron Research's Recommendations to the Market

#### a) XL

125. As of December 23, 2020, Left and Citron Capital held long positions of XL Fleet Corp. ("XL"), meaning both Left and Citron Capital stood to profit if the price of XL stock increased.

126. Later that day, Left issued a tweet representing that Citron Capital held a long position in XL and that they believed the stock price was going to $60: "*Citron long $XL tgt $60. TAM of $XL over $1T. Electrification as a Service (EaaS) will be massive . . . more than twice $QS and $LAZR combined. Blue chip customer base with FedEx, Coke, Pepsi, DHL and many more. SPACS always cautious-this story has great Risk/Reward.*"

127. In the minutes leading up to the tweet telling the market that he thought XL stock was going to $60, Left placed a limit order to automatically sell XL if it reached $27.50 per share.

128. Despite telling the market that Citron was long and that he thought the stock price would go to $60, Left began selling shares of XL the very same minute as the publication. Left exited his entire position that day at an average price of $28.86, or 52% below the target price he published.

129. Citron Capital sold 98% of its shares by the following day at an average price of $31, or 48% below the recommended target price.

130. Left and Citron Capital's trading in XL generated proceeds of at least $2.3 million.

131. Several months later, in May 2021, a retail investor admonished Left on his recommendation on XL stating: "*Me and lots of my friends bought xl stock when you uploaded your bullish these on it. Since then the company almost dissapeared (sic) and goes to zero. Please post your opinion right now and respect your followers worldwide.*"

COMPLAINT                                                    23

132. In response, Left admitted the recommendation on XL "*sucked*" and made another false statement, stating that "*I fired the analyst that made that call*," referring to Business Associate One.

133. In fact, Left did not fire Business Associate One and continued to work closely with him through at least 2022.

### b) AAL

134. On June 5, 2020, Left and Citron Capital acquired short positions in American Airlines Group Inc. ("AAL"), meaning they would profit if AAL's stock price decreased. The short positions in the Left and Citron Capital accounts included put options that expired that same day ("short-dated put option") with strike prices of $19 and $20.

135. After Left and Citron Capital acquired their short positions, Left published a negative tweet through Citron Research encouraging the market to sell the stock and pronouncing that the stock would decrease to $10 per share: "*$AAL Back to $10 Robinhood traders have 0 idea what they buying. Balance sheet is upside down. Unencumbered assets worth far less than current price. The reason why Buffett fully exited lower. They don't teach finance in the Sherwood Forest.*"

136. Approximately fourteen minutes after the first tweet, Left again published a Citron Research tweet criticizing investors who bought AAL stock at $19: "*$AAL. To clarify previous tweet the 25k new users on Robin Hood who bought stock at $19 must know more about airlines than Buffet who sold the stock at $11. Send your resumes to Omaha. Expect stock to trade back to $10.*"

137. Within three minutes of publishing his initial tweet, Left began buying back shares of AAL, and Citron Capital similarly began buying back AAL within five minutes of the initial tweet.

138. Despite representing to Citron Research's readers that Left "*expect[s] stock to trade back to $10*" and criticizing traders who "*bought stock at $19*," Left and Citron Capital bought back at an average price of approximately $19.20 in the

COMPLAINT                                        24

minutes and hours following the tweets.

139. In addition, Left and Citron Capital's short-dated put option positions with strike prices well above the target price demonstrate that Left and Citron Capital did not intend to hold the positions beyond that day, nor did they intend to hold their positions to a price near the $10 price target.

140. Left and Citron Capital's trading profits around the AAL tweets generated profits of more than $400,000.

### 4. Defendants Published Trading Recommendations Without Conducting Adequate Research

#### a) VUZI

141. Between December 16, 2020 and December 22, 2020, Left and Citron Capital established long positions in Vuzix Corporation ("VUZI"), meaning that they would profit if the stock price increased.

142. On Friday, December 18, 2020, Left published a tweet through the Citron Research platform telling the market that the company was undervalued and suggesting that VUZI was a good buy: "*Getting emails about shorting $VUZI. NO WAY we would short this flyer. Small market cap with story that is tied to 5G, $AMZN and $PLUG and Covid. There has to be easier pickings...still doing research. Risk/Reward easier on other high flyers*"

143. Later that day, Left admitted to a colleague that he had only "*put out that tweet to see what would come back to me*," demonstrating Left had not actually done research on whether VUZI was an appropriate investment to recommend to Citron Research's readers.

144. After Left issued the tweet, Business Associate One conducted research over the weekend into VUZI by speaking with VUZI company representatives and others in an effort to determine if the company was a good long investment. Business Associate One concluded that it was not an appropriate long investment, telling Left that "*we can't have enough conviction in this being an actual long*"

COMPLAINT 25

investment.

145. However, even after receiving research that the company was not a good investment, Left did not remove the tweet from Citron Research's platform, nor did he communicate to the market that he did not have the conviction to recommend VUZI as a long investment.

146. Instead, Left and Citron Capital sold their stock in VUZI within three days of the tweet, generating profits of over $700,000.

### 5. Defendants Falsely Represented that Left Never Received Any Compensation From Hedge Funds

147. As alleged above, to perpetuate the market's view that Citron Research was an independent short publisher, Left falsely told Citron Research readers that he had never received compensation from hedge funds in connection with publishing trading recommendations.

#### a) GE

148. On August 15, 2019, a third-party publisher issued a short report on General Electric ("GE") recommending that the market sell their stock in GE. In the short report, the third-party publisher disclosed to the market that he was being paid a percentage of profits from a hedge fund that was trading around his short report.

149. In response, on August 16, 2019, Left published commentary on GE. Unlike the third-party short publisher's report, Left encouraged readers to buy GE and represented that "*Citron took the opportunity to buy [GE] stock.*"

150. Approximately two and a half hours before releasing the commentary, Left purchased GE stock, meaning he would profit if the stock price of GE increased.

151. Left's commentary criticized the recommendation in third-party short publisher's report. In addition, he criticized the short publisher for being paid profits from a hedge fund trading around the short report, telling readers that "*No*

COMPLAINT                                                26

*credible hedge fund or short seller would ever do this.* Left further stated that "*Unfortunately. what we have just witnessed with [third-party short publisher] is reckless, dishonest, and most importantly secretive – all which gives activist short selling a bad name.*"

152. Left claimed that he and Citron had not and would not engage in such actions, representing that "*in 18 years of publishing, we have never been compensated by a third party to publish research. More important, compensation tied to the 'success of a trade' would not pass internal compliance nor would it pass compliance of any fund that Citron would collaborate with on ideas.*"

153. Left's commentary defined "Citron" as both Citron Research and Citron Capital.

154. Contrary to his statement, Left had received substantial trading profits ten months earlier from Anson, an outside hedge fund, in connection with Left publishing recommendations on two securities. In addition, at the time he issued his commentary on GE, Left was receiving compensation from Hedge Fund Two for his trading around target securities that were the subject of trading recommendations published by Citron Research, including GE.

155. Left's statement about never receiving compensation from a hedge fund was materially false and misleading and designed to further Citron Research's reputation as an independent research publication, as well as to bolster its long recommendation on GE.

156. Left's statement about his trading around the GE report was also materially false and misleading. Despite representing in the commentary that "*Citron took the opportunity to buy stock,*" Left had already entered a limit order to sell GE before issuing his commentary on GE and completely sold his GE stock within sixty-five minutes of telling the market he had a long position.

157. Left's trading in GE in connection with his long recommendation took place over approximately three and a half hours and yielded Left nearly $50,000 in

COMPLAINT 27

profits.  Citron Capital did not trade in GE around the commentary.

### b) Left's Compensation from Anson

158. In at least two instances in late 2018, Left received compensation from Anson in connection with Citron Research Publications relating to two securities: Namaste Technologies, Inc. ("Namaste") and India Globalization Capital Inc ("IGC").  Namaste's securities traded on the Canadian Securities Exchange under the symbol "N," and also traded as a penny stock in the United States under the symbol "NXTTF."

### (1) Namaste

159. On or about September 11, 2018, Anson Advisors contacted Left about issuing a short recommendation on Namaste through Citron Research.  In exchange, Anson Advisors agreed to pay Left a share of its fund's profits from its short position in Namaste.

160. Left agreed to the arrangement to share in Anson's profits in Namaste and responded "*DONE…let me kill it*."  Left bragged that *"these retail holders are nervous. we will hit them*."

161. Portfolio Manager One and Left then worked together to prepare short reports and tweets, which Citron Research published in September and October 2018.

162. On or around September 14, 2018, Citron Research released a tweet and report on Namaste recommending that his readers sell Namaste stock: "*Namaste $N Canada.  Some cannabis stocks are overvalued, and some are total jokes.  This is a joke Drop it like its hot' after the pledge party prohibits listing in US, downside: 80%. That .50*"

163. Approximately thirty-five minutes later, Left published a second tweet as an "*urgent update*" with an updated report further recommending that his readers sell their Namaste stock due to alleged illegal activities at the company: "*$N, Canada. urgent update: Quebec newspaper highlights Namaste's illegal activities*

COMPLAINT                                          28

*and Quebec investigation in $N for violation of laws. Tilray quickly drops $N, shareholders are next.*" The updated report provided a price target of "$.25 cents."

164. Contrary to Left's recommendation that his readers sell Namaste stock and his price target of $0.25, Portfolio Manager One and Left agreed that Anson would "*cover about 1/3*" of their holdings in Namaste, meaning that Anson would buy back Namaste stock, at a time when the stock was trading at approximately $2.36. Left noted to Portfolio Manager One that "*Canadians so gullible. Very.*"

165. In a televised BNN Bloomberg interview that was filmed on September 25,2018 and aired on September 26, 2018, Left represented to viewers that he "*would keep shorting [Namaste] until it goes to 0.*" However, within 10 minutes, Left asked Portfolio Manager One "*should we cover all namaster* [sic]," indicating that he did not intend to keep shorting Namaste. At that time, the stock was trading at approximately $2.18.

166. Left also traded in his personal account in a manner inconsistent with his statement on Bloomberg. Left established a short position in Namaste in his personal account, and contrary to his statement that he would "*keep shorting [Namaste] until it goes to 0,*" he covered that position between approximately $1.42 and $3.00, and did not short Namaste until it went to $0.

167. To anonymously amplify his recommendation on Namaste and to add more legitimacy to his recommendation, Left created a website, namastetruth.com and posted negative information on Namaste. Left later informed Anson that he "*might take down the namaste website…only to put it back up…if the stock goes higher,*" indicating that he viewed the website as another tool that he could use to impact prices for his own personal profit.

### (2)    IGC

168. On or about October 2, 2018, Left messaged Portfolio Manager One and requested that Anson establish a short position in IGC and share the profits with him. Portfolio Manager One agreed to pay Left a share of its fund's profits from

COMPLAINT                                         29

trading around Citron Research's bearish tweets on IGC.

169. This agreement meant that Anson and Left would profit if the value of IGC stock decreased.

170. Within hours of their agreement, Left tweeted to his Citron Research readers that they should sell IGC stock: "*$IGC. If you are able to short, it is a gift. No product. All hype. Raised Money 2 weeks ago at $1.15 Finger traders will get burned. This hype stock is the poster child of a cannabis bubble. Always cautious but nothing but air. Could write pages about this scheme.*"

171. Ten minutes later, Left published another tweet setting a target price of $6.00: "*Correction. $IGC has raised money 3 times in 3 weeks at an average price of $3.31. At least the company is honest about the absurd move The stock should have a skull and crossbones at Fidelity. Just praying for more borrow to open up. Target price - $6 fast.*"

172. Less than twenty-five minutes after Left had released the tweet telling the market IGC was going to *"$6 fast,"* Left asked Portfolio Manager One *"do we cover half."* IGC was trading at approximately $12 at that time, double the price target Left had provided to the market.

173. Following the Citron Research tweet, and in accordance with its agreement with Left, Anson covered its position in IGC stock on the same day as the tweets at $12.55.

### (3) Left Submitted Fabricated Invoices to Conceal His Compensation Arrangement

174. Left's share of Anson's profits for trading around Namaste and IGC totaled more than $1.1 million.

175. Left took steps to conceal that he was being compensated by Anson in connection with using his Citron Research platform by asking Anson to send him his share of trading profits through Third-Party Intermediary, to which Anson agreed.

COMPLAINT                                          30

176. Third-Party Intermediary submitted invoices to Anson Funds for purported research services that Third-Party Intermediary never performed, and inaccurately stated that the amounts invoiced were for the benefit of the Third-Party Intermediary, when in fact they were for the benefit of Left. Anson Funds paid the Third-Party Intermediary pursuant to these sham invoices.

177. To collect his share of trading profits, Left then submitted invoices to Third-Party Intermediary for "consulting services" that Left never provided. Using the funds from the sham invoices submitted to Anson, Third-Party Intermediary funneled more than $1.1 million to Left.

### c) Left Also Had a Compensation Arrangement With Hedge Fund Two

178. In January 2019, Left entered into a compensation arrangement with Hedge Fund Two whereby Citron Capital agreed to recommend trading for Hedge Fund Two.

179. In exchange, Hedge Fund Two agreed to pay Citron Capital a percentage of the alpha (the difference between the return on the particular security and the return on a predetermined risk-free benchmark) for the trades.

180. Although Left was responsible for entering into and carrying out this arrangement, Business Associate One handled the day-to-day relationship with Hedge Fund Two. Left, often using Business Associate One as an intermediary, directed Hedge Fund Two to trade around reports and tweets issued by Citron Research.

181. Pursuant to this arrangement, Hedge Fund Two paid Citron Capital a total of $2.6 million. Left and Business Associate One split these profits, with Left receiving 85% and Business Associate One receiving 15%.

182. By making false and misleading statements to the market that Left and Citron Capital had not, and would not, receive money from hedge funds, when in fact they had and were, Left concealed his own and Citron Capital's financial

COMPLAINT 31

motivations in issuing publications, and perpetuated the false and misleading impression that Citron Research was an independent research firm.

## II. Defendants' Materially False and Misleading Statements

183. In addition to and in furtherance of their scheme, Defendants made materially false and misleading statements in the Citron Research Publications.

### A. Affirmative False and Misleading Statements About Defendants' Trading

184. In January 2019, Defendants represented to the market that they were not trading in ROKU, when in fact, they had just successfully traded in ROKU by taking positions contrary to the recommendations in the Citron Research Publication.

185. In July 2019, Defendants represented to the market that they would stay long NVTA until the stock reached $65, when in fact they immediately began selling at approximately $27 to $28.

186. These statements, which Left published through Citron Research, were materially false and misleading because the Defendants falsely told or misled the market in connection with the Citron Research Publications by representing that they were taking one action, when in fact they actually took an action in direct contradiction to that statement. In evaluating the credibility of the trading recommendations in the Citron Research Publications, a reasonable investor would have wanted to know that Defendants made false representations about their intentions to follow their own recommendations.

### B. False and Misleading Statements to the Media About Defendants' Short Exposure

187. In August 2018, Left represented in a CNBC televised interview that Defendants had only covered a small portion of his short exposure in CRON and were still "*extremely short*," when in fact they had already covered over 75% of their short exposure in CRON.

COMPLAINT                                    32

188. In September 2018, Left represented in a televised Bloomberg interview that he *"would keep shorting [Namaste] until it goes to 0,"* when in fact he bought back his short position at prices between $1.42 and $3.00.

189. In May 2019, Left represented to CNBC that he had shorted BYND in connection with a tweet on the company, without disclosing that he had closed the majority of his position at that time.

190. These statements were materially false and misleading, as Defendants misrepresented that he still had short exposure in certain target companies when in fact they no longer held these positions. A reasonable investor would have wanted to know whether Defendants' public statements to the media regarding their trading positions were accurate in evaluating the credibility of the trading recommendations in the Citron Research Publications.

## C. False and Misleading Statements In Connection with His Trading Recommendation in GE

191. In connection with their August 2019 recommendation that readers purchase stock in GE, Left represented to his readers that *"in 18 years of publishing, we have never been compensated by a third party to publish research"* and that *"compensation tied to the success of a trade' would not pass internal compliance nor would it pass compliance of any fund that Citron would collaborate with on ideas,"* when in fact they had received millions of dollars in compensation from Anson and Hedge Fund 2 in connection with trading around the Citron Research Publications.

192. Defendants made this false and misleading statement in connection with their recommendation that the market purchase GE stock, which Defendants traded around and profited nearly $50,000.

193. These statements, which Left published through Citron Research, were materially false and misleading. In evaluating the credibility of the trading recommendations in the Citron Research Publications, a reasonable investor would

COMPLAINT 33

have wanted to know about the Defendants' undisclosed financial incentives to impact stock prices, specifically GE stock.

### D. False and Misleading Half-Truths Related to Defendants' Recommendations in the Citron Research Publications

194. As set forth above, Defendants frequently stated or led their readers to believe that they had long (or short) exposure in a target stock and encouraged readers of the Citron Research Publications to buy (or sell) the target stock, when in fact Defendants had a preexisting intent to sell (or buy).

195. Defendants engaged in this conduct on the 26 occasions set forth in Appendix A, including in the following tickers on the following dates: XL (December 23, 2020), VUZI (December 18, 2020), PLTR (November 27, 2020), AAL (June 5, 2020), NVAX (April 20, 2020), INO (March 9, 2020), LK (January 31, 2020), GE (August 16, 2019), NVTA (July 17, 2019), NVTA (July 31, 2019), BYND (May 17, 2019), ROKU (January 8, 2019), FB (December 26, 2018), TWTR (December 20, 2018), VEEV (December 4, 2018), NVDA (November 20, 2018), TSLA (October 23, 2018), PTE (October 18, 2018), Namaste (October 4, 2018), IGC (October 2, 2018), Namaste (September 14, 2018), CRON (August 30, 2018), ABBV (July 19, 2018), SNAP (May 31, 2018), BABA (May 2, 2018), and TWTR (March 27, 2018).

196. For example, as alleged above:

(a) In August 2019, Left told Citron Research readers that he was long GE stock, without disclosing that he had in place limit orders to sell and in fact did sell his GE stock within sixty-five minutes of the Citron Research Publication.

(b) In June 2020, Defendants told Citron Research's readers that they had short exposure in AAL and that AAL shares were only worth $10 to induce the market to sell, when within minutes Defendants bought AAL shares at around $19.20.

(c) In December 2020, Defendants told their readers that they were

COMPLAINT 34

long XL and that its shares were worth $60, when within minutes Defendants began to sell their XL stock at around $28.

197. These statements, and the additional statements set forth in Appendix A, were materially false and misleading and concealed that Defendants did not intend to maintain their long or short exposure following the publications, and concealed their preexisting intent to immediately buy (when Defendants were telling the market to sell) or sell (when Defendants were telling the market to buy). These statements, as well as certain statements set forth in Appendix A, were half-truths that were rendered these statements regarding Defendants' intended trading materially false and misleading.

198. In evaluating the credibility of the trading recommendations in the Citron Research Publications, a reasonable investor would have wanted to know that following the release of the publications the Defendants actually intended to quickly abandon the long or short exposure that they represented they held in the publications.

### E. False and Misleading Statements In Connection With the Target Prices that Defendants Published

199. As alleged in paragraph 87 above, in 21 of the Citron Research Publications detailed above, Defendants encouraged readers to sell or purchase target stocks at specific target prices.

200. Despite Defendants representing that the price targets were the prices at which they expected the target companies to trade, their actions demonstrate that they did not have a reasonable basis for the target prices they published and that the purpose of including the target prices was to serve as a catalyst to move the stock price.

201. As set forth in Appendix A, in all 21 of the instances involving price targets, Defendants sold at prices well above the target price for short reports and well below the target price for long reports, including in the following tickers on the

COMPLAINT 35

following dates: XL (December 23, 2020), PLTR (November 27, 2020), AAL (June 5, 2020), NVAX (April 20, 2020), INO (March 9, 2020), NVTA (July 17, 2019), NVTA (July 31, 2019), BYND (May 17, 2019), FB (December 26, 2018), TWTR (December 20, 2018), VEEV (December 4, 2018), NVDA (November 20, 2018), PTE (October 18, 2018), Namaste (October 4, 2018), IGC (October 2, 2018), Namaste (September 14, 2018), CRON (October 30, 2018), ABBV (July 19, 2018), SNAP (May 31, 2018), BABA (May 2, 2018), and TWTR (March 27, 2018).

202. For example:

(a)     In December 2020, Defendants told their readers that XL Fleet would trade to $60, but immediately turned around and sold XL around $28 (a 53% difference).

(b)     In June 2020, Defendants claimed that AAL was going to $10, and then began buying back at around $19.20 (a 47% difference).

(c)     In July 2019, Defendants advised readers that NVTA would trade to $100, despite selling their NVTA stock at around $27 to $28 shortly thereafter (less than a third of the target price).

(d)     In August 2018, Defendants projected that CRON would trade to $3.50, then sold CRON at an average price of around $10 (a 65% difference).

(e)     In October 2018, despite claiming that IGC was going to *"$6-fast,"* Left instructed Anson to buy IGC while the stock was trading around $12 (a 50% difference).

203. In addition, Defendants drastically revised price targets in draft reports leading up to their dissemination, demonstrating that they had no reasonable basis for setting the target prices.  For example, in July 2019, Defendants initially selected $60 as the price target for NVTA in the draft report, but revised it to $100, a 66% increase, in the days leading up to the dissemination of the report.  Similarly, in August 2018, Left discussed with Portfolio Manager One various price targets for CRON ranging from $5 to $7.50, before he ultimately published a target price of

COMPLAINT                                                      36

$3.50.

204.    Defendants' lack of a reasonable basis in selecting target prices further demonstrates their lack of belief in those prices.  For example, before selecting the $100 target price that he included in the July 2019 Citron Research Publication on NVTA, Left discussed with a colleague his hope to "*get stock to 30*" and asked "*[w]hat can I put in a tweet to juice it[?]*"

205.    Defendants also published false information in connection with the published price targets.  For example, in connection with the Citron Research Publication on NVTA, Left set a $100 price target and stated that he would "*continue to stay long until the stock hits at least $65*," when in fact he immediately began selling his NVTA stock at approximately $27 to $28 per share.

206.    Defendants concealed that they were trading far above (for short reports) or far below (for long reports) the price targets that they disseminated rendered the price targets misleading.  For example, in connection with the Citron Research Publication on XL, Defendants' price target of $60 was a misleading half-truth because they omitted to state that they planned to immediately begin selling their shares of XL within five minutes of the publication at approximately $28, less than half of the target price that they set.

207.    These statements regarding Citron Research's target prices, as well as other statements identified in Appendix A relating to target prices, were materially false and misleading.  In evaluating the credibility of the trading recommendations in the Citron Research Publications, a reasonable investor would have wanted to know that that Defendants did not have a reasonable basis for the target prices they were publishing, that the target prices were unsubstantiated, and omitted information about the Defendants' intent to trade inconsistently with those recommendations.

**F.    Defendants Made the False and Misleading Statements**

208. Defendants' false and misleading statements allowed them to generate approximately $20 million in trading profits in connection with the Citron Research

COMPLAINT                                                    37

Publications.

209. As explained in paragraphs 36-38 above, Left was the control person of Citron Research. Left drafted, reviewed, approved, or published the Citron Research Publications. The reports released through the Citron Research platform also included a statement that they "*have been prepared by either Citron Research or Citron Capital,*" and at times Left defined "Citron" as both Citron Research and Citron Capital.

210. Left, whose conduct is imputed to Citron Research, was the maker of the statements in the Citron Research Publications.

## III. Defendants Acted with Scienter

211. During the Relevant Period, Left, who controlled Citron Research and whose mental state was imputed to it, acted with scienter as evidenced, in part, by the following:

(a) Left traded around the Citron Research Publications, where he frequently recommended that readers buy (or sell) stock at purported target prices, without disclosing that he intended to quickly trade in the opposite direction at far different prices than the target prices he projected.

(b) Left falsely portrayed himself as managing Citron Capital, a successful hedge fund with numerous investors, when in reality he was Citron Capital's only investor.

(c) Left created anonymous websites and posted negative information about target companies to amplify his Citron Research recommendations.

(d) Left made public appearances on televised financial programs where he made materially false and misleading statements about his trading positions and intended trading activity.

(e) Left falsely told the market that he had never received any compensation from hedge funds, when in fact he had received over $1 million in profits pursuant to arrangements with two hedge funds trading around the Citron

COMPLAINT                                        38

Research Publications.

(f)     Left took active steps to conceal the financial arrangements he had with one of the hedge funds, Anson, including working with Anson to funnel profits through a third-party intermediary pursuant to sham invoices.

212.   During the Relevant Period, Left acted knowingly or recklessly in issuing the materially false and misleading tweets and reports in Appendix A and in carrying out the scheme.  Left also acted unreasonably under the circumstances, and by engaging in this conduct, acted negligently.

## IV.  Defendants' Fraudulent Scheme and False and Misleading Statements Were in Connection with the Purchase, Offer, or Sale of Securities

213. Defendants' scheme and materially false and misleading statements were in connection with the purchase, offer, or sale of securities.

214. In the Citron Research Publications, as well as in public media appearances, Defendants induced readers to purchase or sell the target companies' stock.  Defendants sold stock or call options, or purchased put options, following positive recommendations they published through Citron Research.  Defendants purchased stock or call options, or sold put options, following negative recommendations they published through Citron Research.  Defendants earned illicit profits by selling stock for a higher price as a result of their statements.

215. Similarly, Defendants' scheme and false and misleading statements relating to compensation Left received from hedge funds were in connection with the offer or sale of securities.  As alleged above, these false and misleading statements were in connection with a Citron Research Publication on GE, wherein Defendants recommended that readers purchase GE stock, in which Defendants held a long position.  Pursuant to these statements, Left obtained trading profits from selling his GE stock at a profit.

COMPLAINT                                        39

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder

### (against Defendants Left and Citron Capital)

216. The SEC realleges and incorporates by reference paragraphs 1 through 215 above.

217. By engaging in the conduct described above, in particular paragraphs 24 through 182, Defendants Left and Citron Capital, directly or indirectly, with scienter, in connection with the purchase or sale of a security, by use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

218. By engaging in the conduct described above, Defendants Left and Citron Capital violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Securities Act Section 17(a)(1) and (a)(3)

### (against Defendants Left and Citron Capital)

219. The SEC realleges and incorporates by reference paragraphs 1 through 215 above.

220. By engaging in the conduct described above, in particular paragraphs 24 through 182, Defendants Left and Citron Capital, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:

COMPLAINT

employed devices, schemes, or artifices to defraud; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

221. By engaging in the conduct described above, Defendants Left and Citron Capital violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3).

## THIRD CLAIM FOR RELIEF

**Materially False or Misleading Statements in Connection With the Purchase or Sale of Securities in Violation of Exchange Act Section 10(b) and Rule 10b-5(b)**

**(against Defendants Left and Citron Capital)**

222. The SEC realleges and incorporates by reference paragraphs 1 through 215 above.

223. By engaging in the conduct described above, in particular paragraphs 183 through 210, Defendants Left and Citron Capital directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

224. By engaging in the conduct described above, Defendants Left and Citron Capital violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

COMPLAINT

41

## FOURTH CLAIM FOR RELIEF

### Materially False or Misleading Statements

### Violations of Securities Act Sections 17(a)(2)

### (against Defendants Left and Citron Capital)

225. The SEC realleges and incorporates by reference paragraphs 1 through 215 above.

226. By engaging in the conduct described above, in particular paragraphs 183 through 210, Defendants Left and Citron Capital, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter and/or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

227. By engaging in the conduct described above, Defendants Left and Citron Capital violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

## FIFTH CLAIM FOR RELIEF

### Control Person Liability Under Section 20(a) of the

### Exchange Act for Citron Capital's Violations of Section 10(b) of the

### Exchange Act and Rule 10b-5 Thereunder

### (against Defendant Left))

228. The SEC realleges and incorporates by reference paragraphs 1 through 215 above.

229. Defendant Left was, at the time of the acts and conduct set forth herein were committed, directly or indirectly, a person who controlled Defendant Citron

COMPLAINT                                    42

Capital, which violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

230. By engaging in the conduct described above, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendant Left is jointly and severally liable with, and to the same extent as, the persons he controlled for violations of Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Left and Citron Capital, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue an order against Defendant Left pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2), prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15

COMPLAINT                                   43

U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 78 U.S.C. § 78o(d).

### IV.

Issue an order against Defendant Left under Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6)(B) of the Exchange Act [15 U.S.C. § 78u(d)(6), prohibiting him from participating in an offering of penny stock.

### V.

Issue an order against Defendant Left, in accordance with Section 20(b) of the Securities Act [15 U.S.C. § 77t] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(1), (d)(5)], permanently restraining and enjoining Left from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Left, purchasing or selling a security within five (5) trading days following any Publication by Left, or through any entity owned or controlled by Left, about that security. For purposes of this injunction, "Publication" means the dissemination of information on a security, to the public, either directly or indirectly, whether through a report, tweet, social media post, media interview, or other written or oral means.

### VI.

Pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], issue an order against Defendant Left permanently restraining and enjoining Left from, directly or indirectly, acting as or being associated with any investment adviser. This injunction shall not prevent him from being a client of an investment adviser. For purposes of this paragraph, a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser.

### VII.

Order Defendants Left and Citron Capital to disgorge all funds received from

COMPLAINT                                44

their illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

## VIII.

Order Defendants Left and Citron Capital to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  July 26, 2024

*/s/ Stephen Kam*
STEPHEN T. KAM
Attorney for Plaintiff
Securities and Exchange Commission

# APPENDIX A

## APPENDIX A: FALSE AND MISLEADING STATEMENTS BY LEFT AND CITRON CAPITAL

| | DATE | TICKER | DIRECTION/ SOURCE | FALSE AND MISLEADING STATEMENTS | APPROX. AVERAGE EXIT PRICE[1] |
|---|---|---|---|---|---|
| 1. | 12/23/20 | XL | Long Tweet | Citron Research Tweet: "Citron long $XL tgt $60. TAM of $XL over $1T.  Electrification as a Service (EaaS) will be massive…..more than twice $QS and $LAZR combined. Blue chip customer base with FedEx, Coke, Pepsi, DHL and many more.  SPACS always cautious-this story has great Risk/Reward"<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to XL | $30 |
| 2. | 12/18/20 | VUZI | Long Tweet | Citron Research Tweet: "Getting emails about shorting $VUZI.   NO WAY we would short this flyer.  Small market cap with story that is tied to 5G, $AMZN and $PLUG and Covid.   There has to be easier pickings...still doing research.  Risk/Reward easier on other high flyers."<br><br>and other statements concerning Defendants' positions and recommendation with respect to VUZI | $9 |
| 3. | 11/27/20 | PLTR | Short Tweet | Citron Research Tweet: "What a run the past month for all.  But as traders looking for short exposure, $PLTR is no longer a stock but a full casino.  Does not take a ball of crystal to know this will fall back to Arda.  Shorting with a $20 2020 target"<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to PLTR | $27 |

---

[1] Average exit price represents the average price that Left and Citron Capital exited their equity positions that were opened before the report and closed within five trading days after.  Average exit prices are not provided where only options were traded.  The prices are rounded down to nearest dollar for short reports, and up to the nearest dollar for long reports.

| | | | | | |
|---|---|---|---|---|---|
| 4. | 06/05/20 | AAL | Short Tweet | First Citron Research Tweet: "$AAL Back to $10 Robinhood traders have 0 idea what they buying. Balance sheet is upside down. Unencumbered assets worth far less than current price. The reason why Buffett fully exited lower. They don't teach finance in the Sherwood Forest."<br><br>Second Citron Research Tweet: "$AAL. To clarify previous tweet the 25k new users on Robin Hood who bought stock at $19 must know more about airlines than Buffet who sold the stock at $11. Send your resumes to Omaha. Expect stock to trade back to $10."<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to AAL | $19 |
| 5. | 04/20/20 | NVAX | Short Tweet | Citron Research Tweet: "As much as Citron wants a vaccine $NVAX is a serial promise and non deliver on every virus. Insiders sold most holding 85% lower last year. Bal sheet upside down and $$ is needed for NanoFlu. Expect secondary soon and stock back to $15. Retail mania!!"<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to NVAX | $23 |
| 6. | 03/09/20 | INO | Short Tweet | Citron Research Tweet: "$INO. SEC should immediately HALT this stock and investigate the ludicrous and dangerous claim that they designed a vaccine in 3 hours. This has been a serial stock promotion for years. This will trade back to $2. Investors have been warned."<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to INO | options only |

| 7. | 01/31/20 | LK | Long Tweet | Citron Research Tweet: "Citron long $LK. We also rec. this report but all data from Biz Con China and App download and calls with competitors confirm financials. $LK biz is on fire in China. Citron has respect for Muddy, but this anon. report will fall short on accuracy. Expect LK management response."<br><br>and other statements concerning Defendants' positions and recommendation with respect to LK | $32 |
| 8. | 08/16/19 | GE | Long Tweet and Report | Citron Research Tweet: "[Third party] report on $GE was the worst that activist short selling has to offer. Aggressive accounting is not fraud. Disingenuous all the way through [link to report]"<br><br>Citron Research Report:<br>"No credible hedge fund or short seller would ever do this . . . . what we have just witnessed with [third-party short publisher] is reckless, dishonest, and most importantly secretive – all which gives activist short selling a bad name."<br><br>"in 18 years of publishing, we have never been compensated by a third party to publish research. More important, compensation tied to the 'success of a trade' would not pass internal compliance nor would it pass compliance of any fund that Citron would collaborate with on ideas."<br><br>"Using full disclosures, short sellers have become an important facet of self-regulation of the markets."<br><br>and other statements giving the false impression that Defendants did not take compensation from hedge funds, and concerning Defendants' positions, stated price target and recommendation with respect to GE | $9 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9. | 07/17/19 | NVTA | Long Investor Letter | <u>Citron Capital 7/17/19 Investor Letter</u>: "Going into the second half of 2019, on the long side we're most excited about our position in Invitae (NVTA). While Invitae was a contributor to fund performance during 1H 2019, we continue to add to our position at current levels. … We see Invitae as the clear winner within the mega trend of the genetic testing market and expect the stock to trade to $100 in the next 24 months."<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to NVTA | | $28 |
| 10. | 07/31/19 | NVTA | Long Tweet and Report | <u>Citron Research 7/31/19 Tweet</u>: "In our letter to investors Citron expressed our excitement about $NVTA   The $EXAS acquisition of Genomic Health only makes us more certain that Invitae is on its way to $100.  Our investment thesis is most clearly stated here [link to report]"<br><br><u>Citron Research July 31, 2019 Report</u>:  Citron "will continue to stay long until the stock hits at least $65 as we believe it is on its way to $100."<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to NVTA | | $25 |
| 11. | 05/17/19 | BYND | Short Tweet and Media Statement | <u>Citron Research Tweet</u>: "$BYND has become Beyond Stupid.  Most heavily traded retail stock on Robinhood, market cap now bigger than industry, and superior competitor coming to market soon.  We expect $BYND to go back to $65 on earnings On retail exhaustion."<br><br><u>Citron Research Media Statement</u>: "Yes I shorted some today."<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to BYND | | options only |

| 12. | 01/08/19 | ROKU | Short Tweet | **Citron Research Tweet**: "We initially went long $ROKU at $35. However, have to recognize when the story has changed. APPLE TEAMING UP WITH SAMSUNG., (sic) ROKU CEO selling last week, and short interest at lows. Risk/reward no longer there. Expect big retracement. ROKU stock is uninvestable now"<br><br>**Citron Research Tweet**: "To clarify, we are watching $ROKU from the side  After successfully shorting ROKU as it traded as high as $50 in late 2017, we reversed our position at $35 last year. With Apple teaming up with Sams, LG, and Vizio investors must consider the risk to the bigger story."<br><br>and other statements concerning Defendants' positions and recommendation with respect to ROKU | $40 |
| --- | --- | --- | --- | --- | --- |
| 13. | 12/26/18 | FB | Long Tweet and Report | **Citron Research Tweet**: "$FB Backing up the sleigh.  $160 tgt.  Citron presents the only information that counts on $FB looking past the rhetoric. Would you rather have your kids addicted to Nicotine or Instagram?  Wall St answer will amaze you [link to report]"<br><br>**Citron Research Report**: Citron Research Backing Up the Sleigh on Facebook - 2019 S&P Stock of the Year<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to FB | $132 |

| 14. | 12/20/18 | TWTR | Short Tweet and Report | Citron Research Tweet: "$TWTR has become Harvey Weinstein of social media. Price tgt $20 Amnesty Intl study cannot be ignored by Wall St. or Madison Ave. $TWTR will be forced to clean up the site and will have a fast impact on MAU [link to report]"<br><br>Citron Research Report: "Twitter has become the Harvey Weinstein of Social Media - New Price Target -$20"; "Amnesty International Study makes Twitter "Toxic" to investors and advertisers"; when we read the just published piece from Amnesty International, we immediately knew the stock had become uninvestable"<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to TWTR | $29 |
| --- | --- | --- | --- | --- | --- |
| 15. | 12/04/18 | VEEV | Short Tweet | Citron Research Tweet: "$VEEV price target $65. Competition has arrived as multiple is at peak and short interest at low.  Same setup as $NVDA at $280.  A market correction will hit $VEEV harder than any other SaaS name.  Buyout off the table until $40"<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to VEEV | $92 |
| 16. | 11/20/18 | NVDA | Long Tweet | Citron Research Tweet: "Citron buys $NVDA. This is the first time in 2 years stock offers an appealing risk-reward to investors.  $NVDA still a player in AI and Data..will eat through inventory issue. We see $165 before we see 120.  Anyone remember this interview?  MUST WATCH [link to interview]"<br><br>and other statements concerning Defendants' positions, stated price target and recommendation with respect to NVDA | $151 |

| 17. | 10/23/18 | TSLA | Long Tweet and Report | Citron Research Tweet: "$TSLA dropping earnings on top of $F tomorrow might be a bad sign for shorts. After reviewing all recent info on $TSLA dominating its categories, Citron is LONG Telsa for this quarter.  Full report  [link to report]"<br><br>Citron Research Report: "Citron reverses opinion on Tesla.   The story has become too compelling to ignore." "Citron is long TSLA"<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to TSLA | $295 |
| 18. | 10/18/18 | PTE | Short Tweet and Report | Citron Research Tweet:  "FDA just opened of the kimono of $PTE and OMG.  In our shortest but most damning report of the year. We let the FDA do the talking as we present the one document Polarity tried to hide from investors Tgt- $2 [link to report]"<br><br>Citron Research Report: "PolarityTE:  This Game Is Over! Price Target -$2"PolarityTE has always had the signs of a stock scheme but now the FDA has proven it"; "we believe the stock is a ZERO."; "Sound like the company is bullshit?? Of course it does."<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to PTE | $12 |

| 19. | 10/04/18 | Namaste | Short Tweet and Report | Citron Research Tweet: "Citron proves without a doubt the fraud being committed at Namaste Tech $n $nxttf. This $700 mil company will be a 0 one (sic) regulators and accountants read. [link to report]"<br><br>Citron Research Report: "Citron has exposed complete FRAUD that underpins the 'Business' of Namaste. Namaste could be halted by the TSXV;" "Rarely in its history has Citron seen a fraud so blatant"<br><br>and other statements concerning Left's position, stated price target, recommendation and concealing Left's financial motivation with respect to Namaste | $1.1. million profit[2] |
| 20. | 10/02/18 | IGC | Short Tweet | First Citron Research Tweet: "$IGC. If you are able to short, it is a gift. No product. All hype. Raised Money 2 weeks ago at $1.15 Finger traders will get burned. This hype stock is the poster child of a cannabis bubble. Always cautious but nothing but air. Could write pages about this scheme"<br><br>Second Citron Research Tweet: "Correction. $IGC has raised money 3 times in 3 weeks at an average price of $3.31. At least the company is honest about the absurd move The stock should have a skull and crossbones at Fidelity. Just praying for more borrow to open up. Target price - $6 fast"<br><br>and other statements concerning Left's position, stated price target, recommendation and concealing left's financial motivation with respect to IGC | $12<br><br>$1.1. million profit[2] |

---

[2] Represents the approximate share of profits that Anson paid Left in connection with the Citron Research publications on Namaste and IGC.

| 21. | 09/14/18 | Namaste | Short Tweet and Report | First Citron Research Tweet: "Namaste $N Canada. Some cannabis stocks are overvalued, and some are total jokes.  This is a joke Drop it like its hot' after the pledge party prohibits listing in US, downside: 80%. That .50"<br><br>Citron Research Report: "New target price $0.25." If you own Namaste Technologies stock, in the opinion of Citron you better, "Drop it like it's hot" "This is the type of euphoria, hype and promotion that the SEC has been warning investors about"; "an income statement shows a company that looks like a frat house"<br><br>Second Citron Research Tweet:  "$N, Canada. urgent update: Quebec newspaper highlights Namaste's illegal activities and Quebec investigation in $N for violation of laws.  Tilray quickly drops $N, shareholders are next."<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to Namaste | $1.1 million profits[2] |
|---|---|---|---|---|---|
|  | 9/26/18 | Namaste | Media Statement | Citron Research Statement to the Media: During an interview on BNN Bloomberg, Left represented that he "would keep shorting Namaste until it goes to 0."<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to Namaste | $2 |

| 22. | 08/30/18 | CRON | Short Tweet, Report and Media Statement | Citron Research Tweet: "$CRON tgt price $3.5. Everything that is contaminated about the Cannabis space.  ALL HYPE with possible securities fraud. For full report go to [link to report]"<br><br>Citron Research Report: "The Dark Side of Cannabis Space. Target Price - $3.50"; "Cronos management appears to have been deceiving the investing public"; "What are you getting when you buy Cronos? Nothing more than fluff and distribution agreements."; Cronos' sky high valuation looks completely out of whack with fundamentals."<br><br>Citron Research Tweet: Andrew Left from Citron on CNBC Fast Money 5:25pm ET to discuss why $CRON is the most overhyped of all the "pot stocks" with a target price of $3.5<br><br>Citron Research Statement to the Media: During a CNBC interview, Left represented that he "took a small size position off today but I am still extremely short the stock"<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to CRON | $10 |
| 23. | 07/19/18 | ABBV | Short Tweet | Citron Research Tweet: "$ABBV the next great drug short. TGT price $60  Gottlieb's comments for biosimilars and the removal of safe harbor is a DIRECT hit on Abbvie's abuse of Humira. Citron to release a series of reports detailing the Dirty Money. POTUS, AMZN, and now FDA on the case $60 in 12 months"<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to ABBV | $89 |

| 24. | 05/31/18 | SNAP | Long Tweet and Report | Citron Research Tweet: "Citron puts a $17 tgt on $SNAP Time to spook shorts who have overstayed their welcome.  [link to report]"<br><br>Citron Research Report: "Citron Research Initiates Coverage on Snap Inc.  Target Price $17.  Time to Spook the Shorts who have overstayed their welcome"; "The most heavily shorted social media site offers a compelling opportunity for investors as even no news is good news"; "Citron will present a mosaic of what we believe to be the key points that are overlooked by shorts and why the stock is heading back to $17"; "See you back at $17"<br><br>Citron Second Tweet: Good Timing, just came out this morning from Pew Research, $SNAP Snapchat is now the social media app that teens use most often  $$$$$$ [link to news article]<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to SNAP | $13 |
| 25. | 05/02/18 | BABA | Long Tweet and Report | Citron Research Tweet:  "Citron will soon get back to "exposing" companies- but in the meantime we wanted to comment our bullish position on "the most shorted stock in the world"  [link to report]"<br><br>Citron Research Report:  "Citron Research is Bullish on the Most Shorted Stock in the World." "Alibaba on its way to $250"; "we will focus on what we believe to be some of the most compelling reasons why we have been and continue to be long Alibaba"; "How can you be short this???"; "Still scratching the head thinking who is short"<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to BABA | $182 |

| 26. | 03/27/18 | TWTR | Short Tweet and Report | Citron Research Tweet: "Citron short $TWTR. Near-Term target $25  Of all social media, they are most vulnerable to privacy regulation  Wait until Senate finds out what Citron has published. [link to report]"<br><br>Citron Research Report: "CITRON SHORT TWITTER $25 TARGET SHORT TERM"; "[We] are now short Twitter"; "Dynamics Are In Place to Short Twitter"<br><br>and other statements concerning Left's position, stated price target and recommendation with respect to TWTR | $29 |