**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE GIGACLOUD TECHNOLOGY INC SECURITIES LITIGATION | No. 1:23-cv-10645-JMF |
|---|---|
| | **CLASS ACTION** |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**GIGACLOUD TECHNOLOGY INC, LARRY LEI WU, XIN WAN,**
**KWOK HEI DAVID LAU, AND AEGIS CAPITAL CORP.'S**
**MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

    I.     Structure of the SAC ............................................................................................... 2

    II.    Background of GigaCloud and its IPO ................................................................... 3

    III.   Facts Relevant to Plaintiffs' AI Claims. ................................................................ 3

        A.    The Registration Statement Boasted About GigaCloud's use of AI in its Logistics. ............................................................................................... 3

        B.    Multiple Former GigaCloud Employees in Both China and the U.S. Stated that GigaCloud Did Not Use AI in its Logistics Operations. .......... 4

    IV.   Facts Relevant to Plaintiffs' Marketplace Activity Claims ................................... 5

        A.    GigaCloud's Registration Statement Attached Special Importance to GigaCloud Marketplace Transactions and Attracting Third-Party Buyers. 5

        B.    A Significant Percentage of GigaCloud 1P Revenue and GigaCloud Marketplace GMV was Generated From Purchases by Entities Closely Connected to GigaCloud. ................................................................................ 6

        C.    Additional Allegations Only Relevant to Exchange Act Claims. ............... 8

            1.    Scienter Allegations. ...................................................................... 8

            2.    The Truth About Marketplace Activity Was Revealed, Harming Investors. ........................................................................................ 9

ARGUMENT ...................................................................................................................... 10

    I.     Plaintiffs' AI Allegations State Securities Act Claims. ........................................ 10

        A.    Plaintiffs' Sufficiently Allege That GigaCloud Did Not Use AI in its Logistics ....................................................................................................... 10

        B.    GigaCloud Also Misrepresented That AI Provided it a Competitive Advantage ....................................................................................................... 13

    II.    Plaintiffs' Marketplace Activity Allegations State a Section 11 Claim. .............. 13

        A.    Defendants GigaCloud Marketplace Activity Statements Were Misleading. ..................................................................................................... 14

        B.    Defendants' Misrepresentations Were Material. ....................................... 16

    III.   Plaintiffs Also Plead an Exchange Act Claim Based on Marketplace Activity. .. 17

        A.    Defendants Misrepresented Marketplace Activity Throughout the Class Period. ............................................................................................................. 17

        B.    The SAC Establishes a Strong Inference of Scienter ............................... 18

          1.      The SAC Establishes Motive and Opportunity ............................. 18

          2.      The SAC Establishes Knowledge, or At Least Recklessness ....... 19

          3.      Defendants Cannot Offer a More Compelling Inference .............. 22

     C.      The SAC States a Scheme Liability Claim ............................................... 23

IV.     Defendants' Loss Causation Arguments Fail. ....................................................... 24

     A.      Pleading Loss Causation is not Necessary to State a Section 11 Claim. .. 24

     B.      Plaintiffs Plead Loss Causation for Their Exchange Act Claims. ............ 24

CONCLUSION ..................................................................................................................... 25

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)....................................................................................................25

*Afr. v. Jianpu Tech. Inc.*,
  2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022)........................................................................17

*Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*,
  2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) ........................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................................10

*Bishins v. CleanSpark, Inc.*,
  2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) .......................................................................24, 25

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
  547 F. Supp. 3d 439 (S.D.N.Y. 2021).....................................................................................17

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
  412 F. Supp. 3d 206 (E.D.N.Y. 2019) ....................................................................................19

*Cortina v. Anavex Life Scis. Corp.*
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ........................................................................22

*Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen
  Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019)..............................13

*Friedman v. Endo Int'l PLC*,
  2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ...........................................................................24

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)...........................................................................18

*Harris v. AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015)......................................................................................16

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)................................................................................................................10

*In re AppHarvest Sec. Litig.*,
  684 F. Supp. 3d 201 (S.D.N.Y. 2023)................................................................................11, 13

*In re Canopy Growth Sec. Litig.*,
    2024 WL 3445436 (S.D.N.Y. July 17, 2024). ..........................................................17

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ...................................................24, 25

*In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*,
    2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ............................................................12

*In re China Organic Sec. Litig.*,
    2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013)........................................................25

*In re Doral Fin. Corp. Sec. Litig.*,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008), *aff'd sub nom. W. Va. Inv. Mgt. Bd. v.
    Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009) ...............................................21

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023).....................................................................19

*In re Francesca's Holdings Corp. Sec. Litig.*,
    2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ........................................................13

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009)...............................................................14, 24

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009).....................................................................19

*In re Ideanomics, Inc., Sec. Litig.*,
    2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) ..........................................................25

*In re ITT Educ. Servs., Sec. Litig.*,
    34 F. Supp. 3d 298 (S.D.N.Y. 2014)........................................................................21

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) .........................................................13

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).........19

*In re Nevsun Res. Ltd.*,
    2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013).........................................................18

*In re Sequans Commc'ns S.A. Sec. Litig.*,
    2019 WL 4805072 (E.D.N.Y. Sept. 30, 2019) ........................................................20

*In re Signet Jewelers Ltd. Sec. Litig.*,
    389 F. Supp. 3d 221 (S.D.N.Y. 2019)......................................................................13

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012)......................................................................................23

*In re VEON Ltd. Sec. Litig.*,
2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).........................................................................23

*In re Winstar Commc'ns*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).............................................................................25

*In re XL Fleet Corp. Sec. Litig.*,
2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)......................................................................17, 20

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
2024 WL 451691 (S.D.N.Y. Feb. 5, 2024)...............................................................................21

*Janbay v. Canadian Solar, Inc.*,
2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) .........................................................................20

*Jiajia Luo v. Sogou, Inc.*,
465 F. Supp. 3d 393 (S.D.N.Y. 2020)......................................................................................12

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. C. States, Se. and Sw.
Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d
Cir. 2013) ................................................................................................................................16

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006)......................................................................................18

*Lea v. TAL Educ. Grp.*,
837 F. App'x 20 (2d Cir. 2020) ...............................................................................................25

*Lewy v. SkyPeople Fruit Juice, Inc.*,
2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012).........................................................................14

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011)......................................................................................10, 16, 17

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)....................................................................................................24

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
518 F. Supp. 3d 772 (S.D.N.Y. 2021)......................................................................................21

*Marcu v. Cheetah Mobile Inc.*,
2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..........................................................................20

*Metz v. U.S. Life Ins. Co. in City of N.Y.*,
662 F.3d 600 (2d Cir. 2011)....................................................................................................10

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)......................................................................................14

*Meyer v. Organogenesis Holdings Inc.*,
   2024 WL 1346432 (E.D.N.Y. Mar. 29, 2024) ...........................................................19

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013)............................................................................10, 11, 13

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)......................................................................................10

*Noto v. 22nd Century Grp., Inc.*,
   650 F. Supp. 3d 33 (W.D.N.Y. 2023) ........................................................................23

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996).............................................................................................11

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) .............................................................20

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ........................................................................................24

*Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) .............................................................19

*Reilly v. U.S. Physical Therapy, Inc.*,
   2018 WL 3559089 (S.D.N.Y. July 23, 2018) ............................................................19

*Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................................14

*Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)..........................................................................12, 16, 19

*Saskatchewan Healthcare Emp's. Pension Plan v. KE Holdings Inc.*,
   2024 WL 775195 (S.D.N.Y. Feb. 26, 2024)..........................................................22, 25

*Schiro v. Cemez, S.A.B. de. C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019).........................................................................13

*SEC v. CKB168 Holdings, Ltd.*,
   210 F. Supp. 3d 421 (E.D.N.Y. 2016) ........................................................................23

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   417 F. Supp. 3d 379 (S.D.N.Y. 2019).........................................................................15

*Software Techs. Ltd. Sec. Litig.*,
  2022 WL 596861 (S.D.N.Y. Feb. 25, 2022).............................................................................16

*Szulik v. Tagliaferri*,
  966 F. Supp. 2d 339 (S.D.N.Y. 2013)...................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................................18

*Yi Xiang v. Inovalon Holdings, Inc.*,
  254 F. Supp. 3d 635 (S.D.N.Y. 2017)....................................................................................24

**Statutes**

15 U.S.C. §§ 77a.............................................................................................................. *passim*

15 U.S.C. §77k.......................................................................................................1, 10, 13, 24

15 U.S.C. § 78a................................................................................................................ *passim*

PSLRA .........................................................................................................................................25

**Rules**

Fed. R. Civ. P. 8.........................................................................................................................10

Fed. R. Civ. P 9(b) ............................................................................................................10, 11, 13

Fed. R. Civ. P. 12(b)(6)...............................................................................................................10

**Other Authorities**

17 C.F.R. § 240.10b5-1(c)(1)(i)(A) ...........................................................................................19

**INTRODUCTION**

GigaCloud Technology Inc. ("GigaCloud" or the "Company") runs on online business-to-business marketplace called "GigaCloud Marketplace." Defendants made misstatements in two areas: GigaCloud's use of Artificial Intelligence ("AI") and activity on GigaCloud Marketplace.

*AI.* Plaintiffs' AI-related claims are only under the Securities Act of 1933 ("Securities Act"). Section 11 of the Securities Act imposes *strict liability* for misstatements in registration statements. Here, GigaCloud made numerous statements touting AI in its logistics. Statements by multiple former employees from both China (where GigaCloud's technology department was located) and the U.S., including a software engineer and the President of U.S. Operations, show that these statements were false because GigaCloud does not actually use AI in its logistics. These witnesses must be credited on a motion to dismiss. Plaintiffs state a Section 11 claim.

*Marketplace Activity.* Plaintiffs bring claims under both the Securities Act and Securities Exchange Act of 1934 ("Exchange Act") for misleading investors as to the nature of the transactions on GigaCloud Marketplace. GigaCloud touted revenue from and Gross Merchandise Value ("GMV") transacted on its marketplace without disclosing that a significant portion of the revenue it reported from selling its own products on GigaCloud Marketplace (*50%, according to it former President of U.S. Operations*) was from sales to companies managed by current or former GigaCloud employees and, in many cases, founded by high-level GigaCloud insiders. Furthermore, Defendants gave reasons for the growth of those statistics and explained why GigaCloud sold its own products on its Marketplace while making the same omission.

Evidence of the Defendants' scienter is strong. Among other things, Defendant Wu, the Company's founder and CEO, who sold almost *$42 million* in stock during the Class Period, *personally* founded at least two of the entities used for GigaCloud's closely connected company buying scheme and he had weekly calls with 20 to 50 of the closely connected entities that

1

purchased the most from GigaCloud on its Marketplace. Defendant Wan also founded one of the entities used in the scheme. Defendants' arguments about loss causation are also wrong — the type of short-seller reports at issue are routinely accepted as corrective disclosures in this Circuit.

## STATEMENT OF FACTS

### I.    Structure of the SAC

*First*, the Second Amended Complaint ("SAC", cited "¶_," ECF No. 88) asserts claims for two classes of GigaCloud stock purchasers. It asserts strict liability and negligence under the Securities Act for purchases traceable to the Company's Registration Statement for its August 18, 2022 IPO.[1] ¶¶8-202. It separately asserts fraud claims under the Exchange Act for purchasers from August 18, 2022 to May 22, 2024 against Defendants GigaCloud, Wu, Lau, and Wan. ¶¶203-451.

*Second*, the SAC asserts claims on two different subjects. *First*, under **only** the Securities Act, it brings claims about AI. ¶¶53-82. Since the Securities Act does not require it, the SAC makes no effort to plead scienter or loss causation for the AI claims. The misstatements for the AI claims are in ¶¶128-42.[2] *Second*, under both the Securities Act and Exchange Act, it brings claims concerning GigaCloud Marketplace activity. For those, the SAC separately lays out the allegations (¶¶83-126) and misstatements (¶¶143-77)[3] for the Securities Act and the additional allegations (¶¶203-18, 357-434) and misstatements (¶¶219-356) only relevant to the Exchange Act.

---

[1] The Securities Act Defendants are: GigaCloud; Larry Lei Wu ("Wu"), founder and CEO; Kwok Hei David Lau ("Lau"), CFO; Xin Wan ("Wan"), CTO; GigaCloud's directors at the time of the IPO; and Aegis Capital ("Aegis"), sole underwriter of the IPO. ¶¶20-30. Capitalized terms have same meaning as in the SAC. Unless otherwise noted, emphases are added and internal citations and quotations are omitted. "MTD" is Defendants' brief in support of dismissal. ECF No. 96.

[2] Appendix A to MTD wrongly asserts ¶¶49, 55, 57, 58, 61, 62, and 66 are alleged misstatements.

[3] Appendix A to MTD wrongly asserts ¶¶83, 85, 89, 125, and 359 are alleged misstatements.

## II.    Background of GigaCloud and its IPO

Defendant Wu founded GigaCloud's predecessor company in 2006, and entered the U.S. by acquiring Comptree Inc. ("Comptree") in 2014. ¶48. The Company launched its business-to-business online marketplace, "GigaCloud Marketplace," in 2019 and changed its name to GigaCloud and Comptree's to GigaCloud Technology (USA) Inc. in 2021. ¶¶48-49. GigaCloud Marketplace, which specializes in large parcels (primarily furniture) and connects manufacturers, mostly in Asia, with resellers in the U.S. and elsewhere, is the core of GigaCloud's business. ¶50. GigaCloud received net proceeds of $34.2 million from its IPO, completed August 22, 2022. ¶52.

## III.    Facts Relevant to Plaintiffs' AI Claims.

### A.    The Registration Statement Boasted About GigaCloud's use of AI in its Logistics.

GigaCloud's IPO Registration Statement boasted repeatedly about the Company's use of AI in its logistics operation and how important and effective it was for attracting third-party buyers and sellers to GigaCloud Marketplace, which was key to the Company's future growth. ¶¶55-66. The "**Overview**" of the "**PROSPECTUS SUMMARY**," on page 2 of the Prospectus, stated that GigaCloud has "AI, that generates seller ratings and credit profiles through volume data," "optimizes routing by organizing incoming orders and rebalancing inventory levels within our warehousing network," and that it "leverage[s]" that "AI to accelerate the network effects in [its] marketplace" ¶129 (emphasis in original). The Prospectus Summary also lists "Data Intelligence powered by AI" under "**Our Strengths**" (emphasis in original). ¶131.

The Prospectus further listed "*Data Intelligence Powered by AI*" under "**Competitive Strengths**" and "*AI Algorithm and Data Analysis*" under "**Logistics Network and Value Added Services**" and made claims about how GigaCloud used AI to optimize inventory management under those headings. ¶¶135, 139 (emphasis in original). It further claimed: "Our AI-powered

3

warehousing management system solves the many practical problems faced by sellers and buyers …with complex, cross-border transactions" and admitted that "software such as *our AI…are critical to our reputation and our ability to acquire and retain customers*" and "unavailability of . . . our logistics algorithm would reduce the volume of GMV." ¶¶61-62, 137.

Aegis' first analyst report following GigaCloud's IPO showed the importance of GigaCloud's AI representations to investors, stating that its AI optimization software was important and effective in recruiting sellers and increasing sales on GigaCloud Marketplace. ¶66.

### B. Multiple Former GigaCloud Employees in Both China and the U.S. Stated that GigaCloud Did Not Use AI in its Logistics Operations.

Three former GigaCloud employees—a Java Development Engineer (FE-1) and two Supply Chain Managers (FE-2 and FE-3)—who worked for the Company in Suzhou, China, where its technology development is based, said there was no AI used in GigaCloud's logistics. ¶67. FE-1, who worked as *a member of the team that developed the software that handled logistics* for GigaCloud's U.S. warehouses and the distribution of the Company's inventory, stated that "*No AI technology was involved*" in GigaCloud's logistics. ¶¶68-69. FE-2 liaised with e-commerce businesses that purchased from GigaCloud and resold those products. ¶70. FE-2 stated that "*AI technology is not used*" in GigaCloud's logistics and said *its logistics system relied on manual computations* of existing data and required at least 100 IT employees to maintain. ¶¶71-72. He said that if GigaCloud's logistics system had used AI, fewer people would have been needed and its capacity and accuracy would have improved. *Id.* FE-3, who managed relationships with over 30 furniture suppliers, stated that "*AI technology was not being developed*" and that "GigaCloud is not a technology company" and "does not rely on technology to create value." ¶¶73-74

The former Suzhou employees' statements were further corroborated by former U.S. based employees. FE-4, *who was the President of GigaCloud's U.S. Operations*, stated that GigaCloud

4

used "AI" and "Machine Learning" as "buzzwords," but, in reality, GigaCloud's warehouse management system was not state-of-the-art and would have been found in most warehouse operations. ¶76. FE-5, GigaCloud's former Business Development Director, never heard about GigaCloud using AI even though he was responsible for persuading U.S. furniture stores to use GigaCloud Marketplace to source furniture. ¶¶78-79. Finally, FE-6, who held multiple positions at GigaCloud over several years, saw no evidence of AI technology, noting that optimization decisions for warehouse placement would take days and did not appear to be automated. ¶81.

## IV.   Facts Relevant to Plaintiffs' Marketplace Activity Claims

### A. GigaCloud's Registration Statement Attached Special Importance to GigaCloud Marketplace Transactions and Attracting Third-Party Buyers.

GigaCloud purportedly launched GigaCloud Marketplace to shift its business away from selling its merchandise directly to end customers on third-party ecommerce sites. ¶83. GigaCloud Marketplace generates revenue in two different ways. *First*, GigaCloud generates product revenue by selling its own merchandise to buyers on the Marketplace who then resell it to individual customers — "GigaCloud 1P" transactions. ¶50. *Second*, it generates service revenue by facilitating transactions between third-party sellers and buyers on the Marketplace — "3P" transactions. *Id.* At the time of GigaCloud's IPO, GigaCloud 1P accounted for around two-thirds of its revenue from the GigaCloud Marketplace. ¶¶86-87. GigaCloud also continued to sell inventory directly to consumers through other ecommerce websites, such as Amazon, and reported it as "off-platform ecommerce," since GigaCloud Marketplace was not involved. *Id.*

Even though GigaCloud 1P and off-platform ecommerce are both GigaCloud selling its own merchandise, GigaCloud's Prospectus made it clear that the distinction was important by dividing GigaCloud's revenue and GMV based on whether the transaction was on GigaCloud Marketplace. ¶¶84, 86-87. GigaCloud reports 3P and GigaCloud 1P as a single GigaCloud

Marketplace GMV without breaking down what portion comes from each type of transaction and listed it as a "key" metric. ¶87. It reports off-platform ecommerce GMV separately. *Id.*

GigaCloud repeatedly stated in its Prospectus that it sold its own merchandise on the GigaCloud Marketplace for reasons beyond the revenue it generated, stating it sold its own inventory on the Marketplace to, among other things, "enhance our marketplace experience" and "give[] us insights into seller needs." ¶¶144, 156, 166. It further claimed that Marketplace GMV "reflects our ability to attract…buyers in the GigaCloud Marketplace" (¶¶158; *see also* ¶¶152, 162), and the Marketplace was "attractive to buyers because we minimize inventory risk" (¶164).

**B. A Significant Percentage of GigaCloud 1P Revenue and GigaCloud Marketplace GMV was Generated From Purchases by Entities Closely Connected to GigaCloud.**

The Company's GigaCloud 1P Revenue and Marketplace GMV were not what they seemed. Grizzly Research LLC ("Grizzly") published a detailed report ("Grizzly Report," attached as Exhibit A to the SAC), based on documentary evidence and former employee statements showing that a significant number of ostensibly independent third-party buyers on the GigaCloud Marketplace were actually closely connected to GigaCloud. ¶¶91-95. Plaintiffs corroborated the Grizzly Report with their own investigation. Grizzly found that the key characteristics of the undisclosed closely connected buyers were: (1) creation and control by current or former GigaCloud employees; (2) shell companies only for distribution; (3) no import records and appear to exclusively source from GigaCloud; (4) business addresses associated with GigaCloud; and (5) online storefronts indicating revenue of tens of millions for each entity. ¶93.

Plaintiffs' interviews with former GigaCloud employees confirms Grizzly's findings. FE-7, GigaCloud's former Director of Business Development, stated: "*[M]ost of the transactions [on the GigaCloud Marketplace] are coming from within the company*….[T]hey are mainly sister companies buying and selling from each other, which illustrates that the marketplace is showing

lots of revenue." ¶96. FE-4, the former President of GigaCloud's U.S. Operations, stated that a network of buyer entities on GigaCloud Marketplace managed by *current* or former GigaCloud employees accounted for **more than 50% of GigaCloud 1P revenue**. ¶97. FE-4 was on weekly calls with 20 to 50 of the entities with the largest volume of purchases and said that there were at least 200 closely connected ones with large purchase volumes on GigaCloud Marketplace. *Id.*

The Grizzly Report identified six closely connected entities,[4] corroborating what witnesses described and providing documentary evidence, which Plaintiffs verified. The six companies appeared on a November 2020 lien financing statement that included disclosed GigaCloud subsidiaries, Comptree and Tmall, Inc ("Tmall"), as co-debtors. ¶100. The six entities had the following characteristics. *First*, all but Compthunder were formerly under explicit control of high-level GigaCloud officers: Orien Life and CompHome (Defendant CEO Wu and Joseph Huang, GigaCloud's former CFO); Steven Roger Digital (Defendant CTO Wan and Xinyan Hao, GigaCloud's COO), General Sherman (Hao); and Comp Goods (Joseph Huang). ¶¶102, 108, 112, 115, 118. *Second*, the six entities are all now run by a current or former GigaCloud employee or a close affiliate of the Company. ¶¶103-04, 109-11, 113, 116, 119, 121. Control of Steve Roger Digital, General Sherman, and Comp Goods was transferred to less visible GigaCloud employees, but they used the same addresses as GigaCloud officers and Compthunder's address is in the same building as GigaCloud subsidiary Tmall. ¶¶112, 115, 118, 122. *Third*, they all sell a large volume of products from GigaCloud Marketplace. CompHome sells millions of dollars of products bought on GigaCloud Marketplace on Wayfair. ¶¶109-11. The other entities sell hundreds of products, with trademarks owned by GigaCloud or sold on GigaCloud Marketplace, costing hundreds of

---

[4] *I.e.*, Orien Life Corp. ("Orien Life"), CompHome Corp. ("CompHome"), Steve Roger Digital Consultation LLC ("Steve Roger Digital"), General Sherman Int'l Inc. ("General Sherman"), Comp Goods Corp. ("Comp Goods"), and Compthunder Int'l Inc. ("Compthunder"). ¶98.

dollars on Amazon storefronts,. ¶¶107, 114, 117. 120, 122. The name of Compthunder's Amazon storefront, Polibi, *is itself a GigaCloud trademark*. ¶122. Orien Life, which sells more than 3,000 products on its Amazon storefront, shares a phone number with Comptree. ¶¶105, 107. Also, FE-6 said that a GigaCloud employee named Martin managed Orien Life and it was so closely connected to GigaCloud that FE-6 thought it was a GigaCloud brand. ¶106. Plaintiffs' investigation uncovered an additional closely connected buyer entity, Shenzhenshi Ziyu Wangluokeji Youxiangongsi, that had the same hallmarks, including an Amazon storefront named with a GigaCloud registered trademark and had the address of one of GigaCloud's Chinese entities. ¶¶123-24.

Finally, GigaCloud's response to Grizzly stated that GigaCloud had disclosed all related-party transactions, but did not deny the connections to GigaCloud described above. ¶¶125-26.

**C. Additional Allegations Only Relevant to Exchange Act Claims.**

Defendants continued to misrepresent the nature of GigaCloud Marketplace transactions throughout the Class Period. *See* ¶¶219-356; Pls.' Appendix A, filed herewith.

**1. <u>Scienter Allegations.</u>**

*Motive. First*, the Exchange Act Defendants touted Marketplace GMV and were, therefore, motived to arrange for nominally third-party entities to act as buyers to inflate it and other metrics. According to FE-7, "sister companies buying and selling from each other" was done to "***pump up the marketplace***." ¶¶358-60. Wu (***almost \$42 million in proceeds***), Wan (\$4 million), and Lau (\$79,879.50) reaped enormous profits from stock sales during the Class Period. ¶¶207, 361-64. Wu's sales were pursuant to a 10b5-1 plan, but the plan was adopted during the Class Period and he sold 93% of the shares covered by the plan within a brief two-month period. ¶362.

***Intentional or Reckless Behavior.*** Defendant Wu formerly explicitly controlled connected buyers Orien Life and CompHome and the same was true of Defendant Wan and Steve Roger

Digital. ¶¶365-66, 382. Wu also participated in weekly calls with 20 to 50 buyers on the GigaCloud Marketplace that were managed by current or former GigaCloud employees. ¶376. FE-4, the former President of U.S. Operations, stated that GigaCloud was "centralized" around Wu as the "ultimate decision-maker," that Wu "was involved in all significant decisions, and even insignificant decisions," and the closely connected buyer scheme "wouldn't have happened without…[Wu] giving the go-ahead." ¶377.

As CFO, Defendant Lau had plenary access to information about GigaCloud's finances and he told investors that he had "real-time visibility of [GigaCloud's] operations." ¶379. Lau also spoke in great detail about the operations of the GigaCloud Marketplace. ¶380.

The reaction of the Exchange Defendants to the short seller reports also supports scienter. After the Culper Report revealed the connection between GigaCloud and Orien Life, GigaCloud Venture (the entity that connected them) was deregistered — the Exchange Act Defendants were trying to cover their tracks. ¶¶384-85. Further, when the Culper and Grizzly Reports were issued, GigaCloud conspicuously did not deny the closely connected company allegations. ¶¶386-90.

### 2. The Truth About Marketplace Activity Was Revealed, Harming Investors.

*First*, when Culper Research published the Culper Report on the morning of September 28, 2023, it partially revealed the truth by disclosing that Orien Life had been incorporated with Defendant Wu as President and Joseph Huang as treasurer and ran several furniture-oriented storefronts and there were also other undisclosed entities connected to GigaCloud insiders. ¶¶402-11. On this news, GigaCloud's shares fell $1.78 from its $9.47 closing price on September 27, 2023, or more than 18%, to close at $7.69 on September 28, 2023. ¶409. *Second*, on May 22, 2024, before the market opened, Grizzly Research issued the Grizzly Report, revealing GigaCloud's scheme to use closely connected companies to inflate GigaCloud 1P Revenue and GigaCloud Marketplace GMV. ¶410. On this news, GigaCloud's shares fell $1.62 from its $31.45 closing

9

price on May 21, 2024, or more than 5.15%, to close at $29.83 on May 22, 2024. ¶411.

## ARGUMENT

On a Rule 12(b)(6) motion, the Court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in City of N.Y.*, 662 F.3d 600, 602 (2d Cir. 2011). A complaint need only "contain sufficient factual matter…to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I.    Plaintiffs' AI Allegations State Securities Act Claims.

Section 11 holds liable any signer, director, and underwriter if the issuer's registration statement contains an "untrue statement of a material fact or omitted to state a material fact…necessary to make…statements… not misleading." 15 U.S.C. § 77k(a). Section 11 is governed by Rule 8 notice pleading, *see N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013), "impose[s] essentially strict liability for material misstatements [and omissions]," and do not require scienter or loss causation. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 148, 156 (2d Cir. 2012). The burden is "relatively minimal." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

This is no credible argument that Rule 9(b) applies to the AI misstatements since Plaintiffs do not bring Exchange Act claims based on AI. In Defendants' cases, Exchange Act claims were brought on the same subject as the Securities Act misstatements at issue. *See* MTD at 8 n.10.

### A.  Plaintiffs' Sufficiently Allege That GigaCloud Did Not Use AI in its Logistics

Defendants argue that Plaintiffs overstate the prominence of AI in GigaCloud's Registration Statement, which is a materiality argument. A complaint may not be dismissed "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011)

10

(omission in original).[5] GigaCloud's AI statements clear this low bar given: (1) the statements about AI in the Prospectus Summary, (2) the Company highlighting AI as a "Competitive Strength," (3) GigaCloud's warning that AI was one of the things "critical to [GigaCloud's] reputation and…ability to acquire and retain customers," and (4) Aegis' discussion of AI in its analyst report. *See* pp. 3-4, *supra*.

Defendants' only other argument is to impermissibly deny allegations drawn from interviews with GigaCloud's former employees, which must be accepted as true and construed in the light most favorable to plaintiffs. *Royal Bank of Scotland*, 709 F.3d at 121 (holding that "factual content" described by former employees must be accepted as true on a motion to dismiss); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023) (even under the higher Rule 9(b) pleading standard for Exchange Act claims plaintiff could rely "almost exclusively" on anonymous former employees to show falsity and the court must take their statements as true).

Defendants misrepresent the allegations about FE-1, claiming he did not work in an area where the Company stated it used AI. MTD at 10. This is false —FE-1 "developed software to handle logistics for [GigaCloud's] U.S. warehouses and monitor the distribution of the Company's inventory." ¶68. GigaCloud specifically claimed it used AI in its warehouse logistics. *See* ¶¶129, 135, 137, 139. This description of FE-1's position "easily 'support[s] the probability' that [FE-1] would have the alleged knowledge" that GigaCloud did not use AI in its logistics. *Royal Bank of Scotland*, 709 F.3d at 124 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

FE-2 was a Supply Chain Manager, whose "primary responsibility was to liaise with e-

---

[5] Defendants' case, *Olkey v. Hyperion 1999 Term Tr., Inc.,* 98 F.3d 2, 5 (2d Cir. 1996), concerns the bespeak caution doctrine, not materiality. Furthermore, contrary to Defendants' contention (MTD at 9 n.12), all the challenged statements specifically claim that GigaCloud used AI (¶¶129-41) and AI is clearly defined in the SAC (¶53). GigaCloud's own former employees believed the Company used the term "AI" in a misleading way. ¶¶67-82.

11

commerce businesses that purchased from GigaCloud" (¶70), not a someone who "recruit[ed] buyers and sellers" as Defendants claim (MTD at 9). FE-2 *does describe* GigaCloud's technology, stating that its logistics system did not use AI and instead "relied on manual computations of existing data and, because of that, required at least 100 IT employees to maintain it." ¶72.[6] It stands to reason that a Supply Chain Manager is knowledgeable about the software and systems that help efficiently manage and optimize the supply chain. Defendants' only response is speculation about where GigaCloud's ERP system is discussed in the Prospectus and inappropriate extrinsic evidence about other ERP systems. MTD at 11. FE-3, another Supply Chain Manager, further corroborated the other Suzhou, China based FEs by adding a third unequivocal statement that GigaCloud did not us AI in its logistics. ¶¶73-74.

The U.S. based FEs corroborate the statements of Suzhou based ones.[7] Given that FE-4 was the ***President of GigaCloud's U.S. Operations***, his observations about the lack of sophistication of GigaCloud's warehouse operations and inventory management should be given significant weight. ¶¶76-77. FE-5's statements that he never heard about GigaCloud using AI and never used them to pitch third-party buyers and sellers seems inexplicable given the Prospectus' claims about the advantages it conferred on those third parties (*see* pp. 3-4, *supra*), but it makes sense if GigaCloud's logistics did not actually use AI. ¶¶78-79.[8] FE-6's experience with

---

[6] *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 414-15 (S.D.N.Y. 2020), was based on the statements' wording and timing of decisions, not on the detail of allegations about technology.

[7] *In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016), is not applicable since FE-1, FE-2, and FE-3 were all in Suzhou, where GigaCloud's technology development was based. ¶¶67-74.

[8] The Court should disregard Defendants' argument about when FE-4 and FE-5 left GigaCloud. MTD at 10. The AI misrepresentations are in the Registration Statement, which became effective when FE-5 worked at GigaCloud. ¶78. FE-4 left the Company only three months earlier (¶76), and the idea that GigaCloud suddenly built AI systems during that time is absurd. *See Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("[T]he Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in

optimization decisions for warehouse placement, which were supposedly powered by AI, taking days, further corroborates the statements of the other FEs. ¶81.

Since a "'comprehensive survey of employees is not needed at the pleading stage,'" the former employee allegations in the SAC are sufficient to plead falsity, and therefore a Section 11 claim. *AppHarvest*, 684 F. Supp. 3d at 262 (quoting *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010)); *see also Royal Bank of Scotland*, 709 F.3d at 123-124.[9]

### B.  GigaCloud Also Misrepresented That AI Provided it a Competitive Advantage

GigaCloud not only misrepresented that it used AI in its logistics, but also that it provided the Company a competitive advantage. *See* ¶131 ("Our Strengths"); ¶135 ("Competitive Strengths"). Those statements are false for the additional reason that, as stated by FE-4, GigaCloud's warehouse management was not state of the art and was similar to most other warehouse operations. ¶76; *see also* ¶74 (FE-3); ¶81 (FE-6); *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (statements are not puffery when "clearly designed to distinguish the company to the investing public in some meaningful way").

### II.    Plaintiffs' Marketplace Activity Allegations State a Section 11 Claim.

Rule 9(b) pleading standards also do not apply to the Section 11 marketplace activity

---

a subsequent period."). Furthermore, GigaCloud made the same AI claims in draft registration statements starting in May 2021. Declaration of Jonathan D. Park ("Park Decl.") filed herewith, Ex. 1. Notably, GigaCloud's draft Registration Statements filed May 21, 2021 through June 10, 2022 listed BofA and Wells Fargo, represented by Davis Polk, as underwriters. Just before the IPO, on July 8, 2022, they were replaced by Aegis, represented by Kaufman & Canoles, P.C. *Id. In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at \*14 (S.D.N.Y. Mar. 31, 2015), concerned a development occurring after the former employee left.

[9] Defendants' other cases are also inapposite. In *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at \*4 (S.D.N.Y. July 31, 2013), the former employee statements were for a complaint filed by separate counsel and *Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019), and *Schiro v. Cemez, S.A.B. de. C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019), both analyzed scienter, which is irrelevant for Section 11.

claims because Plaintiffs "exercise[d] sufficient care in the drafting of a complaint to allow a court to evaluate Securities Act claims independently from Exchange Act claims." *Lewy v. SkyPeople Fruit Juice, Inc*., 2012 WL 3957916, at *9 (S.D.N.Y. Sept. 10, 2012); *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) ("[C]ourts have consistently held that Section 11…[is] subject to notice pleading where…the division between the claims is clear."). In any event, Plaintiffs allegations easily meet either standard.

### A.  Defendants GigaCloud Marketplace Activity Statements Were Misleading.

Plaintiffs' theory is not that Defendants failed to disclose "related party transactions." The term "related party" appears in the SAC only when quoting Culper, Grizzly, and Defendants themselves. Defendants' attacks on this strawman are irrelevant. Rather, the SAC alleges that Defendants misled investors by portraying GigaCloud Marketplace as a thriving operation attractive to third-party buyers while omitting that a significant amount of GigaCloud 1P revenue and GigaCloud Marketplace GMV was generated by companies run by GigaCloud's current and former employees, including companies that Defendants themselves created. ¶¶90-126.

When Defendants spoke at length about GigaCloud Marketplace GMV and GigaCloud 1P revenue and provided reasons for the Company's performance in those metrics, they assumed "a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). The "literal truth" of a statement is "insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Id.* at 250-51; s*ee also In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 569 (S.D.N.Y. 2009*)* (user numbers misleading due to failure to disclose users hired by third-party companies).[10]

---

[10] *Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, 2020 WL 6063539, at *5-6 (S.D.N.Y. Oct. 14, 2020), is not applicable; that company warned of relisting (the omitted fact) in its disclosures and there were no concrete plans to relist at the time of the statements.

Defendants failed to tell the whole truth. Defendants boasted about growth in GigaCloud Marketplace GMV and 1P revenue repeatedly without disclosing a significant portion of it was driven by buyers that were managed by former and even current GigaCloud employees. ¶¶146, 150, 154, 160, 168, 170-72, 174-76. They further claimed growth in GigaCloud Marketplace GMV reflected the Company's "ability to attract and retain sellers and buyers in the GigaCloud Marketplace" (¶158; *see also* ¶¶152, 160, 162 (similar)) and that the GigaCloud Marketplace was "attractive to buyers because we minimize inventory risk" (¶164; *see also* ¶152) without disclosing that many buyers were "attract[ed]" to the Marketplace because of those preexisting ties.

Defendants also told investors that GigaCloud sold its own 1P inventory on GigaCloud Marketplace "[t]o enhance [the] marketplace experience" (¶¶144, 156) and give GigaCloud "insights into seller needs" (¶166). "[A] reasonable investor could read [Defendants' statements] and conclude that" GigaCloud conducted 1P sales on GigaCloud Marketplace "*only*" for these purposes while, "in reality," the SAC plausibly alleges that GigaCloud conducted 1P sales on GigaCloud Marketplace with companies closely connected to it in order to boost GigaCloud Marketplace's GMV and revenue to make it appear more successful than it was. *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 413 (S.D.N.Y. 2019) (misleading for company to state it used a process to manage credit exposure when it also used that process for liquidity).

Furthermore, Defendants' self-imposed division of 1P revenue from GigaCloud's sales of its own inventory into "GigaCloud 1P" revenue and "Off-Platform ecommerce" revenue created the materially false impression that the former reflected sales to true third-party entities and organic activity on GigaCloud Marketplace. ¶¶148, 150, 170-72. Defendants misinterpret plaintiffs as arguing that GigaCloud should have actually categorized the sales to closely connected entities as "Off-Platform ecommerce," but that is incorrect — Plaintiffs instead argue that the omission that

15

so many of the sales were to closely connected companies gave a materially misleading impression

of what the categories of GigaCloud 1P and Marketplace GMV meant.[11]

### B. Defendants' Misrepresentations Were Material.

As discussed above, a complaint cannot be dismissed based on materiality unless the

misstatements or omissions are so "unimportant to a reasonable investor that reasonable minds

could not differ on the question of their importance." *Blackstone*, 634 F.3d at 717.

Materiality is clearly pled here because FE-7, GigaCloud's Director of Business

Development from May 2021 to October 2023, stated that "***most*** of the transactions are coming

from within the company," corroborating the former President of U.S. Operations' report that ***at***

***least 50% of GigaCloud 1P revenue*** was generated by purchases on GigaCloud Marketplace by

companies managed by current or former GigaCloud employees. ¶¶96-97. As discussed in § I.A,

the statements must be accepted as true on a motion to dismiss. Although FE-4 left his position,

on May 2022, three months before GigaCloud's Registration Statement became effective, his

statements should be credited since "the Second Circuit has held that allegations concerning

activity in one period can support an inference of similar circumstances in a subsequent period."

*Blanford*, 794 F.3d at 307. The case for that is particularly true here where FE-4 is corroborated

by FE-7 who indicated the GigaCloud's practices continued unabated after FE-4 left. *See Software*

*Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *8 (S.D.N.Y. Feb. 25, 2022) (crediting FE who left

before the class period when corroborated by FE from the Class Period).

FE-4 and FE-7 are corroborated by the lien financing statement listing acknowledged

---

[11] *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 170-71 (S.D.N.Y. 2015) and *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 180 (S.D.N.Y. 2012), *aff'd sub nom. C. States, Se. and Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013), addressed alleged GAAP violations; they do not hold that a statement must violate GAAP to be misleading.

GigaCloud subsidiaries along-side the undisclosed closely connected companies (¶100 and Ex. B to SAC),[12] and documentary evidence and FE testimony about individual closely connected companies that bought large volume of goods from GigaCloud on the GigaCloud Marketplace (¶¶102-24). Further, the Grizzly Report alleges that the network of closely connected buyers was large and clearly material, and GigaCloud did not deny those allegations. ¶125; *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at \*5 (S.D.N.Y. Feb. 17, 2022) (crediting confidential sources corroborated by short report allegations that defendants "did not deny").

Fifty percent far exceeds the 5% threshold the Second Circuit has set forth "as an appropriate 'starting place'" for materiality. *Blackstone*, 634 F.3d at 713. Furthermore, contrary to Defendants' contention, the SAC alleges specific "entities" that Defendants and other GigaCloud employees created and managed, identifies those executives and employees, and provides granular detail about the products that GigaCloud sold to those entities. *Cf. Afr. v. Jianpu Tech. Inc.*, 2022 WL 4537973, at \*8 (S.D.N.Y. Sept. 28, 2022).[13]

### III.    Plaintiffs Also Plead an Exchange Act Claim Based on Marketplace Activity.

#### A.  Defendants Misrepresented Marketplace Activity Throughout the Class Period.

Throughout the Class Period, the Exchange Act Defendants continued to mislead investors by (1) contrasting between GigaCloud 1P revenue and Off-Platform ecommerce revenue without disclosing the large volume of sales to the closely connected companies, (2) purporting to explain why GigaCloud sold its own inventory on GigaCloud Marketplace, (3) boasting about

---

[12] Defendants submitted the SAC as an exhibit without including the lien statement or the Grizzly Report, which were both attached to the SAC as exhibits.

[13] In *Boluka Garment Co., Ltd. v. Canaan Inc.*, the transaction was not material because it was non-binding agreement for an undetermined amount. 547 F. Supp. 3d 439, 449 (S.D.N.Y. 2021). *In re Canopy Growth Sec. Litig.*'s discussion of scienter regarding accounting and internal controls statements is inapposite. 2024 WL 3445436, at \*13 (S.D.N.Y. July 17, 2024).

GigaCloud's 1P revenue and Marketplace GMV, (4) making claims about why those metrics grew and (5) why buyers were attracted to the Marketplace. *See* ¶¶219-356; Pls.' Appendix 1.

### B. The SAC Establishes a Strong Inference of Scienter

Scienter is shown by alleging "motive and opportunity" to commit fraud or by facts "constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 241 (S.D.N.Y. 2006). Scienter requires a holistic review and is satisfied if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

### 1. The SAC Establishes Motive and Opportunity

Defendants do not dispute that Wu, Wan, and Lau were motivated to create the false impression GigaCloud Marketplace metrics reflected sales to true third-party entities since they touted those metrics to investors and they were key to the Company's narrative. ¶¶357-60.

Defendants Wu, Wan, and Lau were also incentivized to defraud investors to sell stock at inflated prices. Wu sold an incredible ***$42 million*** during the Class Period and Wan and Lau sold 13% and 8% of their respective holdings, each on a *single day*. They had never sold *any* stock before, so these sales were unusual. *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at \*10 (S.D.N.Y. Aug. 8, 2012) . Wan and Lau's sales were *not* pursuant to 10b5-1 plans, and were only seven trading days apart, when they had knowledge of the alleged fraud.[14]

Wu represented that his sales were pursuant to a 10b5-1 trading plan. (¶362), but "[w]here (as here) 10b5–1 trading plans are entered into during the class period, they 'are not a cognizable

---

[14] The Company's granting of shares to Lau on April 10, 2024 does not retroactively offset the suspicious nature of his prior sales since Lau "did not buy any shares on the open market." *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at \*13 n.7 (S.D.N.Y. Sept. 27, 2013).

defense to scienter allegations on a motion to dismiss.'" *Blanford*, 794 at 309; *see also Meyer v. Organogenesis Holdings Inc.*, 2024 WL 1346432, at \*13 (E.D.N.Y. Mar. 29, 2024). Further, Wu adopted his plan while "aware of the information" he misrepresented. 17 C.F.R. § 240.10b5-1(c)(1)(i)(A) (defense only if plan adopted "*[b]efore* becoming aware of the information").[15]

The SAC pleads that "the purpose of [Wu's] plan was to take advantage of an inflated stock price." *Blanford*, 794 F.3d at 309. Wu sold **93%** of the 1.25 million covered shares within a two-month period ending on May 17, 2024, four months before the plan expired. Like Wan and Lau, Wu's sales were after Defendants' misstatements and before Grizzly fully revealed the truth.[16]

The size of Defendants' sales also contributes to scienter. *See Blanford*, 794 F.3d at 302-303 ($49 million by two defendants contributed to scienter).[17] "[I]t is not dispositive that [Defendants] retained some of their stock, because it is possible that they were attempting to soften their losses without drawing attention to their stock sales." *Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at \*6 (S.D.N.Y. Mar. 4, 2019).

## 2. The SAC Establishes Knowledge, or At Least Recklessness

Courts find scienter when plaintiffs "'have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" since "[u]nder such

---

[15] Defendants' cases are inapposite. *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) (one defendant was not aware of fraud when he entered into the 10b5–1 plan and other followed his normal trading pattern), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 (S.D.N.Y. 2023) (nothing pled to raise suspicion about 10b5–1 plans).

[16] *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.,* 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019), concerned non-defendant stock sellers.

[17] In *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009), 99% of insider trading was done pursuant to a "non-discretionary Rule 10b-5-1 trading plan," and in *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at \*15 (S.D.N.Y. July 23, 2018), the sales occurred before defendants were on notice of SEC inquiry.

19

circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *6 (S.D.N.Y. Oct. 5, 2016).[18]

*First*, Defendants Wu and Wan were both "substantially" involved with the establishment of closely connected third party buyers. *XL Fleet*, 2022 WL 493629, at *6; *see In re Sequans Commc'ns S.A. Sec. Litig.,* 2019 WL 4805072, at *2 (E.D.N.Y. Sept. 30, 2019) (finding scienter based on Defendant's personal involvement in activity that made statements false). Wu established and managed Orien Life and CompHome and shifted them to other current and former GigaCloud employees to avoid disclosure and suspicion. ¶¶102-03. Wan did the same with Steve Roger Digital. ¶112. GigaCloud's E-commerce Wholesale Manager left the Company to "spin off" CompHome and was backed by GigaCloud or Wu personally, pursuant to an agreement **with Wu** that CompHome buy goods from GigaCloud. ¶108-11. After leaving, he remained a "constant presence" at GigaCloud's offices, and even trained FE-6. ¶¶109, 111. Attempting to avoid disclosure of GigaCloud's transactions with these companies supports scienter, rather than undermining it. *See* MTD at 20.[19] That GigaCloud quickly deregistered GigaCloud Venture after the Culper Report disclosed the same person controlled it as Orien Life is more evidence of deception. ¶¶384-85; *see Szulik v. Tagliaferri,* 966 F. Supp. 2d 339, 366 (S.D.N.Y. 2013).

*Second,* Wu and FE-4 participated in weekly calls with 20 to 50 of the most significant buyers on the GigaCloud Marketplace that were managed by current or former GigaCloud

---

[18] Defendants' assertion that "Plaintiffs must 'show that individual defendants actually possessed the knowledge highlighting the falsity of public statements'" (MTD at 20) contradicts Second Circuit law and is a misleading quotation of this Court's holding regarding confidential witness statements. *See Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *7 (S.D.N.Y. July 16, 2020).

[19] These allegations are based on Defendants' roles at entities they established, not GigaCloud, distinguishing *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013).

employees. ¶376. The SAC does allege when the meetings occurred and what was actually discussed. FE-4 was GigaCloud's President of U.S. Operations from September 2021 to May 2022; thus, the calls occurred during this period. ¶36. The calls addressed product performance, stock levels, and IT functionality on GigaCloud Marketplace. ¶97. But the granular details of "what was actually discussed" is irrelevant; the fact that Wu had regular calls with the closely connected companies strongly supports scienter. *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *13 (S.D.N.Y. Feb. 5, 2024) (scienter pled based on defendants' supervision over process and attending meetings).[20]

*Third*, according to FE-4, who spoke to Wu virtually every day, the Company was "centralized" around Larry Wu as the "ultimate decision-maker." ¶377. FE-4 reported that Wu "was involved in all significant decisions, and even insignificant decisions," at GigaCloud. The scheme of using closely connected buyers on GigaCloud Marketplace "wouldn't have happened without Larry [Wu] giving the go-ahead." *Id*. Defendant Lau, as CFO, had plenary access information about GigaCloud's finances and stated to investors that he had "real-time visibility of [GigaCloud's] operations." ¶379. Defendants' own authority recognizes, "evidence of a hands-on management style may support an inference of scienter." *Ollie's Bargain*, 563 F. Supp. 2d at 781; *see also In re ITT Educ. Servs., Sec. Litig.,* 34 F. Supp. 3d 298, 308 (S.D.N.Y. 2014).

*Fourth*, Defendants have never denied that they established separate companies to purchase from GigaCloud on GigaCloud Marketplace and then transferred management of those entities to current and former GigaCloud employees. After the Culper Report disclosed GigaCloud's

---

[20] In *Maloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772, 780 (S.D.N.Y. 2021) the former employees had no contact with the defendants. In *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008), *aff'd sub nom. W. Va. Inv. Mgt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009), the allegations suggested the auditor had been deceived.

connection to Orien Life, Defendants stated that "the Company disclosed its related party transaction[s]." ¶387.[21] After the Grizzly Report disclosed more, Defendants again merely claimed that they disclosed related party transactions and said that "sales made through certain entities" are "legitimate sales." ¶¶389-90. This motion makes the same related parties straw man argument.

*Fifth*, scienter allegations may be bolstered by the "inference that a company and its senior executives have knowledge…concerning the 'core operations' of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income.'" *Cortina v. Anavex Life Scis. Corp.* 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016). The Exchange Act Defendants repeatedly emphasized GigaCloud Marketplace as the Company's focus and Marketplace GMV and active buyers as "key" metrics, and GigaCloud Marketplace contributed 76% of revenue by 2022. ¶¶87, 89, 358, 391-394. Further, the closely connected companies, generated at least **50% of GigaCloud 1P revenue**, ¶97 (FE-4); *see also* ¶96 (FE-7: "most of the transactions are coming from within the company").[22]

### 3. Defendants Cannot Offer a More Compelling Inference

Defendants argue that the "more compelling inference is that Defendants have always believed in the accuracy of their statements." Defendants' interpretation is they knew they had established a network of entities to buy from GigaCloud on GigaCloud Marketplace but, even as they hyped GigaCloud Marketplace GMV as showing Company success, they believed this was not material to investors. This unlikely interpretation is, at best, a good faith defense that cannot

---

[21] This is not a "subjective characterization," but a plain reading of Defendants' press releases, distinguishing *Saskatchewan Healthcare Emp's. Pension Plan v. KE Holdings Inc.*, 2024 WL 775195, at *29 (S.D.N.Y. Feb. 26, 2024). Also, Defendants' made misstatements through May 9, 2024, so Defendants' response to the September 28, 2023 Culper Report was not "long after." *Id.*

[22] Given these allegations, the SAC does not set forth a "'naked assertion' of 'key product.'" *See* MTD at 21 (quoting *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020)).

be resolved on a motion to dismiss. *See Noto v. 22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 49 (W.D.N.Y. 2023). It certainly is not more compelling than the inference of scienter.

### C. The SAC States a Scheme Liability Claim.

The Exchange Act Defendants "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016). The SAC alleges that the Exchange Act Defendants established entities to transact with GigaCloud on GigaCloud Marketplace to inflate GMV and sales. As GigaCloud's former Director of Business Development stated, the scheme "illustrate[d] that the marketplace is showing lots of revenue" and was done to "pump up the marketplace."[23] This made GigaCloud Marketplace appear more attractive to true third party buyers and sellers, and more successful to investors, by "obscur[ing] the fact" that a material amount of Marketplace activity was with companies that were connected to GigaCloud. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (scheme liability for creation of in-house transfer agent). Defendants then transferred management of those entities to current and former GigaCloud employees, while GigaCloud continued to transact with them (as Defendants knew). *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017) ("steps to obscure" facts indicated scienter). By shifting management, Defendants purportedly evaded the obligation to disclose the transactions and, therefore, ***made it appear there was an organic shift to GigaCloud Marketplace transactions when the shift was manufactured by Defendants in a way that was intentionally deceptive.*** *See* MTD at 12-14 (arguing that Defendants' transfer of positions to GigaCloud employees meant they were not technically "related parties"). Defendants thus engaged

---

[23] Defendants do not explain why FE-7's description of this logical effect of Defendant's scheme is a "conclusory allegation," and the case they cite provides not support. MTD at 25 n.22.

in deceptive acts distinct from misstatements in order to deceive investors.[24] The SAC establishes

a strong inference of scienter, *see* §III.B, *supra*, and thus scheme liability is adequately pled.

## IV.     Defendants' Loss Causation Arguments Fail.

### A.  Pleading Loss Causation is not Necessary to State a Section 11 Claim.

"[I]t is unnecessary to plead loss causation to maintain claims under Section[] 11." *Giant,*

643 F. Supp. 2d at 572. Defendants argue that courts "routinely dismiss Securities Act claims when

concluding that overlapping Exchange Act claims fail to plead loss causation." MTD at 22. *First*,

this is irrelevant to the AI claims since there is no overlapping Exchange Act claim. *Second*, it

does not apply to the Section 11 marketplace activity claims because "assert[ing] that the corrective

disclosures are not the cause of the loss" is not sufficient for dismissal based on the negative

causation affirmative defense. *See Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 645

(S.D.N.Y. 2017); *see also Giant*, 643 F. Supp. 2d at 572. Defendants' cases involve unusual

situations where the plaintiffs' allegations made loss causation impossible.

### B.  Plaintiffs Plead Loss Causation for Their Exchange Act Claims.

Plaintiffs "must simply give…some indication of the actual loss suffered and…a plausible

causal link between the loss and the alleged misrepresentations" and the burden is "not a heavy

one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).

*First*, "third party analyses of previously public information could be sufficient to plead

loss causation." *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *13 (S.D.N.Y. Jan. 5, 2023)

(report by Culper was corrective); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354,

at *7 (S.D.N.Y. Mar. 23, 2020) (analysis of public financial information can contribute new

---

[24] *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021), concerned money-laundering at a single branch in Estonia; *Friedman v. Endo Int'l PLC,* 2018 WL 446189, at *4 (S.D.N.Y. Jan. 16, 2018), had no involvement of any corporate officers.

information to the market). The Culper and Grizzly reports' extensive research into GigaCloud's obscure collection of shell companies (¶¶90-124; ¶¶405-07; SAC, Ex. 1; Defs. Ex. 6 (ECF No. 97-6), easily distinguishes Defendants cases since "[t]here is no basis to conclude, as a matter of law, that the findings in the…reports were already reflected in the price of [the Company's] securities." *In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006). Also, the Grizzly Report contained interviews of former employees, which are not public information. (¶¶94-95, SAC Ex. 1 at 14-15). *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020).

*Second*, the Second Circuit has upheld a short seller report as a corrective disclosure. *TAL Educ. Group*, 837 F. App'x at 27-28. *See also Bishins*, 2023 WL 112558, at *13; *Chi. Bridge & Iron*; 2020 WL 1329354, at *7; *Winstar*, 2006 WL 473885, at *15.

*Third*, "that the price [of the stock] rebounded does not, at the pleading stage, negate plaintiff's showing of loss causation" because when "drawing all reasonable inferences in favor of [plaintiff], [we] assume that the price rose for reasons unrelated to its initial drop." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012); *see also KE Holdings Inc.*, 2024 WL 775195, at *33.[25] Additionally, the price of GigaCloud stock was $22.12 on August 20, 2024, the end of the 90-day PSLRA look back period for the May 22, 2024 stock drop, which was significantly lower than prior to the disclosure. Park Decl. Ex. 2.

## CONCLUSION

The Motion should be denied. If it is granted, Plaintiffs respectfully request leave to amend.

---

[25] *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *8 (S.D.N.Y. Sept. 30, 2013), is easily distinguishable because the stock price did not drop the day of the corrective disclosure, and *In re Ideanomics, Inc., Sec. Litig.*, 2022 WL 784812, at *11 (S.D.N.Y. Mar. 15, 2022), held that the alleged corrective disclosure did not contain any new facts.

Dated: October 8, 2024                          Respectfully submitted,

                                             **POMERANTZ LLP**

                                             */s/ Jonathan D. Park*
                                             Jeremy A. Lieberman
                                             Jonathan D. Park
                                             600 Third Avenue, 20th Floor
                                             New York, New York 10016
                                             Telephone: (212) 661-1100
                                             Facsimile: (917) 463-1044
                                             jalieberman@pomlaw.com
                                             jpark@pomlaw.com

                                             *Counsel for Co-Lead Plaintiff Sashi Rajan and Co-Lead Counsel for the Class*

                                             **PORTNOY LAW FIRM**
                                             Lesley F. Portnoy, Esq.
                                             1800 Century Park East, Suite 600
                                             Los Angeles, California 90067
                                             Telephone: (310) 692-8883
                                             lesley@portnoylaw.com

                                             *Additional Counsel for Sashi Rajan*

                                             **THE ROSEN LAW FIRM, P.A.**
                                             Laurence M. Rosen
                                             Phillip Kim
                                             Brian B. Alexander
                                             275 Madison Avenue, 40th Floor
                                             New York, New York 10016
                                             Telephone: (212) 686-1060
                                             Facsimile: (212) 202-3827
                                             lrosen@rosenlegal.com
                                             pkim@rosenlegal.com
                                             balexander@rosenlegal.com

                                             *Counsel for Co-Lead Plaintiff Meir Spear and Co-Lead Counsel for the Class*

                                             **THE SCHALL LAW FIRM**
                                             Brian Schall
                                             (*pro hac vice* application forthcoming)
                                             2049 Century Park East, Suite 2460
                                             Los Angeles, California 90067

26

Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Co-Lead Plaintiff Meir Spear*

27