**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GIGACLOUD TECHNOLOGY INC SECURITIES LITIGATION | **Case No. 1:23-cv-10645-JMF-GS** |
| | <u>**CLASS ACTION**</u> |
| THIS DOCUMENT RELATES TO: | **ALL ACTIONS** |
| ALL ACTIONS | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF GIGACLOUD
TECHNOLOGY INC, LARRY LEI WU, XIN WAN, KWOK HEI DAVID LAU, ZHIWU
CHEN, AND AEGIS CAPITAL CORP.'S MOTION TO DISMISS
<u>THE SECOND AMENDED CLASS ACTION COMPLAINT</u>**

LATHAM & WATKINS LLP
Jeff G. Hammel
Jason C. Hegt
Hanyu (Iris) Xie
Chengliang (Larry) Hong
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

*Attorneys for GigaCloud Technology Inc,
Larry Lei Wu, Xin Wan, Kwok Hei David Lau,
and Zhiwu Chen*

SICHENZIA ROSS FERENCE CARMEL
LLP
Sameer Rastogi
John J. Elliott
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
(212) 930-9700

*Attorneys for Aegis Capital Corp.*

**TABLE OF CONTENTS**

**Page**

I.    ALL OF PLAINTIFFS' CLAIMS ARE SUBJECT TO RULE 9(B) .................................2

II.    PLAINTIFFS' AI-BASED SECURITIES ACT CLAIMS FAIL. ......................................2

    A.    GigaCloud Did Not Make Any False Statements Concerning Its Use of AI ...........2

    B.    The Absence of Loss Causation Requires Dismissal ...............................................4

III.    PLAINTIFFS' MARKETPLACE ACTIVITY CLAIMS ALL FAIL ...............................5

    A.    The SAC Does Not Plead Any Misstatements About GigaCloud's Marketplace ...............................................................................................................5

    B.    The Exchange Act Claims Based on Marketplace Activity Allegations Also Fail Because Plaintiffs Fail to Plead a Strong Inference of Scienter ......................6

    C.    Plaintiffs Plead No Loss Causation for Their Marketplace Claims .........................9

IV.    PLAINTIFFS FAIL TO ALLEGE A FRAUDULENT SCHEME ....................................10

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amorosa v. AOL Time Warner Inc.*,
  409 F. App'x 412 (2d Cir. 2011) ..................................................................................4, 5

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) .......................................................................................5

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021)..............................................................................3

*Cortina v. Anavex Life Scis. Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ..................................................................9

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................................8

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016)..............................................................................10

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ..................................................................9

*In re Cloudera, Inc.*,
  2021 WL 2115303 (N.D. Cal. May 25, 2021) ..................................................................4

*In re Farfetch Ltd. Sec. Litig.*,
  2021 WL 4461264 (S.D.N.Y. Sept. 29, 2021), *aff'd*, 2023 WL 2879304 (2d
  Cir. Apr. 11, 2023)............................................................................................................6

*In re FuboTV Inc. Sec. Litig.*,
  2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ..................................................................3

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009)...............................................................................5

*In re Iconix Brand Grp., Inc.*,
  2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ..................................................................8

*In re Manulife Fin. Corp. Sec. Litig.*,
  276 F.R.D. 87 (S.D.N.Y. 2011) ......................................................................................10

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
  2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)..................................................................2, 5

*In re Signet Jewelers Ltd. Sec. Litig.*,
  389 F. Supp. 3d 221(S.D.N.Y. 2019)........................................................................4

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)......................................................................10

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)..........................................................10

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020).......................................................................3

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)...........................................................2

*Lau v. Opera Ltd.*,
  527 F. Supp. 3d 537 (S.D.N.Y. 2021).......................................................................5

*Lea v. TAL Educ. Grp.*,
  837 F. App'x 20 (2d Cir. 2020) ................................................................................9

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)...........................................................2

*Lipow v. Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015).......................................................................9

*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
  2024 WL 2890968 (2d Cir. June 10, 2024) .............................................................10

*Meyer v. Organogenesis Holdings Inc.*,
  2024 WL 1346432 (E.D.N.Y. Mar. 29, 2024)....................................................6, 7, 8

*Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).......................................................................2

*Ret. Sys. of Gov't of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) (cited at Opp. 18-19)....................................................8

*Schiro v. Cemex, S.A.B. de. C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019).......................................................................4

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019) (cited at Opp. 15) ..........................................6

*Turner v. MagicJack VocalTec, Ltd.*,
  2014 WL 406917 (S.D.N.Y. Feb. 3, 2014).................................................................9

GigaCloud, Larry Lei Wu, Xin Wan, Kwok Hei David Lau, Zhiwu Chen, and Aegis respectfully submit this reply memorandum of law in further support of their motion to dismiss.[1]

## PRELIMINARY STATEMENT

This case is merely an echo of two short-seller reports published by investors who admitted that they would profit from a decline in the price of GigaCloud's stock. But the reports themselves bragged that they contained no new information—just sensationalist spin—and GigaCloud's stock price quickly recovered, now trading at roughly double its IPO price. This unusual fact pattern— with investors earning many millions on their investments—had led Plaintiffs to take some unusual positions to try to survive dismissal of their twice-amended Complaint.

When confronted with the full text of GigaCloud's disclosures and the argument that none of its statements were false or misleading, Plaintiffs ask the Court to ignore the "literal truth" of the statements (ECF No. 107, Opp. 14) and focus instead on their "impressions" of the statements (Opp. 15, 16, 18). On scienter, Plaintiffs bob and weave to avoid admitting that the Individual Defendants retained enormous stakes in the Company throughout the class period with one even increasing his ownership percentage—behavior the Second Circuit has held is inconsistent with scienter as a matter of law. And on loss causation, Plaintiffs urge the Court not to look too closely at the rapid recovery in the Company's stock price and assert that other short seller reports are capable of serving as corrective disclosures without any meaningful explanation of how *these* reports were corrective in *this* case.

Plaintiffs have now had three tries to state a claim, but none of what they alleged is sufficient and the SAC should be dismissed with prejudice.

---

[1] Unless otherwise indicated, capitalized words have the meaning ascribed in Defendants' opening brief (ECF No. 96, "Mot"), all internal citations and quotation marks are omitted, emphasis is added, and "Ex._" refers to exhibits attached to the Declaration of Hanyu (Iris) Xie (ECF No. 97).

## ARGUMENT

### I.    ALL OF PLAINTIFFS' CLAIMS ARE SUBJECT TO RULE 9(B)

Plaintiffs' attempt at cosmetic separation between their Securities Act and Exchange Act claims (Opp. 2, 10, 13-14) is "insufficient . . . when Securities Act claims sound in fraud." *In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *11 (S.D.N.Y. Feb. 23, 2024).  Here, Plaintiffs' Securities Act claims about GigaCloud's marketplace sound in fraud because those claims are premised on the *same* statements as those that underpin their Exchange Act claims and are alleged to be false for the *same* reasons.  Opp. 13-14; Mot. 8, 8 n.10.[2]  Plaintiffs argue that their AI-related claims cannot be subject to Rule 9(b) because there are no parallel Exchange Act claims (Opp. 10), but they ignore that "a complaint may sound in fraud even where . . . no fraud claims under the Exchange Act are asserted."  *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008).[3]  "The ultimate question is whether, at its core, [those claims are] predicated on allegations of fraudulent conduct."  *Id.*  That is the case here, although Plaintiffs' claims are so deficient that they fail under either Rule 8 or Rule 9(b).  *See* Mot. 8.

### II.    PLAINTIFFS' AI-BASED SECURITIES ACT CLAIMS FAIL

#### A.    GigaCloud Did Not Make Any False Statements Concerning Its Use of AI

The Opposition does not cure the SAC's deficient allegations that GigaCloud misrepresented its use of AI or general technological capabilities in the Registration Statement. Mot. 8-12; Opp. 2, 10-13.  As an initial matter, Plaintiffs again try to avoid discussion of

---

[2] Plaintiffs' cases are inapposite.  *See Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *9 (S.D.N.Y. Sept. 10, 2012) (plaintiffs relied on "a negligence-type theory to support their Section 11 claim"); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (noting "different theories underlying the fraud and the (at most) negligence claims").

[3] Having previously pled AI-based Exchange Act (*i.e.*, fraud) *and* Securities Act claims before dropping the former and leaving the latter unchanged, ECF No. 88-3, Plaintiffs cannot now pretend (Opp. 10) that their Securities Act claims do not attempt to allege fraudulent conduct.

GigaCloud's disclosures by painting Defendants' falsity arguments as ones about materiality. Opp. 10-11. Central to Plaintiffs' claim is that GigaCloud touted AI as "the foundation of the Company's operations, financial performance, and growth prospects," ¶ 65, but the Company said no such thing. Rather, GigaCloud explained that AI was only one of its "multiple" technology systems and was used to support its larger data analytics operations. Mot. 9-10; Ex. 2, Prospectus at 32, 117-66.[4] Given GigaCloud's disclosures that AI plays a supportive role for certain of the Company's back-end processes, Plaintiffs do not adequately explain how the FEs' musings render the Company's statements false.[5] Nor could they, when all FEs were (i) junior employees in departments not responsible for data analytics (FEs 1-3, 5-6); (ii) based in the United States (FEs 4-6), when GigaCoud's technology department was based in China (Opp. 4); and/or (iii) not at the Company during all or most of the relevant period (FEs 4-5). Mot. 9-10.[6] Plaintiffs cannot distort GigaCloud's disclosures to render the FEs' allegations plausible. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 248-52 (S.D.N.Y. 2020).

Even if the FEs' allegations were considered, they still do not offer any factual allegations supporting Plaintiffs' claim that the Company *did not use AI at all*. Mot. 10-11. For example, Plaintiffs take FE-5's (a U.S.-based "Business Development Director," ¶ 37) statement that he personally "never heard" GigaCloud using the words "artificial intelligence" during sales pitches

---

[4] Plaintiffs claim that Defendants' Appendix A "wrongly asserts" certain statements as allegedly false. Opp. 2 nn 2-3. This ambiguity only highlights the impermissible puzzle pleading used throughout the SAC. *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478-79 (S.D.N.Y. 2021).

[5] FEs 7, 8, and 9 do not speak to anything relating to GigaCloud's use of AI. *See* ¶¶ 67-82.

[6] FE-4's allegations should be given no weight because he left GigaCloud before the class period. *In re FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023). Plaintiffs argue that the Court can consider FE-5's assertions because he left one month into the class period (Opp. 12 n.8), but the fact that this person was present at the Company for a few days of the relevant period still does not explain why this U.S.-based "Business Development Director," ¶ 37, would be expected to know anything about the Company's back-end use of AI.

3

and editorialize that this "seems inexplicable . . . , but it makes sense if GigaCloud's logistics did not actually use AI," Opp. 12.  Courts in this Circuit routinely reject this kind of lawyer-driven speculation.  *See Schiro v. Cemex, S.A.B. de. C.V.*, 396 F. Supp. 3d 283, 305-06 (S.D.N.Y. 2019). More fundamentally, given the Company's disclosures that AI was one of many technologies used to support various aspects of its business, it is unremarkable that some employees may not have heard the term being used in connection with a particular process.  Mot. 9-11.[7]

Finally, the Opposition essentially concedes (Opp. 13) that GigaCloud's general statements about the strength of its technological capabilities were inactionable puffery.  Devoting just two sentences to the issue, Plaintiffs do not identify any specific, non-puffery detail that GigaCloud disclosed, much less how it was false,[8] and they do not attempt to distinguish the long line of cases finding similar statements too general to be puffery as a matter of law.  Mot. 11-12.[9]

### B.    The Absence of Loss Causation Requires Dismissal

Plaintiffs' AI-based claims also fail because "it is . . . apparent from the face of the complaint" that the alleged loss was not caused by the purported AI misrepresentations.  *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 417 (2d Cir. 2011) (finding "absence of loss causation" "a proper basis on which to dismiss" standalone Section 11 claim).  Here, Plaintiffs do not (and cannot) claim that the short-seller reports "revealed" anything about GigaCloud's use of

---

[7] Plaintiffs offer no basis to measure the Company's statements against a working definition of AI in a draft plan by another entity.  Opp. 11 n. 5 (citing ¶ 53); Mot. 9 n. 12 (citing *In re Cloudera, Inc.*, 2021 WL 2115303, at \*13 (N.D. Cal. May 25, 2021)) (holding that if term "had no set meaning" then "the Court cannot find that . . . statements were false when made").

[8] Plaintiffs' FEs do not even agree with each other on this point.  FE-4 offers his fact-free opinion that certain technology was not "state-of-the-art," but FE-1 admits that GigaCloud had "intricate management system . . . tasked with handling complex process."  Mot. 11-12 (citing ¶ 69).

[9] *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221(S.D.N.Y. 2019) (cited in Opp. 13) is inapposite because the defendant there allegedly used statements that might otherwise have been puffery to convey a specific message about accusations made in "another lawsuit."  *Id.* at 230-31.

AI. Opp. 24-25; Mot. 22-23. The Culper Report merely reviewed public data and mused that two (unchallenged) statements about AI were "empty platitudes." Ex. 6, Culper Report at 3. The Grizzly Report did nothing more than "wonder[ing] how little money is truly going into the . . . proprietary 'AI' technology." ECF No. 88-1 at 86-87. At best, these short-sellers "expressed negative opinions about [the Company]" based on public information, which does not establish loss causation as a matter of law. *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 560-62 (S.D.N.Y. 2021); *MINISO*, 2024 WL 759246, at *20 (dismissing Section 11 claims where short-seller report "did not disclose any new facts"). Plaintiffs do not explain how there could ever be loss causation on these facts. Opp. 24. This requires dismissal. *AOL*, 409 F. App'x at 417.

III.   **PLAINTIFFS' MARKETPLACE ACTIVITY CLAIMS ALL FAIL**

A.   **The SAC Does Not Plead Any Misstatements About GigaCloud's Marketplace**

Although the SAC demands disclosure of sales to "closely connected entities" (an undefined term invented for this lawsuit), the SAC fails to name a single GigaCloud executive who owned, controlled, or managed any of these entities during the class period. Mot. 12-14. This forces Plaintiffs to concede that none of these sales (i) were "related party transactions" required to be disclosed under existing rules or (ii) should have been classified differently under the existing rules. Opp. 14-16. Plaintiffs are, therefore, left to argue that Defendants' "literal[ly] tru[e]" statements somehow created a "materially false impression." Opp. 14-15. Plaintiffs are wrong.

*First*, Plaintiffs do not allege that GigaCloud's reported revenue or GMV data was false. Mot. 14-15; Opp. 14-15. Plaintiffs cannot state a claim based on "accurate historical data." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012).[10]

---

[10] *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 569 (S.D.N.Y. 2009) (cited at Opp. 14) dealt with the requirement to disclose competing trends, which is not at issue here.

*Second*, Plaintiffs claim that separating "GigaCloud 1P revenue" and "Off-Platform ecommerce" created the "false impression" that GigaCloud 1P revenue "reflected sales to true third-party entities." Opp. 15-16. As an initial matter, GigaCloud clearly disclosed that the distinction is based on where the sale occurs[11] and Plaintiffs cannot reimagine these statements to render them false. *See In re Farfetch Ltd. Sec. Litig.*, 2021 WL 4461264, at \*9 (S.D.N.Y. Sept. 29, 2021), *aff'd*, 2023 WL 2879304 (2d Cir. Apr. 11, 2023). This is particularly true where Plaintiffs can only render their "impression" false by assuming based on their own metrics that some buyers are not "true" third-party entities. Mot. 12-14.

*Third*, Plaintiffs challenge the reasons Defendants gave for selling 1P inventory on GigaCloud Marketplace. Opp. 15; ¶¶ 144, 156, 166 (stating, for example, that GigaCloud sold 1P inventory on the Marketplace "[t]o enhance the marketplace experience"). This claim switches focus from who the buyer is to who owns the product, but the Opposition cites nothing for the assertion that these reasons were false or that the only reason GigaCloud sold 1P inventory on the Marketplace was to make the Marketplace appear more successful. Opp. 15.[12]

### B.    The Exchange Act Claims Based on Marketplace Activity Allegations Also Fail Because Plaintiffs Fail to Plead a Strong Inference of Scienter

Plaintiffs primarily rely on the Individual Defendants' stock sales to allege scienter, but their own authority highlights why their allegations are insufficient. *See Meyer v. Organogenesis Holdings Inc.*, 2024 WL 1346432, at \*16 (E.D.N.Y. Mar. 29, 2024) (cited in Opp. 19). Although

---

[11] "GigaCloud 1P" revenue is defined as revenue earned "through the *sale* of our inventory *in our GigaCloud Marketplace*." Ex. 2, Prospectus at 117. By contrast, "Off-platform ecommerce" revenue is defined as revenues earned "through the *sale* of our inventory to and through *third-party ecommerce websites*." *Id.*

[12] For this reason, the statements bear little resemblance to the statements at issue in *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 413 (S.D.N.Y. 2019) (cited at Opp. 15), where the company provided *one specific reason* for engaging in a complex corporate process, which a reasonable investor could conclude was the sole reason for that process.

the Opposition carefully alternates between dollar figures and percentages to create a misleading impression, nothing about the stock sales is remotely suggestive of scienter.

*First*, Messrs. Wu, Wan, and Lau sold only a small portion of their overall holdings. The Opposition concedes that Messrs. Wan and Lau sold 13% and 8% of their respective holdings, but then switches to dollars to note that Mr. Wu sold "an incredible $42 million." Opp. 18. But this was just under 12.5% of his holdings. Mot. 18. Courts routinely conclude that sales in even greater percentages are insufficient to suggest scienter and Plaintiffs cite no authority to the contrary. *See* Opp. 18-19 (collecting cases); *cf. Meyer*, 2024 WL 1346432, at *16 (greater "percentages of shares sold fail to establish a strong inference of scienter").[13]

*Second*, Plaintiffs breeze past the argument that Mr. Wu's sales were pursuant to a pre-arranged plan adopted under SEC Rule 10b5-1 and Messrs. Wan and Lau's sales were of stock granted as employee compensation. Mot. 18-19. Recognizing that these types of sales do not suggest scienter absent unusual or suspicious timing, *see id*., Plaintiffs argue that the sales must have been unusual because the trading plan was adopted during the putative class period and none of the individuals had previously sold stock during the short time the Company's stock was publicly traded. Opp. 18-19. That is not the law. *Meyer*, 2024 WL 1346432, at *16 (no scienter where defendants "entered into the relevant 10b5-1 plans during the Class Period"). Rather, courts examine whether there is any relationship between the sales and the at-issue statements. Here, all sales occurred *months after most* of the alleged misstatements were made, and allegedly "corrected." Mot. 19; Opp. 18-19. That timing is not remotely suspicious. Mot. 19 (collecting

---

[13] Equally misleading is Plaintiffs' claim that Mr. "Wu sold 93% of the 1.25 million" shares covered by his trading plan. Opp. 19. In total, Mr. Wu owned nearly 10 million shares. Ex. 14, Larry Wu Forms 4 at 2. Thus, contrary to Plaintiffs' suggestions, the "size of Defendants' sales" (Opp. 19) says nothing about scienter.

cases); *see also Meyer*, 2024 WL 1346432, at *16 (no scienter where "various of [defendant]'s sales pre-dated and post-dated the alleged actionable statements by several weeks").[14]

*Third*, Plaintiffs ignore that Mr. Lau's stock acquisition was *eleven times* his sales during the class period and that 87% of his holdings that Mr. Wu retained were worth (at then-current prices) hundreds of millions of dollars. Mot. 18; Opp. 18. Their response—that Defendants might retain "some of their stock" to "soften their losses" (Opp. 19) is lifted from another case where defendants made "plainly substantial stock sales." Here, by contrast, "[t]he fact that [these executives] continued to hold [Company] stock is inconsistent with [Plaintiffs'] theory" of scienter. *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *16 n.10 (S.D.N.Y. Oct. 25, 2017).[15]

*Fourth*, having pled no motive, Plaintiffs bear a "greater" burden to show that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009). Yet all they allege is that Messrs. Wu and Wan were "'substantially' involved with the establishment of closely connected third parties" years before the class period without any allegation that either of them had continuing roles with these companies during the class period. Opp. 20. Plaintiffs also refer to FE-4's allegation that he and Mr. Wu "participated in weekly calls with 20 to 50 of the most significant buyers on the GigaCloud Marketplace." Opp. 20-21. This is hardly remarkable. It is unclear how a CEO hosting calls with significant customers

---

[14] *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 308-09 (2d Cir. 2015) (cited at Opp. 18-19) underscores the difference because the court there found scienter based on trading plans *the day after* an allegedly misleading statement and repeated timing of subsequent stock sales with "Class Period high." Nothing of the sort is alleged here. Opp. 18-19.

[15] The Company's subsequent SEC disclosures likewise confirm that as of November 6, 2024, GigaCloud has repurchased an aggregate of approximately $11.4 million shares at an average price of $24.35—99% and 217% higher than the Company's IPO price and that on the day of the Culper Report, respectively.

suggests improper relationships with any of them.  *See Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 161-62 (S.D.N.Y. 2015).  Likewise, Plaintiffs' bare assertions about Mr. Wu's "hands-on management style" and Mr. Lau's "plenary access" to financial data could be said about virtually any executives in similar positions and do not plead scienter.  Opp. 21; Mot. 20.[16]

*Fifth*, Plaintiffs' fallback theory of the core operations doctrine is not "independently sufficient" to establish scienter and has been repeatedly rejected by this Court.  *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) (Furman, J.).

### C.     Plaintiffs Plead No Loss Causation for Their Marketplace Claims

All of Plaintiffs' claims also independently fail because neither the Culper Report nor the Grizzly Report was a corrective disclosure.

*First*, as with Plaintiffs' AI allegations, the short-sellers merely "expressed negative opinions about [GigaCloud] based on public information" about its marketplace activity.  Mot. 22-24.  Culper Research admits that it relied on publicly filed "corporate documents" and Internet searches.  Ex. 6, Culper Report at 3, 20-26.  Grizzly Research, in turn, repeatedly cited the Culper Report, relied on the same sources, and discussed many of the same entities.  ECF No. 88-1 at 4, 51, 53, 68.[17]  That is insufficient to establish loss causation.  Mot. 22-23.[18]

---

[16] Plaintiffs also discuss events post-dating short-seller reports, Opp. 20-22, without explaining how they are indicative of scienter *at the time* of the allegedly false statements.  Mot. 20-21.

[17] Grizzly noted only that it spoke with unknown FEs to "confirm [its] suspicions," ECF No. 88-1 at 66, but Plaintiffs do not point to a single new fact that Grizzly revealed based on these alleged discussions.  This is unlike Plaintiffs' cited cases (Opp. 25) where short-sellers used specialized expertise to reveal information not otherwise apparent.  *See, e.g., In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7-8 (S.D.N.Y. Mar. 23, 2020) ("complex economic data understandable only through expert analysis"); *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) ("filings of multiple entities in a different language and Chinese court judgments").

[18] *See also Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *13 (S.D.N.Y. Feb. 3, 2014) (no loss causation where report noted "all information . . . has been obtained from public sources").

*Second*, Plaintiffs offer no response to the argument that investors would not likely view these short-seller reports as "corrective" given their broad disclaimer, professed incentive in shorting GigaCloud stock, and pervasive errors.  Opp. 25; Mot. 23-24; *see also Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 497 (S.D.N.Y. 2016).

*Third*, Plaintiffs tellingly focus on GigaCloud's stock price 90 days after the Grizzly Report (when the price would be affected by myriad intervening events), Opp. 25, as a way to deflect their failure to "address or explain" the rebound in stock price in the days immediately following the report, which "renders their loss causation allegation implausible."  *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011); Mot. 6, 23-24.

## IV.    PLAINTIFFS FAIL TO ALLEGE A FRAUDULENT SCHEME

Plaintiffs' last-ditch attempt at a scheme liability claim also fails.  For starters, Plaintiffs still do not explain with any particularity how GigaCloud's disclosed shift in corporate structure from off-platform transactions towards the Marketplace was "inherently deceptive."  Mot. 24-25; Opp. 23-24.[19]  Instead, Plaintiffs allege that GigaCloud took "steps to obscure facts" and/or "evade the obligation to disclose the transactions," Opp. 23, but these are the same claims underlying their misstatements claims, *id.* 13-18, which doom their scheme liability claim.  *See Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, 2024 WL 2890968, at *5 n. 5 (2d Cir. June 10, 2024).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the SAC be dismissed with prejudice.

---

[19] Plaintiffs' cases involve adequately alleged deceptive acts.  *See In re Smith Barney Transfer Agent Litig.,* 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (defendants "conceal[ed] a scheme designed to channel transfer agent cost savings away from [plaintiffs], to which the savings rightfully belonged"); *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017) (defendants "orchestrated a bribery scheme" that violated federal law).

Dated:  November 7, 2024
      New York, New York

Respectfully submitted,

**LATHAM & WATKINS LLP**

/s/ Jason C. Hegt
Jeff G. Hammel
Jason C. Hegt
Hanyu (Iris) Xie
Chengliang (Larry) Hong
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  jeff.hammel@lw.com
Email:  jason.hegt@lw.com
Email:  iris.xie@lw.com
Email:  larry.hong@lw.com

*Attorneys for GigaCloud Technology Inc,
Larry Lei Wu, Xin Wan, Kwok Hei David
Lau, and Zhiwu Chen*

**SICHENZIA ROSS FERENCE
CARMEL LLP**

/s/ John J. Elliott*
Sameer Rastogi, Esq.
John J. Elliott, Esq.
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
Telephone: (212) 930-9700
Facsimile: (212) 930-9725
Email: srastogi@srfc.law
Email: jelliott@srfc.law

*Attorneys for Aegis Capital Corp.*

* Electronic signature used with consent in
accordance with Rule 8.5(b) of the Court's ECF
Rules and Instructions

11