UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                              :

                              :

                              :           23-CV-10645 (JMF)

IN RE GIGACLOUD TECHNOLOGY INC.     :
SECURITIES LITIGATION                   :        OPINION AND ORDER

                              :

                              :

                              :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this putative class action, Lead Plaintiffs Sashi Rajan and Meir Spear ("Plaintiffs")

bring securities claims against GigaCloud Technology Inc. ("GigaCloud" or the "Company");

eight GigaCloud officers and directors (the "Individual Defendants");[1] and Aegis Capital Corp.

("Aegis"), the underwriter for GigaCloud's initial public offering ("IPO").  The operative Second

Amended Complaint (the "Complaint") alleges that, between August 18, 2022 and May 22, 2024

(the "Class Period"), Defendants made material misstatements with respect to GigaCloud's

marketplace activities and the use of artificial intelligence (or "AI") in violation of Sections 11

and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o; Sections

10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§§ 78j(b), 78t(a); and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5");

17 C.F.R. §§ 240.10b-5.  *See* ECF No. 88 ("SAC"), ¶ 2.

      Now pending are two motions to dismiss all claims in the Complaint.  *See* ECF Nos. 95,

105.  First, all Defendants move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

---

[1]     The Individual Defendants are: Chief Executive Officer and Chairman of the Board of
Directors Larry Lei Wu; Chief Financial Officer and Director Kwok Hei David Lau; Chief
Technology Officer and Director Xin Wan; Director Frank Lin; Director Xing Huang; Director
Zhiwu Chen; Director Binghe Guo; and Director Thomas Liu.  *See* SAC ¶¶ 21-29.

Procedure, to dismiss the Complaint for failure to state a claim. ECF No. 95. Second, Individual Defendant Zhiwu Chen separately moves, pursuant to Rule 12(b)(2), to dismiss the claims against him for lack of personal jurisdiction. ECF No. 105. For the reasons that follow, Defendants' Rule 12(b)(6) motion to dismiss is GRANTED as to the alleged misstatements regarding GigaCloud's marketplace activities and DENIED as to the alleged misstatements regarding GigaCloud's use of AI, and Chen's Rule 12(b)(2) motion to dismiss is DENIED.

## BACKGROUND

The following facts, taken from the Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Plaintiffs. *See, e.g., Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that a court may consider "legally required public disclosure documents filed with the SEC").

### A. GigaCloud

GigaCloud is a holding company based in Hong Kong and incorporated in the Cayman Islands. SAC ¶ 20; ECF No. 96-2 ("Prospectus"), at 11. The Company's principal executive offices were located in Hong Kong at the time of its 2022 IPO and are now located in California. SAC ¶ 20. GigaCloud describes itself as a "pioneer of global end-to-end" — that is business-to-business or B2B — "ecommerce solutions for large parcel merchandise." *Id.* ¶¶ 9, 49; Prospectus 1. The Company, which was founded in 2006, initially offered information technology outsourcing services. SAC ¶ 48. It pivoted to ecommerce in 2010. *Id.*

GigaCloud entered the United States market in 2014 by acquiring Comptree Inc. — now its primary U.S. subsidiary. *Id.* ¶ 122. In January 2019, the Company launched its own ecommerce platform, the GigaCloud Marketplace (the "Marketplace"). *Id.* ¶ 48. The

Marketplace connects manufacturers, primarily located in Asia, with buyers, primarily resellers based in the United States, Asia, and Europe.  *Id.* ¶ 49.  The Company "executes delivery and sale of merchandise bought and sold on GigaCloud Marketplace through a network of warehouses up to and including last-mile delivery to the customer."  *Id.* ¶ 9.  In 2021, the Company renamed itself GigaCloud Technology Inc.  *Id.* ¶ 48.

In connection with its anticipated IPO in the United States, GigaCloud filed a draft registration statement with the U.S. Securities and Exchange Commission ("SEC") on May 24, 2021.  *Id.* ¶ 52.  GigaCloud filed its final Registration Statement on August 17, 2022, and its Prospectus (collectively, the "Offering Materials") two days later.  *Id.* ¶ 2.  On August 22, 2022, the Company completed its IPO and began publicly trading on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "GCT."  *Id.* ¶¶ 20; 52.  As part of the IPO, GigaCloud sold 3,381,000 Class A ordinary shares at a price of $12.25 per share.  ¶ 52.  Defendant Aegis, an investment bank, served as the underwriter.  *Id.* ¶ 45.

## B.  The Alleged Misrepresentations and Omissions

Plaintiffs' claims relate to two categories of alleged misrepresentations and omissions from the Offering Materials, which the Court summarizes in turn.  First, the Offering Materials contained several references to GigaCloud's use of artificial intelligence ("AI") in its operations. The Prospectus claimed that GigaCloud possesses AI "that generates seller ratings and credit profiles through volume data," "optimizes routing by organizing incoming orders and rebalancing inventory levels within our warehousing network," and "to accelerate the network effects in [its] marketplace."  *Id.* ¶ 129.  The Offering Materials also contained other references to the Company's use of "complex AI software" to optimize its logistics and warehousing systems.  *Id.* ¶ 133; *see id.* ¶ 135 ("We leverage self-learning AI to improve our operating

efficiency."); *id.* ¶ 137 ("AI-powered warehousing management system solves the many practical problems faced by sellers and buyers."); *id.* ¶ 139 (discussing "AI Algorithm"); *id.* ¶ 141 (discussing "Big Data Driven Technology Powered by AI & Machine Learning").

Second, the Offering Materials contained statements and charts referencing financial and operating metrics, including the Company's revenues related to the Marketplace.  GigaCloud's revenues are separated into three different revenue streams: (1) GigaCloud 1P ("1P"), which is product revenue from the sale of GigaCloud's own merchandise through the Marketplace; (2) GigaCloud 3P ("3P"), which is service revenue generated from facilitating transactions between third-party sellers and buyers on the Marketplace; and (3) Off-Platform Ecommerce Revenue, which is product revenue from the sale of GigaCloud merchandise through third-party websites such as Amazon or Wayfair.  *See id.* ¶ 148; Prospectus 126-27.  Together, 1P and 3P revenues make up the Marketplace Gross Merchandise Value ("GMV").  *See* SAC ¶¶ 12-13. These revenue metrics were provided from 2019 leading up to the Company's IPO.  *See id.* ¶ 86; Prospectus 126.  They were also accompanied by various explanatory statements.  For example, the Prospectus explained that "1P selling" helped "enhance [the Marketplace] experience" by "giv[ing GigaCloud] insights into seller needs, provid[ing GigaCloud] with proprietary data[,] and "increase[ing] the velocity of sales in [the] Marketplace."  SAC ¶ 156; *see id.* ¶¶ 144, 166.  It also noted in various ways that GigaCloud's "ability to attract and engage buyers" in the Marketplace was important to achieving revenue growth.  *Id.* ¶ 162; *see also id.* ¶¶ 158, 160, 164, 168.

## C.  Short Seller Reports

On September 28, 2023, Shadyside Partners, LLC, a short seller firm that does business under the name Culper Research, published a report on GigaCloud indicating that it had

"uncovered" entities that "list[ed] several different GigaCloud insiders and former insiders on their documents" yet were "engaged in the very same business as GigaCloud." *Id.* ¶¶ 402-07. GigaCloud's stock price fell $1.78, from $9.47 to $7.69, over that trading day. *See id.* ¶ 409. GigaCloud denied the allegations in a press release the next day, *id.* ¶ 386, and on November 13, 2024, issued a press release announcing that, after an "independent review," its audit committee had concluded that the "claims in the Culper Report were not substantiated." *Id.* ¶ 388 (cleaned up).

Another short seller, Grizzly Research LLC, published a report about GigaCloud on May 22, 2024. *Id.* ¶¶ 211, 410. The report alleged that "shell companies" "formed by [GigaCloud] employees" "account for most of [GigaCloud's] 1P revenue growth," ECF No. 88-1, at 2, meaning that "a vast network of undisclosed related shell companies" was being used "to inflate most of [GigaCloud's] key metrics," *id.* at 11. On the same trading day, GigaCloud's stock price dropped over 5%, from $31.45 to $29.83. SAC ¶ 411. The following day, GigaCloud disputed these claims in a press release, stating that it had already disclosed "all related party transactions required by the applicable rules and accounting standards" and there was "no basis" for the report to suggest that "sales made through certain entities are not legitimate." *Id.* ¶ 125.

**D. This Action**

On October 4, 2023, Thomas J. Kinnally filed a securities class action in the Central District of California against Defendants, on behalf of investors who had purchased GigaCloud stock between August 18, 2022 and September 27, 2023. *See Kinnally v. GigaCloud Technology Inc et al.*, No. 23-CV-08381 (C.D. Cal.). On October 30, 2023, Rock Villanueva filed a separate securities class action lawsuit in the same district, asserting substantially the same claims against the same Defendants. *See Villanueva v. GigaCloud Technology Inc et al.*, No. 23-CV-9134

(C.D. Cal.).  On December 4, 2023, three members of the putative class — Kinnally, Sahi Rajan, and Meir Spear — each moved to consolidate the actions and to be appointed as Lead Plaintiff. *See Kinnally*, No. 23-CV-08381 (C.D. Cal.), ECF Nos. 13, 17, 20.

Several days later, both actions were transferred to this Court, *see* ECF No. 9, which thereafter granted the pending motions to consolidate and appointed Rajan and Spear as Co-Lead Plaintiffs, *see* ECF No. 42.  On June 28, 2024, Plaintiffs filed the Complaint.  *See* SAC.  It asserts Securities Act claims based on the statements related to AI and GigaCloud's Marketplace revenue made in the Company's Offering Materials.  *See id.* ¶¶ 128-42 (AI statements); *id.* ¶¶ 143-77 (GigaCloud statements).  Specifically, Plaintiffs assert Section 11 claims against all Defendants and Section 15 claims for control person liability against Wu, Lau, Wan, Lin, Huang, Chen, Guo, and Liu.  *Id.* ¶¶ 29, 195-202.  The Complaint also asserts Exchange Act claims, largely based on statements regarding GigaCloud's Marketplace revenue, substantially similar to those underlying the Securities Act claims, by Wu, Lau, and Wan in earnings calls and SEC filings following the IPO.  *Id.* ¶¶ 213-18.  Specifically, Plaintiffs assert Section 10(b) and Rule 10b-5(b) misstatement claims against GigaCloud, Wu, Lau, and Wan, *id.* ¶ 427, Section 10(b) and Rule 10b-5(a) and (c) scheme liability claims against GigaCloud, Wu, Lau, and Wan, *id.* ¶¶ 397-401, and Section 20(a) claims against Wu, Lau, and Wan, *id.* ¶ 447.

Plaintiffs' claims are based, in part, on information provided by confidential witnesses who are former employees ("FEs") of GigaCloud.  Several FEs who worked in Suzhou, China, "where [GigaCloud's] IT development and management is based," indicated that GigaCloud did not use AI technology as part of its logistics systems.  *See id.* ¶¶ 68-74.  Their accounts were corroborated by FEs who worked for GigaCloud in the United States, including FE-4, the former President of GigaCloud's U.S. Operations, who stated that GigaCloud used "AI" and "Machine

Learning" only as "buzzwords" and that the Company actually used more outdated systems. *See id.* ¶¶ 76-77. FE-4 further indicated that more than half of GigaCloud's 1P revenue came from buyers managed by current or former GigaCloud employees. *Id.* ¶ 97. FE-7 corroborated this account, stating that "most of the transactions are coming from within the company," from "sister companies buying and selling from each other." *Id.* ¶ 96.

## LEGAL STANDARDS

The Court begins with Defendants' Rule 12(b)(6) motion. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Giunta v. Dingman*, 893 F.3d 73, 78-79 (2d Cir. 2018). A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) — that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, the plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

To the extent that Plaintiffs allege fraud under the federal securities laws, they must also satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)); *see In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff "must allege facts supporting a strong inference with respect to each defendant").  The "strong inference" must be "more than merely plausible or reasonable." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  The necessary inquiry is "inherently comparative." *Id.* at 323.  That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324.  Thus, a complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## DISCUSSION

As noted, Plaintiffs bring claims under both the Exchange Act and the Securities Act.

First, Plaintiffs bring securities fraud claims under Sections 10(b) and 20(a) of the Exchange Act and Securities Exchange Commission Rule 10b-5.  To state a claim that Defendants made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5(b), Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); *accord Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).  To state a Rule 10b-5(a) and (c) scheme liability claim, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  "Unlike a misrepresentation or omission claim under Rule 10b-5(b), [a] scheme liability claim is aimed at inherently deceptive conduct and does not require a misleading statement or omission." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 534 (S.D.N.Y. 2020), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-CV, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (internal quotation marks omitted).  Relatedly, to state a control person claim under Section 20(a), Plaintiffs must, at a minimum, plead a plausible "primary violation" of Section 10(b).  *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Total Equity Capital, LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF), 2016 WL 3093993, at *2 (S.D.N.Y. June 1, 2016).

Second, Plaintiffs bring claims under Sections 11 and 15 of the Securities Act.  These claims "do not require a showing of scienter, reliance, or loss causation." *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018).  Instead, to state a claim under Section 11, a plaintiff "must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  "Section 15, in turn, creates liability for individuals or entities that control any person liable under section 11."  *Id.* at 358 (cleaned up).  Thus, as with Sections 10(b) and 20(a) of the Exchange Act, "a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[ ] 11."  *Id.*; *see also In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) ("To establish § 15 liability, a plaintiff must show a primary violation of § 11 and control of the primary violator by defendants." (internal quotation marks omitted)).

Plaintiffs' claims with respect to GigaCloud's statements about its marketplace activities are brought under both the Exchange Act and the Securities Act.  By contrast, their claims with respect to GigaCloud's statements concerning AI are brought solely under the Securities Act.  The Court can and will discuss each set of claims in turn.

## A.  The Marketplace Activities Claims

Plaintiffs' marketplace activities claims are based on statements and charts, in the Offering Materials (in the case of the Securities Act claims) or in earning calls and SEC filings (in the case of the Exchange Act claims), concerning GigaCloud's 1P and Marketplace GMV revenues.  *See* SAC ¶ 147; *see also id.* ¶¶ 90-126.  The gist of Plaintiffs' theory is that these revenue metrics "overstated the success of GigaCloud Marketplace and its attractiveness to buyers," *id.* ¶ 126; *see id.* ¶¶ 143-77, because, in reality, "a significant amount" of 1P and GMV revenues came "from sales by GigaCloud to companies closely connected to it," *id.* ¶ 143.  Plaintiffs allege that, by failing to disclose its relationships with these "closely connected" companies, GigaCloud made materially misleading statements both (1) by reporting these revenue metrics and (2) in various explanatory statements accompanying these metrics.  Notably,

Plaintiffs expressly disavow any claim that Defendants violated any financial accounting

regulation requiring the disclosure of "related-party transactions," which courts have frequently

found sufficient to allege falsity.  *See e.g., Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11-CV-2700

(PKC), 2012 WL 3957916, at *10 (S.D.N.Y. Sept. 10, 2012).

Although Defendants make a host of arguments for dismissal of these claims, the Court

need address only one — that Plaintiffs fail to plausibly plead that the statements were false or

misleading — because it is fatal to all of the claims.  First, Plaintiffs' claims relating to

statements and charts that merely disclosed 1P and GMV revenue metrics fail because "[a]

violation of federal securities laws cannot be premised upon a company's disclosure of accurate

historical data."  *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at

*4 (S.D.N.Y. July 16, 2020).  The Offering Materials defined "1P" as revenue earned from "the

sale of [GigaCloud's] inventory in [the] GigaCloud Marketplace," *see* SAC ¶ 148, and defined

"GMV" as "the total gross merchandise value of transactions ordered through [] GigaCloud

Marketplace including GigaCloud 3P and GigaCloud 1P," Prospectus 20.  And, as Defendants

note, Plaintiffs make no argument that such sales "occurred somewhere other than the

Marketplace."  ECF No. 96 ("Defs.' Mem."), at 15.  In doing so, Plaintiffs essentially concede

that these sales did in fact take place over the Marketplace, which means that they were

accurately categorized as 1P revenues.  Put differently, these statements "did nothing more than

accurately characterize . . . statistical facts."  *Marcu*, 2020 WL 4016645, at *5 (quotation marks

omitted).

Nor does Plaintiffs' subjective belief that certain resellers were too "closely connected"

to GigaCloud and its employees impose any obligation on the Company to categorize these

revenues differently.  None of the alleged misstatements claim that 1P revenues came

exclusively from transactions involving companies with no prior relationship with GigaCloud or its employees. Indeed, the Offering Materials are silent as to *who* the reseller purchasers were. Although additional disclosures about who these resellers were might provide investors with useful information, the "[d]isclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." *Kleinman*, 706 F.3d at 152-53 (cleaned up). Given GigaCloud's silence on the issue, disclosures about who was purchasing GigaCloud's inventory through the Marketplace were not "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011).

The second category of challenged statements, explaining and discussing 1P and GMV revenues, also fall short. Here, Plaintiffs point to various explanatory statements, such as statements claiming that "1P selling" helped "enhance [the Marketplace] experience" by "giv[ing GigaCloud] insights into seller needs, provid[ing GigaCloud] with proprietary data[,] and "increas[ing] the velocity of sales in [the] Marketplace." *See* SAC ¶¶ 144, 156, 166. But Plaintiffs do not explain how Defendants' failure to disclose GigaCloud's relationships with certain buyers was "sufficiently connected to [these] existing disclosures to make [them] misleading." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). As was the case above, none of the statements cited by Plaintiffs suggest that 1P or GMV revenue came exclusively from buyers with no prior connections with GigaCloud. Indeed, the statements at issue were wholly consistent with the allegedly omitted information. Companies that are "closely connected" to GigaCloud, as defined by Plaintiffs, can nonetheless be attracted to the Marketplace because it allows them to "minimize inventory risk." SAC ¶ 144; *see also id.*

¶¶ 152, 156, 158, 166.  Disclosure is not required where, as here, it is not necessary in order to make the existing statements not misleading.  *See Kleinman*, 706 F.3d at 153.

In short, Plaintiffs fail to plausibly allege that Defendants made misstatements relating to revenues from 1P and GMV.  That dooms their claims based on GigaCloud's marketplace activities under Section 10(b) of the Exchange Act, SEC Rule 10b-5(b), and Section 11 of the Securities Act.  Plaintiffs' Rule 10b-5(a) and (c) scheme liability claims also fail because, at bottom, they are premised on the same misstatements.[2]  *See In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 190 (W.D.N.Y. 2022) ("[T]he Court's conclusion that Plaintiffs have not sufficiently alleged that [] any material false statements or omissions were made is also fatal to Plaintiffs' scheme liability claim."); *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 363 (S.D.N.Y. 2024) ("Lead Plaintiffs have failed to plead . . . any actionable misstatements, so their scheme liability claims necessarily fail."); *see also Touchstone Strategic Tr. v. Gen. Elec. Co.*, No. 19-CV-1876 (JMF), 2022 WL 4536800, at *6 (S.D.N.Y. Sept. 28, 2022) ("Plaintiffs' underdeveloped claim for scheme liability fails because the SAC alleges misstatements and omissions, not inherently deceptive conduct." (internal quotation marks omitted)), *aff'd*, No. 22-2835-CV, 2023 WL 6053007 (2d Cir. Sept. 18, 2023).  It follows that Plaintiffs' claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act fail as a matter of law as well.  *See, e.g.*, *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 778 (2d Cir. 2010) ("In order to establish a prima facie case of liability under § 20(a) [of the Exchange Act], a

---

[2]    Although Plaintiffs assert that Defendants "engaged in deceptive acts *distinct* from misstatements," ECF No. 107 ("Pls.' Mem."), at 23-24 (emphasis added), their scheme liability claims actually and ultimately rely on the same alleged misstatements, *see* SAC ¶ 401 ("The Exchange Act Defendants touted increases in these metrics to investors as proof of GigaCloud's success and prospects, and purported to explain the reasons for increases in those metrics without disclosing GigaCloud's transactions with closely connected companies.").

plaintiff must show a primary violation by a controlled person." (cleaned up)); *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d at 185 ("To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants.").

## A.  The AI Claims

By contrast, the Court concludes that Plaintiffs' allegations with respect to Defendants' statements concerning AI are sufficient to support claims under the Securities Act, albeit for only one of the two reasons that Plaintiffs proffer.

First, Defendants argue that Plaintiffs do not state a claim on the ground that GigaCloud misrepresented the general sophistication of its technology.  Defs.' Mem. 11-12.  On this score, the Court agrees.  Vague allegations that GigaCloud's technology "was not state of the art" or was "less sophisticated than Amazon or Walmart," *e.g.,* SAC ¶ 76, are irrelevant because there is no contention that GigaCloud claimed to use more sophisticated technology in the first place. Moreover, such "vague corporate-speak" used to describe the general strength of GigaCloud's technology amounts to mere "puffery."  *In re Farfetch Ltd. Sec. Litig.*, No. 19-CV-8657 (AJN), 2021 WL 4461264, at *10 (S.D.N.Y. Sept. 29, 2021) (Nathan, J.), *aff'd sub nom. IAM Nat'l Pension Fund v. Farfetch Ltd.*, No. 21-2752-CV, 2023 WL 2879304 (2d Cir. Apr. 11, 2023) (internal quotation marks omitted).

But Plaintiffs' claims are also based on specific factual statements regarding GigaCloud's use of AI — statements that Plaintiffs allege, relying on information from the FEs, to be false. *See* SAC ¶¶ 67-82.  "A plaintiff may rely on confidential witnesses so long as allegations in the complaint are sufficient to 'provide an adequate basis for believing that the defendants' statements were false.'"  *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 228 (S.D.N.Y. 2021) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  "[A]lthough a

confidential source need not be identified for his or her statements to be credited on a motion to

dismiss, such a source must be 'described in the complaint with sufficient particularity to support

the probability that a person in the position occupied by the source would possess the

information alleged.'" *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y.

2023) (quoting *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir.

2015)).  "As a general matter, courts consider and take as true the statements of [confidential]

witnesses at [the pleading] stage[.]" *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261

(S.D.N.Y. 2023).  In light of these standards, Plaintiffs' state a plausible claim.

In arguing otherwise, Defendants contend that the Court should not credit the FE

statements because they are mere "musings" from FEs who lack "credible knowledge about the

Company's use of AI" and, in any event, are too "generic" to support Plaintiffs' allegation of

falsity.  Defs.' Mem. 9-10; ECF No. 115 ("Reply"), at 3.  But at least some of the FEs "held

positions that suggest they would have knowledge" about GigaCloud's use of AI.  *In re Tufin*

*Software Techs. Ltd. Sec. Litig.*, 20-CV-5646 (GHW), 2022 WL 596861, at *8 (S.D.N.Y. Feb.

25, 2022) (finding allegations about the defendant's sales cycle sufficient where "the confidential

witnesses worked in [the defendant's] sales divisions" and "held positions that suggest they

would have knowledge of the length of [defendant's] sales cycle").  FE-1, FE-2, and FE-3, for

example, worked for GigaCloud in Suzhou, China, where the Company's "IT development and

management is based."  SAC ¶ 67.  Further, FE-1 was "a member of the Java development team"

and "developed software to handle logistics for [GigaCloud's] U.S. warehouses and monitor the

distribution of the Company's inventory," SAC ¶ 33, while FE-2 and FE-3 were supply chain

managers responsible for managing business purchasers and suppliers, *id.* ¶¶ 34-35.  Of the

remaining FEs, four held senior roles that involved recruiting customers to GigaCloud

Marketplace, *see id.* ¶¶ 36-39; 76, so it can be inferred that they have knowledge about whether, during the relevant times, GigaCloud "use[d] complex AI software in [its] technology infrastructure," *see id.* ¶ 133.  This is especially true in light of the Company's own representation that its "warehouse management system and other technology infrastructures are critical to . . . [its] ability to acquire and retain customers."  *See id.* ¶¶ 61, 133.

Additionally, contrary to Defendants' assertion, the FEs' accounts are not mere "generic allegations," Defs.' Mem. 10, but include "specific descriptions," *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 (S.D.N.Y. 2020).  For example, FE-2 described in detail the logistics system that GigaCloud used — an "Enterprise Resource Planning" system that "relied on manual computations of existing data and, because of that, required at least 100 IT employees to maintain."  SAC ¶¶ 71-72.  The Complaint also "specifies each witness's position, length of employment, and job responsibilities."  *Blanford*, 794 F.3d at 307.  For instance, Plaintiffs specify that FE-5 "was employed from December 2021 to September 2022" as "GigaCloud's Business Development Director," where he was "responsible for persuading U.S. furniture stores to use GigaCloud Marketplace to source furniture."  SAC ¶¶ 78-79; *see also id.* ¶¶ 33-41 (specifying the positions, lengths of employment, and job responsibilities of all nine FEs).[3] Taken together, these allegations are sufficient to support an inference that GigaCloud did not

---

[3]    Defendants' observation that FE-5 left one month into the Class Period, *see* Defs' Mem. 10, is irrelevant, as FE-5 was employed when the AI statements were made in the Registration Statement.  Although FE-4 left three months before the Class Period, *see id.*, his statements about the GigaCloud's use of AI in May 2022 "support an inference of similar circumstances" in August 2022.  *See Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).  As Plaintiffs rightly observe, "the idea that GigaCloud suddenly built AI systems during that time is absurd."  *See* Pls.' Mem 12 n.8.

use AI in its logistics operations as claimed in the Offering Materials.  Accordingly, Plaintiffs plausibly plead falsity.[4]

Defendants' only other argument for dismissal of the AI-related claims — that they can and should be dismissed on loss causation grounds, *see* Defs.' Mem. 22 — can be swiftly rejected because "Section 11 claims do not require plaintiffs to plead loss causation."  *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021).  Instead, the absence of loss causation is an affirmative defense under Section 11, *see Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017), and thus "not properly raised on a Rule 12(b)(6) motion" unless "it is apparent from the face of the complaint that the plaintiff[s] cannot recover [their] alleged losses."  *Boluka Garment Co., Ltd.*, 547 F. Supp. 3d at 447. Defendants contend that is the case here because Plaintiffs' claims rely on reports from short sellers who "only reviewed public sources and then 'expressed negative opinions about the [Company]' based on public information."  Defs.' Mem. 22-23 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x 72, 75 (2d Cir. 2013) (summary order)).  But the Court disagrees.  A "third party's analysis of a company's already-public financial information" can "contribute new information to the marketplace."  *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-CV-1580 (LGS), 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020); *see Bishins v. CleanSpark, Inc.*, No. 21-CV-511 (LAP), 2023 WL

---

[4]    The parties bicker about whether Rule 9(b) applies to Plaintiffs' AI-related claims. Defs.' Mem. 7-8 & n.10; Pls.' Mem 10, 13-14; Reply 2 & n.3  Plaintiffs have the better of the argument because the Complaint affirmatively alleges that Defendants "were responsible for the content and dissemination of the Registration Statement" and "acted negligently" by making no "reasonable investigation" and having no "reasonable grounds" to believe that "the statements . . . were true and not misleading."  SAC ¶¶ 189-91; *see In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007) (finding that Rule 9(b) did not apply where the plaintiffs had "done more than disclaim fraud; they [had] specifically pled alternate theories of fraud and negligence").  In any event, Plaintiffs' AI-related claims would survive even if Rule 9(b) applied.

112558, at *13 (S.D.N.Y. Jan. 5, 2023) (citing cases for the proposition that "third party analyses of previously public information could be sufficient to plead loss causation").  Moreover, the short seller reports here contributed new information extracted from the short-sellers' own investigation — including from conversations with former and current employees and from visits to GigaCloud's warehouses.  *See also In re Signet Jewelers Ltd. Secs. Litig.*, No. 16-CV-6728 (CM) (RWL), 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and] . . . thus qualifie[d] as corrective."); *Meyer v. Greene*, 710 F.3d 1189, 1199 n.10 (11th Cir. 2013) (noting that short-seller opinions may constitute corrective disclosures if they "reveal to the market something previously hidden or actively concealed").  That is sufficient here.[5]

Accordingly, Plaintiffs state a Section 11 claim against Defendants based on alleged misstatements in the Offering Materials related to GigaCloud's use of AI.  As Defendants make no independent argument for dismissal of Plaintiffs' Section 15 control person claims, it follows that those claims also survive as to the AI statements.

**B.  Chen's Motion**

Lastly, the Court turns to Defendant Chen's separate motion to dismiss the Securities Act claims against him for lack of personal jurisdiction under Rule 12(b)(2).  Jurisdiction is proper

---

[5]    Defendants also challenge loss causation on the ground that GigaCloud's stock prices rebounded, *see* Defs.' Mem. 24, but they appear to make that argument only with respect to the marketplace activities claims.  In any event, "that the price [of the stock] rebounded does not, at the pleading stage, negate the plaintiff's showing of loss causation" because when "drawing all reasonable inferences in favor of [plaintiff], [we] assume that the price rose for reasons unrelated to its initial drop."  *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012); *see also Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 394 (S.D.N.Y. 2024).

"when a defendant has purposefully directed his activities toward the forum and the litigation arises out of or is related to the defendant's contact with the forum." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 466-67 (S.D.N.Y. 2008), *aff'd sub nom. State Univs. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 Fed. App'x 404 (2d Cir. 2009).[6]  Chen argues that Plaintiffs fail to meet that standard as to him because he, unlike the other Individual Defendants, did not sign the Registration Statement and "status as a board member is not alone sufficient to establish jurisdiction."  Chen Mem. 2 (quoting *AstraZeneca Sec. Litig.*, 559 F. Supp. 2d at 466).  In compliance with 17 C.F.R. § 230.438, however, Chen did sign a letter "consent[ing] to the references of [his] name in the Registration Statement . . . , which indicate[d] that [he had] accepted [his] appointment as a director of the Company," effective upon the effectiveness of the Registration Statement.  ECF No. 110-2.  The question is whether that letter suffices to support jurisdiction.

Chen notes that "Plaintiffs . . . do not cite a single case holding that signing the required consent agreeing to become a director . . . automatically subjects the director to jurisdiction for claims about a Registration Statement he did not sign for a company of which he was not yet a director."  ECF No. 116 ("Chen Reply"), at 2.  True, but neither do Defendants cite a single case going the other way.  Instead, the question presented appears to be one of first impression.

In the Court's view, Plaintiffs have the better of the argument.  By its terms, Section 11 liability extends not only to "every person who signed the registration statement," but also to "every person who, with his consent, is named in the registration statement as being or about to

---

[6]     A court may also exercise jurisdiction over a defendant if he is "essentially at home" in the district.  *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014).  Plaintiffs do not contend, however, that this is a basis for jurisdiction over Chen and for good reason: They make no allegations that Chen, allegedly a domiciliary of Hong Kong, lives or works in the United States.

become a director." 15 U.S.C. § 77k(a)(1), (3); *see Obasi Inv. LTD v. Tibet Pharms., Inc*, 931 F.3d 179, 190 (3d Cir. 2019). In other words, for purposes of a Section 11 claim, there is no material difference between a director who signs the registration statement and someone, such as Chen, who signs the written consent required by 17 C.F.R. § 230.438 to be submitted with the registration statement. By signing the written consent, Chen "availed himself of the privilege of doing business here, even though he remained in" Hong Kong. *Sec. & Exch. Comm'n v. Hurgin*, 484 F. Supp. 3d 98, 114 (S.D.N.Y. 2020); *see, e.g.*, *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 399 (S.D.N.Y. 2005) ("The signing of documents filed with the SEC which form the basis for Plaintiffs' claims is sufficient contact with the jurisdiction to justify this Court's exercise of jurisdiction over [the signatory].").  For the same reasons, Chen "could expect to face litigation regarding such statements," *Alpha Cap. Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 (VEC), 2014 WL 6466994, at *8 (S.D.N.Y. Nov. 18, 2014). Accordingly, his motion to dismiss for lack of personal jurisdiction is DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss under Rule 12(b)(6) is GRANTED in part and DENIED in part, while Chen's motion to dismiss under Rule 12(b)(2) is DENIED. In particular, the Court concludes that Plaintiffs plausibly allege that Defendants made materially misleading statements in the Offering Materials about GigaCloud's use of AI in violation of Section 11 of the Securities Act. It follows that Plaintiffs' Section 15 claims relating to these statements also survive. By contrast, the Court concludes that Plaintiffs fail to state a claim based on GigaCloud's marketplace activities. It follows that Plaintiffs' claims relating to these statements — under Sections 11 and 15 of the Securities Act, Sections10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 — must be and are dismissed.

The only remaining question is whether Plaintiffs should be permitted to replead their claims to the extent they have been dismissed — as Plaintiffs request in passing. *See* Pls.' Mem. 25. Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend, *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019). Here, the problems with Plaintiffs' dismissed claims are substantive, so amendment would be futile. *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases). Nor do Plaintiffs suggest that they are in possession of facts that would cure the problems with their dismissed claims. *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014). Finally, the Court granted Plaintiffs leave to amend in response to Defendants' first motion to dismiss and explicitly warned that they would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 85. "Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend *sua sponte*." *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (citing cases)). Accordingly, Plaintiffs' request for leave to amend is DENIED.

Unless and until the Court orders otherwise, Defendants shall file their Answer to Plaintiffs' surviving claims within **three weeks** of the date of this Opinion and Order. *See* Fed. R. Civ. P. 12(a)(4)(A). In addition, the initial pretrial conference, previously adjourned, is hereby reinstated and **RESCHEDULED** for **March 26, 2025, at 9:00 a.m**. To access the conference, counsel should call the Court's **new** dedicated conference call line at (855) 244-8681

and use access code 2303 019 3884, followed by the pound (#) key.  When prompted for an attendee ID number, press the pound (#) key again.  (Members of the press and public may call the same number, but will not be permitted to speak during the conference.)  The parties are reminded to follow the procedures for telephone conferences described in the Court's Individual Rules and Practices for Civil Cases, which are available at https://nysd.uscourts.gov/hon-jesse-m-furman, including Rule 3(B)(i), which requires the parties, **no later than 24 hours before the conference**, to send a joint email to the Court with the names and honorifics (e.g., Mr., Ms., Dr., etc.) of counsel who may speak during the teleconference and the telephone numbers from which counsel expect to join the call.  The parties are reminded that, no later than the **Thursday before the initial pretrial conference**, they must submit a joint status letter and proposed Case Management Plan.  *See* ECF No. 53.

The Clerk of Court is directed to terminate ECF Nos. 95 and 105.

SO ORDERED.

Dated: January 27, 2025
New York, New York

_____
JESSE M. FURMAN
United States District Judge